1    BETHANY W. KRISTOVICH (SBN 241891)
     bethany.kristovich@mto.com
2    JOHN M. GILDERSLEEVE (SBN 284618)
     john.gildersleeve@mto.com
3    JULIANA M. YEE (SBN 304564)
     juliana.yee@mto.com
4    ANNE K. CONLEY (SBN 307952)
     anne.conley@mto.com
5    MUNGER, TOLLES & OLSON LLP
     350 South Grand Avenue, Fiftieth Floor
6    Los Angeles, California 90071-3426
     Telephone:  (213) 683-9100
7    Facsimile:  (213) 687-3702

8    MICHAEL E. SWARTZ *(pro hac vice)*
     michael.swartz@srz.com
9    RANDALL T. ADAMS *(pro hac vice)*
     randall.adams@srz.com
10   FRANK W. OLANDER *(pro hac vice)*
     frank.olander@srz.com
11   MINJI REEM *(pro hac vice)*
     minji.reem@srz.com
12   SCHULTE ROTH & ZABEL LLP
     919 Third Avenue
13   New York, New York 10022
     Telephone:  (212) 756-2000
14   Facsimile:  (212) 593-5955

15   *Attorneys for Defendants*

**REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL**

16

17                    **UNITED STATES DISTRICT COURT**

18        **CENTRAL DISTRICT OF CALIFORNIA, SOUTHERN DIVISION**

19

20                                          Case No. 8:24-cv-01568-JVS-JDE

21   MASIMO CORPORATION,                    **DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR**
22                  Plaintiff,              **PRELIMINARY INJUNCTION**

23          vs.                             Judge:      Hon. James V. Selna
                                            Ctrm:       10C
24   POLITAN CAPITAL                        Hearing:    September 9, 2024
     MANAGEMENT LP, et al.,                 Time:       1:30 p.m.
25
                    Defendants.
26

27

28

DOC ID - 47132435.1

# TABLE OF CONTENTS

**Page**

I.     INTRODUCTION .................................................................................. 1

       A.     Masimo's Poor Corporate Governance and Disregard for Stockholders ................................................................................. 3

       B.     Masimo Adopts Preclusive Bylaw Amendments in Response to Politan's Request for Board Representation ................................ 4

       C.     Politan Is Forced to Bring Suit in Delaware Chancery Court to Vindicate its Rights as a Stockholder ......................................... 5

       D.     Masimo's Stockholders Overwhelmingly Elect Koffey and Brennan to the Board, Yet Kiani Continues to Stonewall Them ........... 6

       E.     Kiani Is Called Out for Attempting to Manipulate the Shareholder Vote Through Use of Illegal "Empty Voting" ................. 7

       F.     Kiani Initiates This Lawsuit and Delays the Election After It Becomes Clear He Will Lose ................................................. 7

       G.     Politan Files Suit in Response to Kiani's Manipulation of the Stockholder Vote ...................................................................... 8

       H.     Masimo's False Claim that Koffey Was Conspiring With Wolf Haldenstein Falls Apart in Discovery ...................................... 9

       I.     Defendants Make Supplemental Disclosures During the Course of this Lawsuit ....................................................................... 11

II.    PRELIMINARY INJUNCTION LEGAL STANDARD ............................... 11

III.   ARGUMENT ..................................................................................... 12

       A.     Masimo Is Not Likely to Succeed on the Merits of the Section 14(a) Claim ...................................................................... 12

              1.     The Court Must Consider Whether the Section 14(a) Claim Would Survive Dismissal Under the PSLRA ................. 13

              2.     Politan's Supplemental Disclosures Moot the Section 14(a) Claim ............................................................... 14

              3.     Following Discovery, Masimo Fails to Show the Alleged Misstatements Are False ....................................... 14

                     a.     Politan's Use of a Research Firm to Speak to Former Masimo Employees Is Not a Material Omission ........................................................ 15

                     b.     Spinoff / Special Committee ............................. 17

-1-

1
2

**TABLE OF CONTENTS**
(continued)

**Page**

3        c.    Joint Venture ...................................................................22

4        d.    Information Flow (Onboarding, Budget, 10-K,
              Other Items).............................................................24
5
         e.    Whole Company Sale Process.........................................28
6
     4.    Masimo Is Not Likely to Show a "Substantial Likelihood"
7          That Any of the Alleged Misstatements and Omissions
           Are Material...............................................................29
8
     5.    Masimo Fails to Show That Any Defendant Acted
9          Negligently Under Section 14(a)..................................31

10   6.    Masimo Fails to Show Loss Causation for Its Section
           14(a) Claim ...............................................................31
11
 B.    The Section 13(d) Claim Is Irrelevant Because Masimo Seeks No
12     Relief for That Claim in the PI Motion....................................32

13 C.    Masimo Fails to Show the Likelihood of Irreparable Harm................34

14 D.    The Balance of the Equities Does Not Favor an Injunction ................36

15 E.    An Injunction Does Not Serve the Public Interest...............................36

16 IV.    CONCLUSION .........................................................................37

17
18
19
20
21
22
23
24
25
26
27
28

DOC ID - 47132435.1

1

# TABLE OF AUTHORITIES

2

3    **Cases**                                                                                        **Page(s)**

4

*Anderson v. United States*,

5        612 F.2d 1112 (9th Cir. 1979) ............................................................... 11

6

*Arcturus Therapeutics Ltd. v. Payne*,

7        2018 WL 2316790 (S.D. Cal. May 22, 2018) ....................................... 35

8    *Azurite Corp. v. Amster & Co.*,

9        52 F.3d 15 (2d Cir. 1995) ....................................................................... 33

10   *D & N Fin. Corp. v. RCM Partners Ltd. P'ship*,

11       735 F. Supp. 1242 (D. Del. 1990) .......................................................... 37

12   *eBay Inc. v. MercExchange, LLC*,

13       547 U.S. 388 (2006) ................................................................................ 35

*Eisner v. Meta Platforms, Inc.*,

14       2024 WL 3228089 (N.D. Cal. June 28, 2024) ......................... 13, 14, 35

15   *Elec. Specialty Co. v. Int'l Controls Corp.*,

16       409 F.2d 937 (2d Cir. 1969) ..................................................................... 3

17   *Enzo Biochem, Inv. v. Harbert Discovery Fund, LP*,

18       2021 WL 4443258 (S.D.N.Y. Sept. 27, 2021) ..................................... 31

19   *Frontera Res. Corp. v. Hope*,

20       2019 WL 2410513 (N.D. Cal. June 7, 2019) ........................................ 36

21   *Garcia v. Google, Inc.*,

22       786 F.3d 733 (9th Cir. 2015) .................................................................. 11

23   *Groupion, LLC v. Groupon, Inc.*,

24       826 F. Supp. 2d 1156 (N.D. Cal. 2011) ................................................. 35

25   *Hubner v. Mayer*,

         2015 WL 12513581 (C.D. Cal. June 8, 2015) ........................... 11, 31, 34

26

27   *Johnson ex rel. Johnson Fam. Tr. v. Saba Cap. Mgmt., L.P.*,

         2023 WL 1345717 (S.D.N.Y. Jan. 31, 2023) ....................................... 35

28

-iii-

1
2

**TABLE OF AUTHORITIES**
(continued)

Page(s)

3
4
*Kass v. Arden-Mayfair, Inc.*,
 431 F. Supp. 1037 (C.D. Cal. 1977)..................................................12

5
6
*Masters v. Avanir Pharms., Inc.*,
 996 F. Supp. 2d 872 (C.D. Cal. 2014)................................................35

7
8
*Mendell v. Greenberg*,
 612 F. Supp. 1543, 1548 (S.D.N.Y. 1985), *aff'd in part*, 927 F.2d
 667 (2d Cir. 1990), *amended by* (2d Cir. 1991) .................................12

9
10
*Mgmt. Assistance Inc. v. Edelman*,
 584 F. Supp. 1021 (S.D.N.Y. 1984).....................................................36

11
12
*Munaf v. Geren*,
 553 U.S. 674 (2008) ...........................................................................11

13
14
*Nano Dimension Ltd. v. Murchinson Ltd.*,
 102 F.4th 136 (2d Cir. 2024)..............................................................14

15
16
*N.Y.C. Emps.' Ret. Sys. v. Jobs*,
 593 F.3d 1018 (9th Cir. 2010), *overruled in part on other grounds*,
 *Lacey v. Maricopa Cnty.*, 693 F.3d 896 (9th Cir. 2012) ...............13, 31

17
18
*Or. Pub. Emps. Ret. Fund v. Apollo Grp. Inc.*,
 774 F.3d 598 (9th Cir. 2014)..............................................................25

19
20
*Paskowitz v. Pac. Cap. Bancorp*,
 2009 WL 4911850 (C.D. Cal. Nov. 6, 2009) ......................................30

21
22
*Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*,
 759 F.3d 1051 (9th Cir. 2014)............................................................14

23
24
*Rubenstein ex. rel. Jefferies Fin. Grp. Inc. v. Adamany*,
 2022 WL 6592503 (S.D.N.Y. Oct. 5, 2022), *aff'd*, 2023 WL
 6119810 (2d Cir. Sept. 19, 2023) .......................................................31

25
26
*Stormans, Inc. v. Selecky*,
 586 F.3d 1109 (9th Cir. 2009)............................................................34

27
28
*Taro Pharm. Indus., Ltd. v. Sun Pharm. Indus., Ltd.*,
 2010 WL 2835548 (S.D.N.Y. July 13, 2010)......................................14

DOC ID - 47132435.1

1

**TABLE OF AUTHORITIES**
(continued)

2

**Page(s)**

3
*TSC Indus. Inc. v. Northway, Inc.*,
4
    426 U.S. 438 (1976) ..................................................................... 14, 30

5
*Weston Fam. P'ship LLLP v. Twitter, Inc.*,
6
    29 F.4th 611 (9th Cir. 2022)................................................................ 14

7
*Winter v. Nat. Res. Def. Council, Inc.*,
8
    555 U.S. 7 (2008) .................................................................... 3, 11, 34

9

10
**STATUTES & REGULATIONS**

11
15 U.S.C. § 78u-4 ..................................................................... 13

12
15 U.S.C. § 78u-4(b)(3)(B)............................................................. 12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DOC ID - 47132435.1

## MEMORANDUM OF POINTS AND AUTHORITIES

Defendants hereby submit this memorandum of points and authorities in opposition to Masimo Corporation's ("Masimo" or the "Company") Motion for a Preliminary Injunction (the "PI Motion" or "Br.").

## I.    INTRODUCTION

Last year, Politan nominated two candidates to the Masimo Board of Directors (the "Board"), Politan's Quentin Koffey and independent candidate Michelle Brennan, who were elected over Masimo's nominees in a landslide victory.[1]  This year, Masimo Chairman and CEO Joe Kiani and his hand-picked co-nominee are up for election, facing off against two other highly qualified, independent candidates nominated by Politan, Dr. Darlene Solomon, former Chief Technology Officer of Agilent Technologies, and William Jellison, former Chief Financial Officer of Stryker Corporation.  Following a very public and hard-fought proxy contest, by all indications Masimo's shareholders want change and intend to elect the Politan nominees to office.  In that event, a majority of the Masimo Board will, for the first time in Company history, consist of truly independent directors, free of ties to Kiani.

The likelihood of a Politan victory increased dramatically when, on July 11, 2024 and July 15, 2024, the two leading, independent proxy advisory firms that issue recommendations on director elections, Glass Lewis and Institutional Shareholder Services ("ISS"), respectively, recommended in favor of the Politan nominees, with ISS stating that Kiani *"has demonstrated that he has no regard for public shareholders.  He has been at the center of so many corporate governance scandals and abuses that no credible argument exists to the contrary"* and describing Masimo's corporate governance as *"firmly among the most troubling of*

---

[1] Masimo has a "staggered" board.  Two seats of the six seats are up for election each year.  Directors are elected to three-year terms.

DOC ID - 47132435.1

1  *any modern public company.*"  Cutting to the core of Masimo's lack of credibility,

2  ISS further observed that, "*like last year, Kiani and his cohort have adopted*

3  *defensive rhetoric that reflects disregard for shareholders,*" continuing an

4  "*established pattern of presenting arguments … that crumble under basic*

5  *scrutiny.*"  (Swartz Ex. 1, (ISS 8, 31-32).)  So too do Masimo's arguments in its PI

6  Motion.

7           Rather than proceed with the election as scheduled and face nearly certain

8  defeat, the very evening of the ISS report, Masimo moved the annual meeting two

9  months past Delaware's (and its bylaws') thirteen month legal limit and filed this

10 suit, propagating a fantastical story that Koffey was conspiring with a plaintiffs'

11 firm, Wolf Haldenstein, to harm the Company and enhance his chances of winning

12 the election.  No matter that the theory made no sense and ███████████

13 ████████████████████████████████████████████████████████

14 ████████ and therefore should not be included in a court filing, Masimo used it to

15 grab headlines, urge this Court to lift the PSLRA discovery stay, expedite the

16 proceedings, and obtain expansive discovery.  Following the production of

17 thousands of documents and multiple depositions, Masimo **abandoned** that central

18 claim because, as it has admitted, no evidence supports it.  Instead, it now makes up

19 other equally fanciful claims.

20          Masimo's only explanation for its current predicament in which every

21 proponent of good corporate governance is steadfastly aligned against it is that

22 Politan is exceedingly good at lying.  But, for every "lie" Masimo claims Politan is

23 telling, Masimo already has published direct responses in its own proxy materials.

24 (Swartz Exs. 105-109.)  Those responses are not resonating in the marketplace of

25 ideas, so Masimo has turned to the Court, hoping for something—anything—to save

26 Kiani from near certain defeat.  But its claims entirely lack merit.

27          Masimo's PI Motion is predicated solely on trumped up allegations that

28 Defendants made material misstatements and omissions in their proxy materials in

DOC ID - 47132435.1

violation of Section 14(a) of the Securities Exchange Act ("Section 14(a)").
Masimo's misconduct in bringing this action and making spurious, defamatory
allegations only serves to breathe fresh life into Judge Henry Friendly's framing of
the purpose of, and danger posed by, Section 14:  "Congress intended to assure basic
honesty and fair dealing, not to impose an unrealistic requirement of laboratory
conditions that might make the new statute a potent tool for incumbent management
to protect its own interests against the desires and welfare of the stockholders."
*Elec. Specialty Co. v. Int'l Controls Corp.*, 409 F.2d 937, 948 (2d Cir. 1969).  In that
same vein, in a prior discovery ruling, this Court has expressed its commitment to
protect against the "chilling effect on the election process and the First Amendment
implications thereof."  (Dkt. 58 at 2.)

For the reasons set forth below, Masimo has failed to satisfy the well-known
four factor test articulated by the Supreme Court in *Winter v. Nat. Res. Def. Council,
Inc.*, 555 U.S. 7, 20 (2008), as well as the PSLRA's demanding requirements.  Thus,
a preliminary injunction should not issue.

## BACKGROUND

### A.    Masimo's Poor Corporate Governance and Disregard for Stockholders

Masimo is a medical technology company, whose core business is pulse
oximetry.  Long-simmering stockholder discontent with Masimo's leadership boiled
over when, on February 15, 2022, Masimo announced that it was acquiring Sound
United —a company that sells speakers and headphones—for $1.025 billion.
(Swartz Ex. 178).  The Sound United acquisition was a significant departure by
Masimo into unrelated consumer audio products.

The market's backlash was immediate—the following day, Masimo's stock
fell ***37%***, erasing ***$5.1 billion*** in market capitalization.  (Swartz Ex. 2.)  To Politan's
knowledge, based on extensive research, never before in the history of U.S. publicly
traded companies has an acquiring company's market cap declined by more than

DOC ID - 47132435.1

*two* times, let alone *five* times, the purchase price of a material acquisition (*i.e.*, 5% or more of the acquiring company's market cap).

### B.    Masimo Adopts Preclusive Bylaw Amendments in Response to Politan's Request for Board Representation

Politan was founded in 2021 by Koffey, a veteran activist and graduate of Stanford Law and Business Schools with a reputation for creating stockholder value through constructive private dialogue and, if necessary, nominating candidates for election to a company's board.  "Politan's style is to amicably and quietly work with management to achieve its objectives.  They do not send angry public letters, and they do not seek proxy fights.  However, they will also not back down from a proxy fight if their hand is forced."  (Swartz Ex. 3.)

Politan first invested in Masimo on May 17, 2022.  (Ellison Ex. 84, Schedule I.)  By the fall of 2022, Politan had acquired 8.8% of Masimo.  (Compl. ¶ 59.)  At a meeting in September 2022, Koffey told Kiani that Politan sought to work constructively with Masimo to improve corporate governance and instill greater focus on disciplined capital allocation and stewardship of stockholder resources.

Instead of working collaboratively with Politan, Kiani and the Board took extraordinary action to entrench themselves in office.  Three business days after their meeting, the Board adopted perhaps the most preclusive advance notice bylaws in Delaware history.  (Swartz Ex. 180.)  Among other things, the amended bylaws required investment fund stockholders wishing to nominate candidates for election to the Board to disclose highly confidential information about the identities and investment holdings of their own investors—information no investment fund can or would surrender.  (*Id.*)  If allowed to stand, the bylaws could have ended the ability of public stockholders to nominate their own candidates of choice to company's boards.

Almost immediately, Masimo faced a torrent of criticism from commentators, academics, and advisors.  One prominent commentator remarked that the amended

DOC ID - 47132435.1

bylaws "represent[ed] an existential threat for activist campaigns." (Swartz Ex. 5.) Another warned that they would have "catastrophic repercussions … on the institution of shareholder activism and the concept of corporate democracy," causing "the complete eradication of shareholder activism as we know it." (Swartz Ex. 6.)

### C. Politan Is Forced to Bring Suit in Delaware Chancery Court to Vindicate its Rights as a Stockholder

After the Board rejected Politan's demands to rescind the amended bylaws, Politan was forced to commence an action in the Delaware Court of Chancery in October 2022. *Politan Cap. Mgmt. LP v. Kiani*, C.A. No. 2022-0948-NAC (Del. Ch. 2023) ("Delaware Bylaw Litigation"). (Swartz Ex. 2.)

During that action, the Managed Funds Association ("MFA")—a trade association of more than 150 members who collectively manage nearly $2.6 trillion in assets (of which Politan is not a member)—took the unusual step of filing an *amicus curiae* brief in support of Politan's position.

Echoing the fears expressed by the aforementioned commentators, MFA cautioned that, if the amended bylaws were allowed to stand, it "would have significant and profoundly adverse effects on capital allocation decisions and stockholder engagement." (Swartz Ex. 7.) MFA explained that its members "have contractual agreements in place with their investors or limited partners that would prevent disclosure of their identities," and thus requiring such disclosure would make it impossible "for investment funds with such confidentiality obligations to make nominations or proposals." (*Id.*) If the amended bylaws were upheld, "the practical effect likely would be dramatically fewer nominations and proposals at public companies, because an investment fund stockholder will understandably have little incentive to breach its contracts with its investors." (*Id.*) On February 6, 2023, after months of hard-fought, expedited litigation, Masimo rescinded the amended bylaws in their entirety.

DOC ID - 47132435.1

In awarding Politan all its fees and expenses arising from the litigation, the Chancery Court noted "the phalanx of impediments that Masimo had thrown up to the exercise of the stockholder franchise" and found that the Delaware Bylaw Litigation had conferred an "extraordinary corporate benefit" on Masimo and its stockholders by removing roadblocks to the stockholder franchise. (Swartz Ex. 4, 138:1-6, 151:22-152:1.)

### D.    Masimo's Stockholders Overwhelmingly Elect Koffey and Brennan to the Board, Yet Kiani Continues to Stonewall Them

Masimo held its 2023 annual meeting on June 26, 2023. At the meeting, stockholders overwhelmingly voted to elect Koffey and Brennan, a former senior executive at Johnson & Johnson, with more than **70%** of votes cast by non-insiders. (Swartz Ex. 185.)

Although Koffey and Brennan were elected in a landslide victory, Kiani has sought to marginalize them at every turn. Just one week after their election and before the new Board had even met, █████████████████████████████████ ███████████████████████████████████████████████ █████████████████████████████████████████ ████████████████████████████████████████████████ ███████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ██████████████████████████████████████████

As described in greater detail in the Koffey Declaration, Kiani also rebuffed Koffey and Brennan's requests for material information about Masimo's operations, denied them access to management, held unofficial Board meetings with advisors and all directors except for Koffey and Brennan, and refused to consider any review of Masimo's strategy or capital allocation. (Koffey Decl. ¶¶ 9-13, 23-31, 44.)

DOC ID - 47132435.1

Kiani's stonewalling is all the more concerning given that weeks after Masimo's 2023 annual meeting, Masimo reported a revenue decline that caused its share price to decline over 20% in a single day and continued to slide thereafter ultimately equaling a decline of 50%. The revenue miss was shocking as Masimo had never before had year-over-year negative organic sales growth in its more than fifteen-year history as a public company. As management's explanations did not make sense to shareholders concerns grew that Masimo had engaged in discounting and bulk discounts during the 2023 proxy contest to try to prop up its results and convince shareholders not to elect Politan's nominees. (*Id.*)

### E. Kiani Is Called Out for Attempting to Manipulate the Shareholder Vote Through Use of Illegal "Empty Voting"

As the election neared, Kiani was called out publicly for colluding with RTW Investments to engage in "empty voting," a practice wherein a shareholder votes shares in which it has no economic interest. RTW, which according to its SEC filings owns 2.7% of Masimo, attempted to exercise voting power of nearly 10% of Masimo, or more than 3x its economic interest, by buying and simultaneous shorting the same amount of shares in advance of the record date for voting. (Ellison Ex. 111.)

███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████

### F. Kiani Initiates This Lawsuit and Delays the Election After It Becomes Clear He Will Lose

On July 11, 2024, Glass Lewis issued its report strongly criticizing Masimo's corporate governance and recommending that Masimo's stockholders vote for *both* Politan nominees at the annual meeting. Glass Lewis cited "a wealth of evidence to

DOC ID - 47132435.1

suggest operational and strategic execution, shareholder value and fundamentally sound corporate governance continue to take a back seat to the espoused preferences of Kiani, who continues to run roughshod over a largely self-selected board seemingly disinterested in basic accountability and effective oversight." Glass Lewis called for change because Masimo's "existing board remains obdurately committed to legacy oversight methodologies which have consistently enabled and amplified poor governance architecture, wide operational misses, nil-return strategic excursions, seemingly *de minimis* accountability and, ultimately, a lax commitment to acknowledging and addressing profound damage to shareholder value." (Ellison Ex. 111.)

On July 15, 2024, ISS likewise concluded that change in the boardroom was "absolutely necessary" and recommended that shareholders vote in favor of both of Politan's nominees. (Swartz Ex. 1.)

Kiani knew that the support of both major proxy advisory services all but ensured that Politan's nominees would be elected. Even his favored, senior employees in the Engineering department were publicly expressing that they "have lost trust in what [Kiani] says." (Swartz Ex. 63.) So, later that same day, in a last-ditch attempt to maintain control of Masimo, he and his aligned directors in a Board meeting lasting only 12 minutes voted to bring this suit and delay the annual meeting from July 25, 2024 to September 19, 2024, in violation of both Delaware law and Masimo's own bylaws. (Ellison Ex. 90.)

## G. Politan Files Suit in Response to Kiani's Manipulation of the Stockholder Vote

On July 17, 2024, Politan commenced an action in Delaware Chancery Court against Kiani and his affiliated directors in order to ensure a fair election. *Politan Cap. Mgmt. LP v. Kiani*, C.A. No. 2024-0755-NAC (Del. Ch.) (the "2024 Chancery Litigation").

DOC ID - 47132435.1

Masimo has asserted that Kiani, as Chairman of the Annual Meeting, has the power under the Company's bylaws and to reject Solomon and Jellison's nominations if this Court "finds a likely violation of Section 14(a)." (Swartz Ex. 4, 64:5-12; *see also id* 70:18-71.)  Politan seeks, among other things, a declaration that Masimo and Kiani are estopped from doing so.

The Chancery Court has scheduled a merits hearing for September 13, 2024 and has made clear that, if necessary, it will adjudicate Politan's request for "some form of equitable relief to prevent the invalidation of the nomination notice." (*Id.* 70:1-10, 93:4-7.)  The Chancery Court noted that it is "cognizant" of Politan's argument that this action is "a use of federal securities laws with an intent to inject confusion and chaos into exercise of the stockholder franchise" and is "quite aware of the potential policy ramifications that could flow from it, particularly if that were to be seen as a tool in folks' toolbox and it becomes a routine thing, and now what are otherwise orderly election processes suddenly become chaotic." (*Id.* 80:18-82:10.)  The Court concluded: "[C]ertainly, I think I would have a view in considering all of these circumstances as to the equities of creating possible confusion for stockholders' exercise of their franchise, and that would be something I would anticipate addressing in a ruling." (*Id.* 84:8-13.)

### H.    Masimo's False Claim that Koffey Was Conspiring With Wolf Haldenstein Falls Apart in Discovery

When Masimo filed its original complaint, its central allegation was that Koffey had been conspiring with the Wolf Haldenstein law firm to assist in litigation against the Company.  In the PI Motion, Masimo finally admits it has been **"unable to prove"** the allegation.  (Br. 16.)  That is a massive understatement.  In truth, that allegation has been conclusively disproven: (i) every alleged participant has categorically denied it under oath, (ii) there are no communications between the alleged participants, and (iii) discovery has revealed that the alleged confidential

DOC ID - 47132435.1

1  witnesses ("CW") on whose statements the allegation rests ***do not appear to even***

2  ***exist***.  (Dkt. 82-1, at 4-10.)

3          Nevertheless, Masimo shamelessly repeats the allegation in its PI Motion,

4  even going so far as to include a statement, ████████████████████████████

5  ████████████████████████████████████████████████████████████

6  ██████████████████████████████████████████████████████████████

7  ████████████████████████████████████████████████████

8  ██████████████████████████████████████████████████

9  ██████████████████████████████████████████████████████

10  ████████████████████████

11        ████████████████████████████████████████████████████████████

12  ██████████████████████████████████████████████████████████

13  ██████████████████████████████████████████████████████████

14  ████████████████████████████

15        ██████████████████████████████████████████

16  ████████████████████████████████████████████████████

17  ████████████████████████████████████████████████████

18  ██████████████████████████████████████████████████████

19  ██████████████████████████

20        ████████████████████████████████████████████

21  ██████████████████████████████████████████████████

22  ██████████████████████████████████████████████████

23  ████████████████████████████████████████████████████

24  ████████████████████████████████████████████████████████

25  ████████████████████████████████████████████████████

26  ████████████████████████████

27

28

-10-

## I.    Defendants Make Supplemental Disclosures During the Course of this Lawsuit

Since this lawsuit was filed on July 15, 2024, Defendants have made four supplemental disclosures, amending its proxy statement three times, (Swartz Exs. 168, 169, 153), and its Schedule 13D once, (Swartz Ex. 154), by attaching the Complaint and Amended Complaint, as applicable.

## II.    PRELIMINARY INJUNCTION LEGAL STANDARD

A "preliminary injunction is an extraordinary and drastic remedy" that is "never awarded as of right." *Munaf v. Geren*, 553 U.S. 674, 689-90 (2008) (citations omitted).  The Court considers four factors in determining whether a preliminary injunction should issue: (i) whether the plaintiff is likely to succeed on the merits; (ii) whether the plaintiff is likely to suffer irreparable harm in the absence of preliminary relief; (iii) whether the balance of equities tips in the plaintiff's favor; and (iv) whether an injunction is in the public interest. *Winter*, 555 U.S. at 20.

Here, Masimo must meet additional requirements because it is seeking affirmative relief from Defendants to make purported "corrective disclosures," thereby seeking more than just the preservation of the status quo and final relief. *See Garcia v. Google, Inc.*, 786 F.3d 733, 740 (9th Cir. 2015) (en banc).  Indeed, this Court has held that a Section 14(a) plaintiff seeking an injunction requiring "corrective statements be made" in amended proxy statements seeks a mandatory injunction.  *Hubner v. Mayer*, 2015 WL 12513581, at *4 (C.D. Cal. June 8, 2015).

A mandatory injunction may only issue if "the facts and law clearly favor the moving party." *Anderson v. United States*, 612 F.2d 1112, 1114 (9th Cir. 1979).

The Ninth Circuit has further cautioned that mandatory injunctions should not be issued "unless extreme or very serious damage will result." *Id.* at 1115.  But even without applying the higher standard for a mandatory injunction, Masimo has failed to carry its burden.

DOC ID - 47132435.1

## III.    ARGUMENT

The sole claim for which Masimo seeks a preliminary injunction in the PI Motion is Masimo's Section 14(a) claim.  Section 14(a) prohibits material misrepresentations and omissions in proxy statements.  15 U.S.C. § 78u-4(b)(3)(B). However, "proxy materials need not be perfect, but must simply convey a 'sufficiently accurate picture so as not to mislead.'"  *Mendell v. Greenberg*, 612 F. Supp. 1543, 1548 (S.D.N.Y. 1985).

As this Court put it when denying a plaintiffs' request for a preliminary injunction based on a Section 14(a) claim: "In light of the fact that proxy contests are adversary proceedings, it is inevitable that each side will find some fault with what is said about itself by the opponents.  The absence of complete candor and the presence of some 'puffing' will not necessarily render a proxy contest invalid." *Kass v. Arden-Mayfair, Inc.*, 431 F. Supp. 1037, 1045 (C.D. Cal. 1977).

### A.    Masimo Is Not Likely to Succeed on the Merits of the Section 14(a) Claim

Without exception, when courts evaluate Section 14(a) claims, they do so on a statement-by-statement basis, considering whether *specific text* in the proxy statement is false or misleading.  Masimo eschews this approach in its PI Motion, instead citing to multiple pages of Politan's proxy statements at a time, asserting the statements therein are false, and then offering Masimo's preferred spin on the same events.  Masimo rarely bothers to connect actual evidence to actual text that it claims are false and misleading.

The difficulty of disentangling Masimo's Section 14(a) claim notwithstanding, Masimo has no likelihood of success.  To state a claim under Section 14(a), a plaintiff must establish that "(1) a proxy statement contained a material misrepresentation or omission which (2) caused the plaintiff injury and (3) that the proxy solicitation itself, rather than the particular defect in the solicitation

DOC ID - 47132435.1

1   materials, was an essential link in the accomplishment of the transaction." *N.Y.C.*

2   *Emps.' Ret. Sys. v. Jobs*, 593 F.3d 1018, 1022 (9th Cir. 2010) (citation omitted).

### 1.    The Court Must Consider Whether the Section 14(a) Claim Would Survive Dismissal Under the PSLRA

3
4

5        The PSLRA requires that Masimo "specify each statement alleged to have

6   been misleading [and] the reason or reasons why the statement is misleading."  15

7   U.S.C. § 78u-4; *N.Y.S. Emps.' Ret. Sys.*, 593 F.3d at 1022.  Critically, Masimo bears

8   the burden of providing "particularized reasons why" Politan's statements are false

9   or misleading by establishing facts that "directly contradict" Politan's statements.

10  *Eisner v. Meta Platforms, Inc.*, 2024 WL 3228089, at *4-5 (N.D. Cal. June 28,

11  2024).

12       The Amended Complaint fails to state a Section 14(a) violation as to any

13  alleged misstatements because, among other reasons:  (1) the Complaint is rampant

14  with impermissible "puzzle pleading," relying on lengthy and repetitive block

15  quotes from Politan's proxy materials without specifying which of the quoted

16  statements is false or misleading and why (*see, e.g.*, *id.* ¶¶179-182, 198-200, 215-

17  224, 237-238); and (2) as for the specific statements that the Complaint does

18  identify, they are all (i) non-actionable statements of puffery or opinion (*see, e.g.*, *id.*

19  ¶¶158-159, 166, 168, 181, 194, 200, 215); (ii) immaterial discrepancies (*see, e.g.*, *id.*

20  ¶¶107, 115, 141-149, 159-165, 179-182, 196); (iii) non-actionable omissions (*see,*

21  *e.g.*, *id.* ¶¶144, 203, 206, 237-238); and/or (iv) not actually alleged to be false,

22  failing the PSLRA's fundamental requirement that requires particularized

23  allegations as to *how, why, and on what basis* particular statements are false or

24  misleading (*see, e.g.*, *id.* ¶¶174, 182, 194, 200).

25
26
27
28

DOC ID - 47132435.1

### 2.      Politan's Supplemental Disclosures Moot the Section 14(a) Claim

As set forth above, Politan has filed amended proxy statements that appended the original and amended complaints and described the allegations therein.  Those filings mooted the Section 14(a) claim.

As the Second Circuit recently explained in the context of a Section 13(d) litigation, an amended disclosure in the context of a proxy contest that acknowledges "the possibility of [] disputed fact[s]" and appends the relevant complaint satisfies the Exchange Act's disclosure purpose and moots claims of misrepresentation—even where the facts are hotly disputed—because the Act "requires only that the disputed facts and the possible outcomes be *disclosed*." *Nano Dimension Ltd. v. Murchinson Ltd.*, 102 F.4th 136, 141-42 (2d Cir. 2024) (per curiam) (emphasis added).  This rule logically follows from Section 14(a)'s purpose of ensuring adequate disclosure of information to "enable the shareholders to make an informed choice."  *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 448 (1976). Where facts are disputed, that purpose is accomplished by disclosing the dispute and any related facts and allegations.  *See Taro Pharm. Indus., Ltd. v. Sun Pharm. Indus., Ltd.*, 2010 WL 2835548, at *9 (S.D.N.Y. July 13, 2010).

### 3.      Following Discovery, Masimo Fails to Show the Alleged Misstatements Are False

For a statement to be false or misleading, it "must directly contradict what the defendant knew at that time or omit material information."  *Weston Fam. P'ship LLLP v. Twitter, Inc.*, 29 F.4th 611, 619 (9th Cir. 2022) (cleaned up); *see also Eisner*, 2024 WL 3228089, at *4.  For a statement to be false by omission, it must "affirmatively create an impression of a state of affairs that differs in a material way from the one that actually exists."  *Police Ret. Sys. of St. Louis v. Intuitive Surgical*, Inc., 759 F.3d 1051, 1061 (9th Cir. 2014) (internal quotations omitted).  Tellingly, the PI Motion is completely silent on more than a dozen alleged misstatements that

DOC ID - 47132435.1

the Amended Complaint alleges are false or misleading.  (*See, e.g.*, Compl. ¶¶ 217, 235)

The PI Motion fails to provide any evidence that "directly contradicts" any of the alleged misstatements in Politan's proxy materials or that creates a material misimpression.

### a.  Politan's Use of a Research Firm to Speak to Former Masimo Employees Is Not a Material Omission

Masimo argues that Politan's noting the existence of a pending securities class action against Masimo in its proxy materials—which alleges that Masimo misled investors about its financial performance in the second quarter of 2023—is false and misleading because it omits that Politan had "recruited and paid former employees to privately discuss the Company's performance," one of whom told Politan that he was not aware of discounting or channel stuffing.  (Br. 4, 18.)

Masimo's aggressive attempt to recast standard investment due diligence as a violation of Section 14(a) falls flat.  Expert (or consultant) networks, like AlphaSights or Mosaic Research Management ("Mosaic"), are widely used by professional investors—including investment funds, traditional asset managers, family offices, insurance funds, and even non-investment entities like corporations—to conduct due diligence.  (Taxin ¶56-61; Swartz Ex. 175, Koffey 85:4-9.)

Here, Politan used AlphaSights and Mosaic as a tool to help in its initial diligence of Masimo, as well as subsequently to understand why Masimo's sales had collapsed by 20% in the second quarter of 2023—a first for Masimo, which had never before had a down quarter.  Politan was "trying to figure out what was going on," because "what the company was telling the market and … the board didn't make sense." (Swartz Ex. 175, Koffey 68:24-69:17; *see also* Kapito Decl. ¶¶ 5-10.)[2]

---

[2] The Declaration of Aaron Kapito, submitted herewith, is referred to herein as "Kapito Decl."

DOC ID - 47132435.1

No evidence supports Masimo's pejorative claim that Politan was seeking to "dig[] up dirt" or "harm the Company."

Contrary to Masimo's assertion, Politan use of expert networks was no secret. Koffey told Micah Young, Masimo's CFO, that Politan "use[s] these consultant networks and so does everyone else" and described to him "what's in those consultant networks." (Swartz Ex. 175, Koffey 80:22-81:2.) Koffey further testified that other members of the Masimo Board were aware that Politan, like many public stockholders, used expert networks. (*Id.* 84:7-85:1.) Notably, Masimo also knew that Politan used expert networks from the prior litigation between Politan and Masimo in the Delaware Court of Chancery, in which, in January 2023, Politan produced communications with AlphaSights and Mosaic.

Nor is there any merit to Masimo's suggestion that Politan acted wrongfully by allegedly speaking with two former Masimo employees, ███████████, who Masimo alleges were later "cited as confidential sources in the class action and derivative complaints against Masimo."[3] (Br. 4-5, 18.) To begin, no one at Politan ever spoke with ████ (Kapito ¶19).

Aaron Kapito, co-founder of Politan, spoke with ████ on October 30, 2023. (*Id.* ¶20.) That call focused on the year-over-year sales decline at Masimo—in particular, ████ discussed changes in salesforce compensation and expressed his view those changes had disincentivized the sales force. (*Id.*) Masimo emphasizes the fact that ████ said he was "not aware of any discounting or channel stuffing." (Br. 18 (quoting Ellison Ex. 32).)

The fact that a *single* former Masimo employee—whose title was ████ ████████████████████—was not aware of discounting or channel stuffing proves *nothing* about whether such practices were actually taking

---

[3]Masimo presents no evidence showing that any of the individuals with whom Politan spoke actually was a confidential witness in any lawsuit against Masimo.

DOC ID - 47132435.1

1    place.  Nor does the fact that ████ might have acted as confidential witness in the

2    pending whistleblower lawsuits against Masimo change anything, particularly given

3    that those complaints cite sixteen other confidential witnesses, many of whom

4    appear to have been in a far better position to observe any alleged misconduct than

5    ████

6        In short, this claim is nothing more than unsupported conjecture and

7    innuendo, which is far short of the type of direct, contradictory evidence required to

8    support a Section 14(a) claim.  In any event, in its amended proxy, Politan expressly

9    described the information that Masimo claims is missing.  Accordingly, this

10   purported disclosure issue is moot in any event.  (Swartz Exs. 153, 154.)

11              **b.    Spinoff / Special Committee**

12       The PI Motion fails to present any evidence that directly contradicts Politan's

13   statements concerning the spin-off and Special Committee process.  Although the PI

14   Motion is far from clear, as best Defendants can tell, the specific statements that

15   Masimo claims are false are addressed below.

16       ***Kiani proposed a spin-off in which he would control SpinCo and not forfeit***

17   ***his special payment.***  Relying solely on Kiani's testimony, Masimo claims this

18   statement is false and misleading because purportedly it was Koffey—rather than

19   Kiani—who first proposed the spin-off in January 2024, and accuses Defendants of

20   "misleading stockholders about the intentions behind the spin-off proposal" on that

21   basis.  (Br. 20.)

22       But Kiani's deposition testimony, as well as Kiani's and Masimo's public

23   statements, corroborate Politan's statement that, during a dinner on January 29,

24   2024, Kiani proposed a spin-off to Koffey.  In Kiani's own words: ████████

25   ████████████████████████████████

26   ████████████████ (Swartz Exs. 179 (Transcript – The Claman

27   Countdown), 17 (CNBC – "[J]oe Kiani first proposed the idea" of a spin-off

28   "following a listening tour with shareholders"), 16 ("Quentin Koffey has been a key

-17-

DOC ID - 47132435.1

part of the discussions concerning the separation dating back to January *when Joe Kiani brought the idea to him before introducing it to the rest of the board*.") (emphasis added); *see also* Swartz Ex. 173, Kiani Tr. 116:11-121:16; Swartz Ex. 175, Koffey Tr. 252:8-257:25.)

Moreover, the documentary evidence of Koffey and Kiani's early exchanges on non-binding term sheets in February 2024 confirms that it was Kiani who proposed the terms he now tries to disclaim. ███████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████ Masimo's assertion that those terms reflected in *Kiani's* redline are Koffey's proposed terms is disingenuous.

**Alleged omission regarding Koffey's purported control of the Special Committee process.**  Again, citing no directly contradictory evidence and relying only on Kiani's testimony, as purportedly corroborated by long-time Kiani ally Craig Reynolds,[4] Masimo asserts that Politan's Proxy Materials are false because they do not disclose Koffey's purported "control" over the Special Committee process.  (Br. 20-21.)  That claim is contradicted by a mountain of evidence.

To begin, the Special Committee was advised by Melissa Sawyer, Global Head of Sullivan & Cromwell's ("S&C") Mergers & Acquisitions Group and co-head of the Firm's Corporate Governance Group, as well as Centerview Partners, a prominent investment banking advisory firm.  (Ali Decl. ¶¶ 1-28; *see also* Supp. Ali

---

[4] ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████

DOC ID - 47132435.1

Decl.)[5]  Not surprisingly then, each and every one of Masimo's bases for claiming that Koffey "controlled" the Special Committee process is directly refuted by the evidence.

*First*, contrary to Masimo's assertion that Koffey "insisted on selecting S&C and Centerview as advisors," (Br. 20), those advisors were engaged by ████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████

*Second*, Masimo claims that Koffey "pushed for broader powers for the Committee than originally contemplated" to use those powers to craft an agreement that Koffey knew would be rejected.  (Br. 21.)  Not so.  As reflected in the Board's

████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████

*Third*, in the "Background" section of the PI Motion, Masimo makes a hodge podge of vague allegations—none of which move the needle.

Masimo's vague and unsubstantiated allegation regarding Koffey's "undisclosed personal relationship with S&C" is perplexing.  (Br. 20-21.)  Indeed, when asked during his deposition, Kiani, ████████████████████████████████

██████████████████████████████████████████████████████

█████████████████████████████████████████████████

████████████████████████████████████ (Swartz Ex. 175, Koffey Tr. 221:7-

---

[5] The Declaration of Najeeb Ali dated August 19, 2024 is referred to herein as "Ali Decl."  The Declaration of Najeeb Ali dated August 30, 2024 is referred to herein as "Supp. Ali Decl."

DOC ID - 47132435.1

1  14; Swartz Ex. 176, Brennan Tr. 71:8-15.) ███████████████████████

2  █████████████████████████████████████████████

3      Masimo also makes the baseless assertion that Koffey "with[eld]" the

4  February term sheets from the Special Committee.  (Br. 21.)  He did no such thing.

5  Rather, Koffey sent the prior term sheets to the Special Committee's legal and

6  financial advisors and did not restrict their use of the term sheets in any way.

7  (Swartz Exs. 19 and 20.) ████████████████████████████

8  ████████████████████████████████████████████████

9

10

11      Nor is there anything nefarious about the handful of emails between Koffey

12  and the Special Committee's advisors in which Koffey communicated without

13  copying the other members of the Special Committee.  (Br. 10-11 (citing Ellison

14  Exs. 39, 46, 49, 82).)  Those types of communications—in which the advisors

15  solicited feedback from Koffey before communicating with the rest of the

16  Committee, were standard practice and necessary to facilitate a fast-moving

17  negotiation process.  (Swartz Ex. 175, Koffey Tr. 288:5-15; Supp. Ali Decl. ¶ 4;

18  Larcker Report ¶ 72.)  Indeed, other Committee members, including Reynolds,

19  thanked Koffey for his work as Chairman of the Committee and even applauded him

20  for doing a good job in reducing Centerview's fee schedule.  (Swartz Ex. 21.)

21      Nor does Masimo present any evidence that the Committee's term sheet did

22  not reflect the Committee's "independent position," as alleged.  (Br. 20.)  The

23  evidence demonstrates that the opposite is true.  The Committee's advisors

24  conducted an independent analysis of the potential spin-off and ████████████████

25  ████████████████████████████████████████████

26  ████████████████████████████████

27      On page 11 of the PI Motion, Masimo also completely mischaracterizes

28  Koffey's email where he articulated a strategy to publicly announce the transaction

1  and negotiate details later.  (Ellison Ex. 51.)  Nowhere in that email did Koffey state

2  that "his 'strategy'" was "to steer the Committee away from a workable agreement

3  on valuation," as Masimo erroneously states in its brief.  (Br. 11.)

4    Rather, as explained in the Centerview declaration, 

5

6

7

8

9

10

11    ***The Special Committee "unanimously" agreed to send the March 11 term***

12  ***sheet.***

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DOC ID - 47132435.1

### c.    Joint Venture

The PI Motion fails to present any evidence that directly contradicts Politan's alleged misstatements concerning the potential joint venture, as required for it to prevail.

***Masimo "refused to disclose" the identity of the potential joint venture partner until after Koffey's Section 220 demand.***  Masimo claims this statement is false because, on May 7, 2024, Kiani asked Brennan and Koffey to sign NDAs in their personal capacities, but they refused to do so.  (Br. 22.)  This is a *non-sequitur*.

The fact that Kiani refused to disclose the identity of the joint venture partner unless Kiani and Brennan signed NDAs[6] does not change the fact that, as Politan accurately stated in its proxy materials, Kiani refused to disclose the identity of the joint venture partner—and did not disclose it—until May 13, 2024, which was after Koffey sent his 220 Demand.  (Swartz Ex. 41; Ellison Ex. 80.)  Moreover, Kiani's email did not make clear whether, if Koffey and Brennan signed the NDA, Kiani would actually disclose the name of the joint venture partner.  (Swartz Ex. 40.)  The fact that Kiani purportedly asked the Board to meet the next week ▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

---

[6] Koffey and Brennan believed this was a highly unusual request that was inappropriate to require of directors.  (Swartz Ex. 40.)

-22-

1 ███████████████████████████████████████████████████████

2 ██████████████████

3 ░███████████████████████████████████████████████████

4 ██████████████████████████████████████████████

5 ███████████████████████████████████████████████████

6 ███████████████████████████████████████████████████

7 █████████████████████████████████████

8     *Kiani signed the joint venture term sheet without providing "any*

9 *information to the Board."* ████████████████████████

10 ██████████████████████████████████████████████████████████

11 █████████████████████████████████████████████████████████

12 ██████████████████████████████████████████████████████████

13 ██████████████████████████████████████████████████████████

14 ████████████████████████████████████████████████████

15 ████████████████████████████████████████████████████████

16 ████████████████████████████████████████████████████████

17 ░░████████████████████████████████████████████████

18 ████████████████████████████████████████████████████

19 ██████████████████████████████████████████████████████

20 █████████████████████████████████████████████████████

21 ██████████████████████████████████████████████████████████

22 ███████████████████████████████████████████████████

23 ████████████████████████████████████████████████████

24 ██████████████████████████

25

26

27 _____

28 [7] ███████████████████████████████████████████
██████████████████████████

1    ***Koffey and Brennan were first provided the name of the potential joint***
2    ***venture partner on May 16, 2024.***  This alleged misstatement is mooted by
3    Politan's supplemental disclosure dated August 30, 2024, which clarifies that
4    Koffey and Brennan were first provided the name of the potential joint venture
5    partner on May 13, 2024 when board materials were circulated in advance of the
6    May 16 Board meeting.  (Swartz Ex. 153.)

7        ***Kiani intends to be Chairman of the separated entity.***  Masimo's public
8    statements ████████████████ make clear that Kiani intended to be the
9    Chairman of the joint venture, and therefore directly corroborate this statement.
10   Specifically, reporting on an interview with Kiani that first disclosed the joint
11   venture negotiations, the Wall Street Journal wrote that "Kiani is expected to remain
12   chairman and CEO of Masimo and to be chairman of the newly created company."
13   (Swartz Ex. 48; *see also* Swartz Exs. 158, 48, 50.)  ████████████
14   █████████████████████████████████████████████
15   ████████████████████████████

16          d.    **Information Flow (Onboarding, Budget, 10-K, Other Items)**
17
18       The PI Motion fails to present any evidence that directly contradicts Politan's
19   statements concerning information flow on the Masimo Board.
20       ***Statements regarding Koffey and Brennan's belief that they were not***
21   ***properly onboarded.***  The challenged statements in Politan's proxy materials are
22   couched in qualifiers conveying subjective belief.  For example:
23   • "The Politan Parties **believe** that the Company failed to properly act on"
24       Koffey and Brennan's onboarding requests;
25   • "The 2023 Newly-Elected Directors **believed** that the absence of a customary
26       onboarding made it difficult for them to engage in certain Board functions[.]"
27   (Ellison Ex. 84 at 7.)
28

-24-

DOC ID - 47132435.1

Those statements are non-actionable as a matter of law because they are statements of opinion that are not "capable of objective verification." *Or. Pub. Emps. Ret. Fund v. Apollo Grp. Inc.*, 774 F.3d 598, 606 (9th Cir. 2014) (the "statements [at issue] were subjective and preceded by qualifiers, such as 'We believe'" and, therefore, not actionable).

Moreover, Koffey and Brennan's belief was well-founded:  Discovery has confirmed that, although Koffey and Brennan were elected to serve as Masimo's directors in a landslide victory—with more than 70% of the votes cast by non-insiders—Kiani sought to marginalize them from the outset.  (Swartz Ex. 8, 70.) Despite multiple requests for basic financial and operational information and meetings with management that Koffey and Brennan believed were necessary to carry out their fiduciary duties, they were met with staunch resistance.  (Swartz Ex. 83, 84, 127, 145.)

For example, Koffey repeatedly asked that he be provided with the analysis that justified that the Company recorded only a $10 million impairment to its consumer business, a figure which represented only 1% of the purchase price for Sound United, a one billion dollar acquisition that experienced a significant deterioration in business.  (Swartz Ex. 145.) ███████████████████ ██████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ███████████████████████████████████████████

Further, David Larcker, Director of the Corporate Governance Research Initiative at Stanford Business School, opined that the onboarding process at Masimo and information flow at Masimo were woefully inadequate.  (Larcker Report ¶¶ 34-43.)  Thus, regardless of whether Masimo believes that the information it provided to Koffey and Brennan was sufficient (Br. 6-7, 23), that does not render Politan's statement false or misleading.

-25-

1    ***The Board never received, or approved, a budget.***  Masimo fails to present

2   any evidence of a budget being provided to the Board.  Masimo claims that Koffey

3   received a "preliminary budget for 2024 and the next five years" in October 2023.

4   (Br. 8 (citing Ellison Ex. 92).)



21    As Professor Larcker confirms, those documents are a far cry from what

22   public corporations typically consider to be a budget because, among other reasons,

23   the presentations do not disaggregate or provide useful details on COGS, R&D, or

24   SG&A, thereby making it impossible for directors to reasonably understand how

25   Masimo spent its resources or why.  Such a disaggregated breakdown of costs is a

26   hallmark of a budget.  (Larcker Report ¶¶ 57-64.)

27    ***Purported failure to disclose the reason why Koffey and Brennan did not***

28   ***sign Masimo's 2023 10-K.***  Relying on declarations that have no basis in objective

DOC ID - 47132435.1

fact, Masimo claims that Politan's proxy materials were misleading because they fail to disclose that Koffey and Brennan refused to sign the Company's 2023 10-K to gain an advantage in the Proxy Contest. This omission theory fails as a matter of law and logic. The evidence makes clear that Koffey and Brennan did not sign the 2023 10-K because they believed they did not receive sufficient information to be able to approve the financials consistent with their fiduciary duties. (Swartz Ex. 175, Koffey Tr. 221:7-14, 176, Brennan Tr. 71:8-15.)

Two months prior to the 10-K signing, Koffey sent Mikkelson, Chair of the Audit Committee at the time, a targeted list of items that felt he needed to be in a position to sign the 10-K, but Kiani rejected the request as not a proper use of management's time. (Swartz Ex. 80.) And, as Chapek acknowledged, the items Koffey requested were reasonable especially in light of the unprecedented financial downturn the Company had experienced in 2023. (Swartz Ex. 177, Chapek Tr. 53:10-58:15.) Koffey and Brennan never received all the information they requested and did not have sufficient opportunity to meet with management to have their questions answered. (Swartz Ex. 175, Koffey Tr. 72:20-74:24, 176, Brennan Tr. 68:8-70:20.) Therefore, they felt they were not in a position to approve the Company's financials.[8]

Masimo's assertion that "the operating heads of major businesses each made lengthy presentations" and "the Board, including Koffey, was provided ample opportunity to ask questions" is patently false. (Br. 8.) The presentations, which took place on February 27, 2024, were each 5-10 minutes long and extremely rushed, and Koffey and Brennan were not given sufficient time to ask questions at the end of the presentation. (Swartz Ex. 175, Koffey Tr. 233:13-25, 234:1-4.)

---

[8] Masimo completely distorts paragraph 11 of Chapek's declaration. Nowhere in his declaration does it say that Koffey and Brennan refused to sign the 10-K because they knew that, if they did not sign, that would suggest to stockholders that "something was amiss" with the Company's financials. (Br. 24.)

DOC ID - 47132435.1



### e.    **Whole Company Sale Process**

*The Board's delegation of authority to Kiani to "carry out a sale of the entire company without any obligation to provide process* **updates** *to the Board."** Masimo claims this statement is false (Br. 24), but the June 24, 2023 Board meeting minutes reflect precisely what Politan stated in its proxy materials.  (Swartz Ex. 94.)  Nowhere in the minutes does it say that the Board required Kiani to provide any updates to the Company; nor do the minutes reflect any obligation for Kiani to obtain any additional approvals from the Board before retaining a financial advisor.  (*See id.*)

*No substantive process update until October 2023 Board meeting.*  First, this allegation has been mooted by Politan's supplemental disclosure dated August 30, 2024.  Masimo claims this statement is false because of a *single* call that Koffey and Brennan had with John Collins from Morgan Stanley via Zoom on August 1, 2023.  (Br. 25.)  As stated in the Larcker Report, typical public company directors are updated nearly weekly or more when management is running an active sale process, as a well-informed board would be involved in regular and frequent oversight of a sale process including which bidders were engaged in discussions.  (Larcker Report

¶¶ 65-79.)  In any event, Politan supplemented its proxy disclosures today to account for the single Zoom with Collins in its narrative.  (Swartz Exs. 153, 154.)

Moreover, Koffey and Brennan were unable to obtain a comprehensive update from Collins, as Collins candidly acknowledged to Koffey that he did not know exactly when and with whom Kiani and Cohen were speaking.  (Koffey Decl. ¶ 40; *see also* Swartz Exs. 8, 96, 103.)  This is corroborated by emails prior to August 1, 2023 where Cohen and Kiani scheduled and prepared for meetings with potential bidders without including Collins.  (*Id.*)

███████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████

█████████████████████████████████████████████

█████████████████████████████████████████████

███████████████████████████████

***No deal on what Kiani considered to be "satisfactory terms."***  Masimo says this is misleading because "it suggests that Kiani in fact received offers and unilaterally evaluated whether they were 'satisfactory.'"  (Br. 25.)  Nowhere in Politan's proxy materials does Politan say that Kiani received an offer—what Masimo *thinks* this statement suggests does not render Politan's statement false or misleading.  There is no material difference between not receiving an offer and not finding a deal on satisfactory terms, and it all goes to show how woefully uninformed Kiani kept the Board about this process and what was discussed with potential acquirers.

### 4.    Masimo Is Not Likely to Show a "Substantial Likelihood" That Any of the Alleged Misstatements and Omissions Are Material

Even assuming that Masimo could show falsity, Masimo offers no evidence to show that any of the purported misstatements and omissions are material.  For information to be material, "there must be a substantial likelihood that the disclosure

DOC ID - 47132435.1

of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *TSC Indus., Inc.*, 426 U.S. at 449. "The 'total mix' of information normally includes information that is and has been in the readily available general public domain and facts known or reasonably available to the shareholders." *Paskowitz v. Pac. Cap. Bancorp*, 2009 WL 4911850, at *6 (C.D. Cal. Nov. 6, 2009).

Here, the total mix included Masimo's response to every alleged misstatement or omission in the proxy materials with its own proxy materials explaining why it believes Politan's statements are purportedly "lies." (Swartz Exs. 105-109.) Further, Politan—**not** Masimo—acted to ensure Masimo's shareholders knew the disputed facts, by publicly filing Masimo's Complaint and Amended Complaint with the SEC. (Swartz Exs. 153, 168.)

In his declaration, Gregory Taxin, the Managing Member of Spotlight Advisors, LLC, the leading strategy and financial consultancy in shareholder activism situations, opines that, like political campaigns, proxy contests "frequently involve puffery, hyperbole, exaggeration and colorful language intended to influence the hearts and minds of voters." (Taxin ¶108.) In Taxin's experience, both shareholders and proxy advisory firms like ISS and Glass Lewis are "adept at sifting through the barrage of solicitation materials to hone in on the substantive issues upon which their votes and opinions hinge." (*Id.* ¶19.)

Taxin observed that "due to Masimo's robust solicitation campaign that focused extensively on rebutting Politan's purported misleading statements," Masimo's shareholder were well aware of the vast majority of Politan's alleged false and misleading statements and omissions but did not regard them or would not have regarded them as material to their voting decisions. (*Id.* ¶127.)

DOC ID - 47132435.1

### 5. Masimo Fails to Show That Any Defendant Acted Negligently Under Section 14(a)

On a preliminary injunction motion, it is Masimo's burden to show it is likely to succeed on the merits by pointing to evidence. With respect to the negligence element for Section 14(a), Masimo just recites the standard, describes it, and then ends its argument before putting forth any evidence. It has not met its burden on this element, particularly given that Politan has identified support for every purported misstatement.

### 6. Masimo Fails to Show Loss Causation for Its Section 14(a) Claim

Even if a plaintiff seeks only equitable relief, a Section 14(a) claim must still plead economic loss, *see N.Y.C. Emps.' Ret. Sys.*, 593 F.3d at 1023-24, and must do so with particularity. *See Apollo*, 774 F.3d at 605. "Ninth Circuit law, and the law from other circuits, make clear that loss causation is required to maintain an action under § 14(a) regardless of the relief sought," and applies even to claims for injunctive relief. *Hubner*, 2015 WL 12513581, at *5 (denying preliminary injunction when plaintiffs had failed to plead loss causation). The Amended Complaint does not plead any economic loss, much less with particularity.

The only economic loss that Masimo identifies in the PI Motion is the money it has spent on the proxy contest. (Br. 25.) No court in this Circuit has ever held that fees expended in a proxy contest can constitute "economic harm" for purposes of loss causation. In support, Masimo relies exclusively on *Enzo Biochem, Inv. v. Harbert Discovery Fund, LP*, 2021 WL 4443258 (S.D.N.Y. Sept. 27, 2021), a case that has not been followed by any court even within the Second Circuit and was subsequently limited by its own author to its facts where a director election would not have taken place if not for the "misleading proxy," as opposed to situations, like here, where an election takes place every year regardless. *Rubenstein ex. rel. Jefferies Fin. Grp. Inc. v. Adamany*, 2022 WL 6592503, at *6 n.8 (S.D.N.Y. Oct. 5, 2022), *aff'd*, 2023 WL 6119810 (2d Cir. Sept. 19, 2023).

DOC ID - 47132435.1

**B.** **The Section 13(d) Claim Is Irrelevant Because Masimo Seeks No Relief for That Claim in the PI Motion**

Masimo also argues that Politan violated Section 14(a) by making, and failing to correct, purported "material misrepresentations and omissions in its Schedule 13D filings." (Br. 18.) At the outset, the question of whether Masimo is likely to succeed on the merits of that claim is immaterial because Masimo does not seek injunctive relief on its Section 13(d) claim, which was added to the pleadings after the PI Motion was filed, nor does it ask the Court to order Politan to make corrective disclosures to its Schedule 13D. (Dkt. 118-13.)

In any case, Masimo is not likely to succeed on the merits of that claim because it rests on factual assumptions that are flatly contradicted—or, at a minimum, unsupported—by the record.

*First*, Masimo asserts that Politan violated Section 13(d) by failing to disclose "its plans to take over the Company," ██████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ██████████████████████████████████

As Koffey testified, Politan did not invest in Masimo with a "plan" to take Board seats. (Swartz Ex. 175, Koffey Tr. 181:8-182:2.) ████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████

DOC ID - 47132435.1

█████████████████████████████ In short, Politan did not disclose an intention to "take over" Masimo because it had—and has—no such intention. Indeed, each of the directors nominated by Politan, other than Koffey, had no prior personal relationship with Politan, and has no contractual or economic relationship with Politan upon their election to the Board.

Politan's Schedule 13D filing is consistent with Koffey's testimony. In Item 4 of its Schedule 13D, Politan stated that it intended to:

> engage in conversations, meetings and other communications with certain members of [Masimo's] board of directors and management team, stockholders, industry analysts, and other interested parties, in each case to discuss [Masimo's] business, operations, financial condition, strategic plans, governance, the composition of the executive suite and board and possibilities for changes thereto.

(Ellison Ex. 7.) The Schedule 13D further stated that Politan "may take or engage in various plans, actions or transactions in seeking to bring about changes to increase stockholder value," and "may also take steps to explore and prepare for various plans and actions, and propose transactions, before forming an intention to engage in such plans or actions." (*Id.*); *see, e.g.*, *Azurite Corp. v. Amster & Co.*, 52 F.3d 15, 18 (2d Cir. 1995) (a "plan" for purposes of Section 13(d) is "something more definite than vaguely formed thoughts for the future" and there is no requirement to "make predictions … of future behavior" or disclose "tentative" or "inchoate" plans) (citation omitted).

Furthermore, in the ensuing two years since Politan filed the Schedule 13D in question, Politan has filed numerous Schedule 13D amendments disclosing its intent to nominate candidates to the board both in the 2023 proxy contest and the 2024 proxy contest. (Swartz Exs. 186, 187.)

*Second*, Masimo continues its now multi-year quest to get its hands on Politan's investor list by now claiming that, because Politan purportedly "raised funds for the direct purpose of investing in and taking control of Masimo," it

DOC ID - 47132435.1

1  violated Section 13(d) by failing to disclose the identities of its investors and the

2  existence of "contracts or other relationships related to its investment in Masimo."

3  (Br. 19-20.)  Again, Masimo seeks the same information that it was roundly

4  criticized for seeking in the Delaware Bylaw litigation, and again, Masimo relies on

5  the June 2022 Presentation, which does not support its position.  (*Id.*)

6        Koffey testified that █████████████████████████████████

7  ████████████████████████████████████████████████████

8  ██████████████████████████████████████████████

9  ████████████████████████████████████████████

10 ████████████████████████████████████████████████████

11 ████████████████████████████████████████████████████

12 ████████████████████████████████████████████

13 ████████████████████████████████████████████████

14 ████████████████████████

15       Accordingly, Masimo fails to demonstrate that it is likely to succeed on a

16 claim that Politan violated Section 14(a) based on a newly asserted violation of

17 Section 13(d).

18       **C.    Masimo Fails to Show the Likelihood of Irreparable Harm**

19       Masimo must show the *likelihood*, not the mere *possibility* of irreparable

20 harm before the Court may issue a preliminary injunction.  *See Hubner*, 2015 WL

21 12513581 at *4.[9]  To do so, Masimo must "demonstrate, by the introduction of

22 admissible evidence and with a clear likelihood of success that the harm is real,

23 imminent and significant, not just speculative or potential."  *Groupion, LLC v.*

24 *Groupon, Inc.*, 826 F. Supp.2d 1156, 1167 (N.D. Cal. 2011) (emphasis added).

25

26 _____

27 [9] This is so even if the Court were to apply the Ninth Circuit's alternative "sliding-scale" test when weighing the *Winter* factors.  *See Stormans, Inc. v. Selecky*, 586

28 F.3d 1109, 1127 (9th Cir. 2009).

DOC ID - 47132435.1

1 Masimo fails to show any likelihood of irreparable harm arising from the election of

2 Solomon and Jellison.

3     Masimo asserts that an "uninformed vote" is irreparable harm.  But "[f]ederal

4 courts in the wake of the Supreme Court's decision in *eBay Inc. v. MercExchange,*

5 *LLC*, 547 U.S. 388, 394 (2006), have rejected the contention that denying

6 shareholders the right to cast an informed vote constitutes a *per se* irreparable

7 harm." *Eisner*, 2024 WL 3228089, at *6 (*citing Masters v. Avanir Pharms., Inc.*,

8 996 F. Supp. 2d 872, 885 (C.D. Cal. 2014)).  This is especially so "if the difficulties

9 inherent in unwinding large corporate transactions are absent."  *Johnson ex rel.*

10 *Johnson Fam. Tr. v. Saba Cap. Mgmt.,L.P.*, 2023 WL 1345717, at *4 (S.D.N.Y. Jan.

11 31, 2023).  In the absence of a *per se* rule, to determine whether such a purportedly

12 uninformed stockholder vote constitutes "irreparable harm" the Court "must engage

13 in a fact-specific analysis and scrutinize Plaintiffs' claims of 'actual harm.'" *Id.* at

14 *3.

15     Masimo puts forth *no* evidence to show the possibility, let alone the

16 likelihood, of irreparable harm if Solomon and Jellison are elected.  Any harm that

17 Masimo hypothesizes is admittedly speculative, as Masimo asserts that new Board

18 "***could take*** any number of material, irreversible actions . . . ."  (Br. 29 (emphasis

19 added).)  But there is no such evidence.

20     *Arcturus Therapeutics Ltd. v. Payne*, 2018 WL 2316790 (S.D. Cal. May 22,

21 2018), cited by Masimo, cuts against its position.  There, the movant sought an

22 injunction in the context of an upcoming shareholder vote requiring the Defendants

23 to make disclosures in its amended Schedule 13D filings.  The Court declined to

24 enter that injunction finding that "it would be inappropriate for the Court to require

25 Defendants to state what they contend is not true in a Schedule 13D." *Id.* at *9.

26 Instead, the Court required only one defendant "to amend his Schedule 13D by

27 attaching a copy of the complaint in this action," which prevented an uninformed

28 vote by apprising shareholders of the dispute. *Id.*

DOC ID - 47132435.1

Here, as noted above, Defendants have *already* filed both the original Complaint and the Amended Complaint from this action in amended Schedule 14A and Schedule 13D filings.

### D.    The Balance of the Equities Does Not Favor an Injunction

The balance of the equities does not favor the issuance of an injunction.

*First*, the Court may consider the unclean hands of the movant when weighing the balance of the equities.  *See, e.g.*, *Frontera Res. Corp. v. Hope*, 2019 WL 2410513, at *3 (N.D. Cal. June 7, 2019).  Kiani has already been criticized publicly for conspiring with a Masimo shareholder, RTW Investments, to manipulate the vote at the upcoming election by engaging in "empty voting."  (*See supra* at 7-8.)

*Second*, as other Courts have recognized in the context of a proxy contest, the issuance of a preliminary injunction may itself constitute an "additional hardship" on Defendants as "[s]hareholders may view an injunction as a final determination of wrongdoing and be unduly influenced by it."  *Mgmt. Assistance Inc.*, 584 F. Supp. at 1025 n.1 (collecting cases).

*Third*, Masimo argues Defendants "are not harmed by an injunction that simply requires them to correct their own false and misleading statements."  (Br. 29.)  That argument is grossly misleading.  Masimo has advised that it may use any order by the Court requiring corrective disclosures to justify disqualifying Solomon and Jellison from running for election.  (*See, e.g.*, Swartz Ex. 4 at 64:5-12.)

### E.    An Injunction Does Not Serve the Public Interest

Protecting Kiani from shareholder accountability serves Kiani, not the public.  Corporate suffrage is in the public interest.  The election was supposed to happen two months ago.  The shareholders are ready to vote.  This Court should let them.  *See D & N Fin. Corp. v. RCM Partners Ltd. P'ship*, 735 F. Supp. 1242, 1254 (D. Del. 1990) ("Accordingly, the Court concludes that the issuance of an injunction

DOC ID - 47132435.1

1    would threaten the public interest which § 14(a) seeks to promote, *i.e.,* fair corporate
2    suffrage.")

3    **IV.    CONCLUSION**

4         Defendants respectfully request that the Court deny the PI Motion.

5

6    DATED:  August 30, 2024

7

8

9                                            By:    ___/s/ *Bethany W. Kristovich*___
10                                                   Bethany W. Kristovich
                                                     Attorneys for Defendants
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DOC ID - 47132435.1

1

## **CERTIFICATE OF COMPLIANCE**

2       The undersigned, counsel of record for Defendants, certifies that this

3  brief contains 10,894 words, which complies with the word limit of L.R.

4  11-6.1, as modified by Court order. (See Dkt. 117.)

5

6  DATED:  August 30, 2024

7                                    By:    /s/ *Bethany W. Kristovich*

8                                           BETHANY W. KRISTOVICH
                                            Attorneys for Defendants

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DOC ID - 47132435.1