1   LATHAM & WATKINS LLP
    Michele D. Johnson (Bar No. 198298)
2   Kristin N. Murphy (Bar No. 268385)
    Jordan D. Cook (Bar No. 293394)
3   650 Town Center Drive, 20th Floor
    Costa Mesa, CA 92626-1925
4   T: (714) 540-1235 / F: (714) 755-8290
    michele.johnson@lw.com
5   kristin.murphy@lw.com
    jordan.cook@lw.com
6
7   Colleen C. Smith (Bar No. 231216)
    12670 High Bluff Drive
8   San Diego, California 92130
    T: (858) 523-5400 / F: (858) 523-5450
9   colleen.smith@lw.com

10  *Attorneys for Plaintiff Masimo Corporation*

11  [Additional Counsel Listed on Signature Page]

12

13                  **UNITED STATES DISTRICT COURT**

14                  **CENTRAL DISTRICT OF CALIFORNIA**

15

16  MASIMO CORPORATION                 Civil Action No. 8:24-cv-01568-JVS-JDE

17              Plaintiff,
                                        **PLAINTIFF'S REPLY IN SUPPORT**
18      v.                              **OF MOTION FOR PRELIMINARY**
                                        **INJUNCTION**
19  POLITAN CAPITAL
    MANAGEMENT LP, POLITAN
20  CAPITAL MANAGEMENT GP LLC,          Hearing Date:    September 9, 2024
    POLITAN CAPITAL PARTNERS GP         Time:            1:30 PM
21  LLC, POLITAN CAPITAL NY LLC,        Courtroom:       10C
    POLITAN INTERMEDIATE LTD.,          Honorable James V. Selna
22  POLITAN CAPITAL PARTNERS
    MASTER FUND LP, POLITAN
23  CAPITAL PARTNERS LP, POLITAN        **REDACTED VERSION OF**
    CAPITAL OFFSHORE PARTNERS           **DOCUMENT PROPOSED TO BE**
24  LP, QUENTIN KOFFEY, MICHELLE        **FILED UNDER SEAL**
    BRENNAN, MATTHEW HALL,
25  AARON KAPITO, WILLIAM
    JELLISON, DARLENE SOLOMON,
26
                Defendants.
27

28

# **TABLE OF CONTENTS**

**Page**

I.   INTRODUCTION ...................................................................................... 1

II.  ARGUMENT ............................................................................................ 2

    A.   Without an Injunction, Masimo and Its Stockholders Will Suffer Irreparable Harm ......................................................... 2

    B.   Masimo Is Likely to Succeed on The Merits ...................................... 3

        1.   Politan's Secret Communications With Former Employees, Customers, and Competitors Must Be Disclosed ................................................................................. 3

        2.   Information Regarding Politan's Investors and Its Longstanding Control Intent Must Be Disclosed ..................... 7

            a.   Politan Must Disclose Its Investors ................................. 8

            b.   Politan Must Disclose It Sought Control From Outset ................................................................... 10

            c.   Politan's Material Omissions Require Correction ................................................................... 11

        3.   Politan Must Correct Misstatements Regarding the Spin-off Process ............................................................. 11

        4.   Politan Must Correct Misstatements Regarding the Joint Venture ................................................................. 14

        5.   Politan Must Correct Its Misstatements Regarding Onboarding ................................................................... 15

            a.   The Politan Directors' Refusal to Sign the 10-K and Conflicted S&C Consultation Were Pretextual ............................................................. 16

            b.   The Larcker Report Holds No Weight .......................... 17

            c.   The Politan Directors Received Full Financials ................................................................... 18

|  |  | 6. | Politan Must Correct Misstatements Regarding the Sale Process ...................................................................... 18 |
|  |  | 7. | Politan's Supplemental Disclosures Do Not Moot Plaintiff's Section 14(a) Claim ...................................... 19 |
|  | C. | Defendants Concede the Proxy Materials Are an "Essential Link" ........................................................................ 20 |
|  | D. | Defendants Do Not Rebut Masimo's Negligence Showing ......................................................................................... 20 |
|  | E. | An Injunction Would Serve the Public Interest ................................. 21 |
|  | F. | The Balance of Equities Strongly Favors Injunctive Relief .......................................................................................... 21 |
| III. | CONCLUSION | | .......................................................................... 22 |

LATHAM&WATKINS LLP
ATTORNEYS AT LAW

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Allergan, Inc. v. Valeant Pharms. Int'l*,
2014 WL 5604539 (C.D. Cal. Nov. 4, 2014) .............................................. *passim*

*Arcturus Therapeutics v. Payne*,
2018 WL 2316790 (S.D. Cal. May 22, 2018) ...................................................... 3

*Arvin Indus. v. Wanandi*,
722 F. Supp. 532 (S.D. Ind. 1989) .................................................................... 19

*Bender v. Jordan*,
439 F. Supp. 2d 139 (D.D.C. 2006) .................................................................. 21

*City of Dearborn Police & Fire Revised Ret. Sys. v. Brookfield Asset Mgmt. Inc.*,
314 A.3d 1108 (Del. 2024)................................................................................ 17

*Dan River, Inc. v. Unitex, Ltd.*,
624 F.2d 1216 (4th Cir.1980)............................................................................ 20

*Eisner v. Meta Platforms, Inc.*,
2024 WL 3228089 (N.D. Cal. June 28, 2024) ................................................... 3

*Hartranft v. Encore Cap. Grp.*,
543 F. Supp. 3d 893 (S.D. Cal. 2021) ............................................................... 20

*In re PMTS Liquidating Corp.*,
526 B.R. 536 (D. Del. 2014) ............................................................................... 7

*In re STEC Deriv. Action*,
2012 WL 8978155 (C.D. Cal. Jan. 11, 2012) (Selna, J.) ................................... 5

*Johnson v. Saba Capital Management*,
2023 WL 1345717 (S.D.N.Y. Jan. 31, 2023).................................................... 3

*Liberty National Ins. Holding v. Charter Co.*
734 F.2d 545 (11th Cir. 1984)........................................................................... 20

*Lone Star Steakhouse & Saloon v. Adams*,
148 F. Supp. 2d 1141 (D. Kan. 2001) ........................................................ 21, 22

LATHAM&WATKINS LLP
ATTORNEYS AT LAW

iii

CIVIL ACTION NO. 8:24-cv-01568-JVS-JDE
PLAINTIFF'S REPLY IN SUPPORT OF MOTION FOR
PRELIMINARY INJUNCTION

*Masters v. Avanir Pharms., Inc.*,
   996 F. Supp. 2d 872 (C.D. Cal. 2014) ................................................................... 3

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension
   Fund*,
   575 U.S. 175 (2015) ............................................................................................... 17

*SEC v. Prakash*,
   2024 WL 781037 (N.D. Cal. Feb. 26, 2024) ....................................................... 21

*SEC v. Teo*,
   746 F.3d 90 (3d Cir. 2014) ................................................................................... 11

*Taseko Mines Ltd. v. Raging River Cap.*,
   185 F. Supp. 3d 87 (D.D.C. 2016) ...................................................................... 21

*Victory Markets, Inc. v. Nelson*,
   1982 WL 2278 (N.D.N.Y. Mar. 26, 1982) ............................................................. 8

*Warner Commc'ns, Inc. v. Murdoch*,
   581 F. Supp. 1482 (D. Del. 1984) ....................................................................... 20

**RULES**

Rule
   13(e) ...................................................................................................................... 11
   13d-101 ................................................................................................................ 7, 9
   14a-3 ................................................................................................................... 7, 9
   14a-13 .................................................................................................................... 21
   14a-101 ................................................................................................................ 7, 9

**REGULATIONS**

17 C.F.R.
   § 240.13d-101 ............................................................................................... 8, 9, 10
   § 240.14a-3 ............................................................................................................. 9
   § 240.14a-101 ......................................................................................................... 9

# I.    INTRODUCTION

This is a paradigmatic situation where injunctive relief is necessary to prevent irreparable harm.  Federal law prohibits false and misleading proxy disclosures.  Investors like Politan must make certain disclosures when they intend to take actions that could alter control of the company.  Those requirements ensure that stockholders have information necessary to make informed decisions.  Injunctive relief is the *preferred* remedy for a breach of those obligations—particularly where (as here) the outcome of a stockholder vote would dramatically affect the company's future.

It is now undisputed that the proxy materials Politan distributed were false and misleading—Politan has belatedly attempted to backfill its disclosures by correcting some of its glaring falsehoods.  But merely correcting a few details does not undo the false narrative that Politan has foisted upon Masimo's stockholders, nor does it supply the specific information to which they are entitled under federal law.  Even limited discovery has revealed the extent to which Politan's disclosures have misstated the facts:

- In the imaginary universe Politan constructed in its securities filings, Politan was just a broadly-focused investor using its general funds to invest in Masimo, with no intent to take control.  But discovery has shown that Politan in fact solicited investors for a "Single Investment" in Masimo, it did not invest in any other company during the relevant period, and its plan from day one was to take control.  Stockholders were entitled to know these facts and the identities of Politan's investors.

- In Politan's fictional world, Koffey was a stalwart fiduciary, selflessly pursuing better corporate governance for the benefit of all stockholders.  But discovery has shown that while he was on notice of pending litigation against Masimo, Koffey secretly used his status as a director to solicit former employees to bad-mouth Masimo about facts relevant to that case—some of whom (coincidentally, according to Politan) ended up as "confidential witnesses" in that pending litigation.

Stockholders are entitled to know how Koffey abused his fiduciary status to benefit himself, disregarding the harm it could cause to Masimo.

- In Politan's alternate reality, Masimo's board gave Kiani unchecked authority to pursue significant transactions with no oversight and to demand self-interested terms, while keeping Koffey and Brennan in the dark. Discovery has shown that Politan's assertions were false, Koffey and Brennan were not denied access to anything, and the key terms were proposed by Koffey. (This part of the discovery process was more challenging because Koffey destroyed his notes of the relevant board meetings.)

Politan asks the Court to ignore these misstatements because Politan has now disclosed Masimo's Complaint, and because *Masimo itself* has taken steps to correct the harm. Those arguments fail: federal law requires *Politan* to tell stockholders the truth. Politan cannot meet its affirmative obligation simply by citing Masimo's efforts and publishing Masimo's pleadings—which Politan has denied, and which do not even contain all the information Politan is required to disclose. Politan cannot avoid its obligations by citing Masimo's own efforts. Politan itself must correct the harm it caused.

## II.    ARGUMENT

### A.    Without an Injunction, Masimo and Its Stockholders Will Suffer Irreparable Harm

*First*, Defendants argue that an uninformed stockholder vote *alone* cannot constitute irreparable harm (Opp. 35), but that is a strawman. The contested election for control of Masimo creates a high likelihood of irreparable harm that cannot be unwound after-the-fact or redressed with damages. Mot. 27-29; *Allergan, Inc. v. Valeant Pharms. Int'l*, 2014 WL 5604539, *16 (C.D. Cal. Nov. 4, 2014) (uninformed stockholder vote is irreparable harm, and prevention through corrective disclosure is preferable to post-vote remedies). Defendants largely ignore Plaintiff's authorities.

Opp. 35 (distinguishing one of ten cited cases).  Defendants' cited authorities have entirely different facts (*Eisner v. Meta Platforms, Inc.*, 2024 WL 3228089, *7 (N.D. Cal. June 28, 2024) (alleged disclosure violations were unactionable and unsubstantiated); *Masters v. Avanir Pharms., Inc.*, 996 F. Supp. 2d 872, 886 (C.D. Cal. 2014) (involving challenge to vote on equity compensation plan which could be "nullified" and "unwound")), or support irreparable harm (*Johnson v. Saba Capital Management*, 2023 WL 1345717, *4 (S.D.N.Y. Jan. 31, 2023) (unwinding transactions—such as those that result in a change of control—based on uninformed vote effectuates irreparable harm)).

        *Second*, Masimo demonstrated specific irreparable harm that Defendants do not dispute would result from a change in control of the Board:

- Politan's nominees, if elected, would remove the founder/CEO, Kiani.  Mot. 29.  And, Masimo's COO and hundreds of Masimo engineers have threatened to leave "if Joe Kiani is replaced by Quentin Koffey and Politan Capital."  Exs. 104; 133.

- Politan's nominees, if elected, are likely to execute a major restructuring, including by separating the Consumer Products Business.  Koffey and Brennan have already delayed a value-maximizing transaction involving that business and stated that Masimo should give it away for nothing.  Ex. 72; Muhsin ¶¶3-4; Reynolds ¶¶11-13; Mot. 28.[1]

## B.    Masimo Is Likely to Succeed on The Merits

### 1.    Politan's Secret Communications With Former Employees, Customers, and Competitors Must Be Disclosed

        Defendants' undisclosed communications with former Masimo employees are worse than previously believed.  Defendants now concede they recruited former Masimo employees to privately speak to them *while Koffey served on the Board*.

---

[1] Defendants' reliance on *Arcturus Therapeutics v. Payne*, 2018 WL 2316790 (S.D. Cal. May 22, 2018), is misplaced.  *Arcturus* found irreparable harm where, like here, "shareholders face[d] a vote on a proxy contest without being informed of the truth behind their choices."  *Id.* *8.

Ex. 140, -3. Defendants admit that one of those former employees (who later became a confidential witness in the Securities Class Action) told Defendants that Masimo had *not engaged in channel stuffing*. *Id*. Yet Politan argued the exact opposite in its proxy materials, quoting another former employee who coincidentally (Defendants say) appeared in the Securities Class Action. Ex. 113, -47.

Defendants downplay the fact that Politan attempted to discredit Masimo's public statements while Masimo is defending those very statements in litigation by calling the interviews "standard investment due diligence." Opp. 15. But Defendants' own documents prove (and common sense supports) that these secret communications were neither "standard" nor "investment due diligence."

**Defendants' Recruiting Was Not "Standard."** Defendants' late-disclosed "expert report" from another serial activist investor (Taxin) declaring that "[s]ome activists even continue their analysis after they achieve board representation." Taxin ¶61. Taxin himself has never served on a public-company board, and even he describes talking to former employees *while on a board* as the exception. The only example he provides—Trian Partners—describes the opposite of what Defendants did here. *Id*. According to Taxin, when activist-investor Trian joins a board, Trian produces "binders of information ... to help the board and management." *Id*. Defendants did none of that, and, to the contrary, Kapito concedes he did not "share the information" he learned from these purported diligence calls "with anyone outside Politan," because he viewed that information as "proprietary investment research." Kapito ¶22. Nor did Koffey tell anyone at Masimo that he was explicitly relying on his status as a board member to access information that would have otherwise violated the investigators' prohibitions (and so would not have been available to him). All of this was done *in secret*, without telling any Masimo director or member of management. Chapek Reply ¶¶6-7; Kiani Reply ¶¶3-5; Reynolds Reply ¶¶5-6.

1    Koffey insists he told CFO Micah Young that Politan "use[s] these consultant

2  networks and so does everyone else."  Opp. 16.  But Young (and Board members)

3  all say Koffey never told them Politan used AlphaSights and Mosaic *after* Koffey

4  joined the Board.  Young Reply ¶¶4-5; Chapek Reply ¶¶6-7; Reynolds Reply ¶¶5-6.

5  Even Koffey ███████████████████████████████████████████

6  ████████████████████████.  Ex. 135, 79:9-83:4.  Of course, Defendants'

7  expert offers no opinion that secretly recruiting former employees to critique the

8  company while serving on the board—much less while the company is defending a

9  securities class action involving the same issues—is standard or appropriate.  *Cf. In*

10  *re STEC Deriv. Action*, 2012 WL 8978155, *4-6 (C.D. Cal. Jan. 11, 2012) (Selna,

11  J.) (granting stay pending securities class action because a "concurrent prosecution

12  of the derivative action" is "likely not in [company]'s best interest").

13    Compounding the omissions, Defendants now concede that their covert

14  outreach did not stop at former employees.  Kapito admits that in 2023, he spoke to

15  *seven* Masimo customers *or* competitors.  Kapito ¶17.  At the same time Politan was

16  recruiting recently departed Company employees, ████████████████████

17  ████████████████████████████████████████████████████

18  ████████████████████████████████████████████████████

19  ████████████████████████████  Ex. 120, -7912.  Secretly

20  communicating with customers, or worse, competitors, is a blatant violation of the

21  fiduciary duties Koffey owed to Masimo stockholders about which stockholders

22  have a right to be informed, and raises other serious legal issues (like antitrust) that

23  Defendants' proxy materials *still* do not address.

24    **Defendants' Recruiting Was Not "Investment Due Diligence."**

25  Defendants argue that they can "moot" their false and misleading statements by now

26  admitting they spoke to a former employee who told them Masimo had not channel

27  stuffed, claiming that such outreach was only "investment due diligence." Opp. 15-

28  17.  But Defendants have not corrected their proxy statements falsely claiming

Masimo *had* engaged in channel stuffing.  Ex. 113, -47.  And Defendants ignore documents (that they produced the night before Plaintiff filed its renewed preliminary injunction brief) that prove Defendants recruited other former employees to dig up dirt on Masimo, not to help with an "investment."  *E.g.*, Exs. 131; 126; 128; 129.

Kapito claims not to have known about the Securities Class Action until Koffey sent him a copy of the amended complaint in February 2024.  Kapito ¶23.  Koffey likewise contends ███████████████████████████ ████████████████████████████████  But Koffey's own documents show ████ ████████████████████████████████████████████████████ ████████████████  One of the challenged statements in that amended complaint involves the separation of former Masimo/Sound United employee ██████ Ex. 122 ¶¶280-281.  Kapito already knew about █████.  Indeed, ████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ██████████████████████████████████████████.  After all, what "diligence" could ██████ provide in April 2024, when he left Masimo almost a year earlier?  Those slide-deck drafts included ████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████.  And sure enough, when Defendants published their proxy materials a few weeks later, they parroted the Securities Class Action's allegations suggesting that Masimo had made false statements about ██████ separation and channel stuffing.  Ex. 113, -66.

Defendants were using AlphaSights and Mosaic not for "standard investment due diligence," but to harvest negative information to weaponize in the proxy contest. Defendants' "mooting" disclosure does not remedy these false and misleading statements—it amplifies them. *See In re PMTS Liquidating Corp.*, 526 B.R. 536, 545 (D. Del. 2014) (director has a duty of disclosure "when he 'is personally engaged in transactions harmful to the corporation, but beneficial to the director.'") (citation omitted).

### 2.    Information Regarding Politan's Investors and Its Longstanding Control Intent Must Be Disclosed

The Opposition is notable for what it does not dispute concerning Politan's violations of Rules 13d-101, 14a-3, and 14a-101. Defendants do not dispute that Politan did not purchase securities *for any other issuer beside Masimo* from at least May 17, 2022, to at least November 14, 2022—during which time Politan acquired 4.6 million shares, constituting approximately 8.8% of Masimo. Ex. 116. Nor do Defendants dispute that Politan fundraised using its "Single Investment" PowerPoint, which pitched Masimo as Politan's sole target, highlighted a "Clear Path to Board Seats," ██████████████████████████, and specifically noted that ██████████████████████. Ex. 4, -1237, -1268, -1272. Indeed, Defendants acknowledge Politan told potential investors that its plans for their investments were to, at a minimum, acquire a large enough stake in Masimo that Politan could ██████████████████ ██████  Opp. 32.

Rules 13d-101, 14a-3, and 14a-101 thus required Politan to disclose additional information, including: (1) the identity of the investors that funded Politan's acquisition of Masimo stock and activist campaigns; (2) a description of Politan's agreements with those investors; and (3) Politan's intention to take control of the Masimo Board. Politan's failure to do so renders its Proxy Materials misleading.

### a.    Politan Must Disclose Its Investors

Schedule 13D Item 3 requires Politan to "***[s]tate the source and the amount of funds*** … used … in making the purchases, and if any part of the purchase price is or will be represented by funds … ***obtained for the purpose of acquiring, holding, trading or voting the securities, a description of the transaction and the names of the parties thereto***." 17 C.F.R. § 240.13d-101, Item 3 (emphasis added).  Politan failed to do so, and must provide the required disclosure to address this glaring omission, which renders its Section 14(a) proxy solicitation materials misleading.

Politan's only response is that it ███████████████████████████ ████████████████████████████████████████████████████ ████████████████    Opp. 34.  In other words, Politan points to itself as the source of the funds, without providing "the names of the parties" that provided funds "for the purpose of acquiring" Masimo stock.

Schedule 13D prohibits such circular reasoning.  Indeed, what Politan argues is precisely what the defendant argued in *Victory Markets, Inc. v. Nelson*, where the defendant pointed to "personal funds and personal borrowings."  1982 WL 2278, *3 (N.D.N.Y. Mar. 26, 1982).  The court held that such disclosure was insufficient, and required defendants to disclose the specific "terms of funding or financing," including the "names of the parties involved."  *Id.* *5.  It held that concealing "the true source of funds used to purchase the Smith stock … subverts one of the Williams Act's purposes: 'to require full and fair disclosure for the benefit of investors.'"  *Id.* (citation omitted).  Thus, when an entity pools investors' resources for the purpose of investing in an issuer—as the "Politan Funds" did here—it is insufficient for that entity to point to itself as the "source" instead of disclosing the "names of the parties" to the "transactions" giving rise to its possession of the funds it used to purchase the securities.  17 C.F.R. § 240.13d-101, Item 3.  Rather, that entity must disclose the identity of the underlying investors on Schedule 13D Item 3.  *Id.*

1        Similarly, Rule 13d-101, Item 6 requires disclosure of those contracts or

2 understandings, including "naming the persons with whom such contracts . . . have

3 been entered into." 17 C.F.R. § 240.13d-101, Item 6. In its 13D filings, Politan

4 represented that, besides certain stock swaps, it had "no contracts, arrangements,

5 understandings or relationships (legal or otherwise) with respect to any securities of"

6 Masimo. Ex. 7, -8. But it defies logic—and contradicts Politan's June 2022 deck—

7 to imagine that Politan's investors would provide hundreds of millions of dollars to

8 a new activist fund without knowing how that capital would be deployed. Politan

9 must disclose those arrangements.

10        Politan has violated *a separate* obligation to disclose its investors: Item

11 5(b)(1) of Rule 14a-101 requires Politan to identify "each participant" in its proxy

12 solicitation, where a "participant" is defined to include anyone who "finance[d] . . .

13 the solicitation of proxies." 17 C.F.R. § 240.14a-101, Items 4 and 5. The funds

14 Politan raised were not just for the purchase of Masimo securities, but also for

15 Politan's forthcoming proxy contests against the incumbent Masimo directors.

16 Indeed, the deck Politan used to fundraise specifically discussed 2023 and 2024

17 Masimo board elections, ███████████████████████████████████

18 ███████ Ex. 4, -1272, -1275. And Defendants concede ████████████

19 ██████████████████████████████ Opp. 32. Yet, in violation of

20 Item 5 of Rule 14a-3, Politan failed to disclose the identity of the investors that

21 funded these efforts. 17 C.F.R. § 240.14a-3 (requiring certain information to be

22 furnished before a proxy solicitation).

23        Finally, Defendants deny any obligation to disclose the investors who funded

24 Politan's purchase of Masimo securities and proxy fights by arguing that Masimo

25 was "criticized" for pursuing this same information during the Delaware Bylaw

26 litigation. Opp. 34. Leaving aside that the "criticism" was from a third-party amicus

27 brief, that litigation was focused on the validity of Masimo's bylaws—not Politan's

28

1   disclosure violations at issue here.  The SEC rules require Politan to disclose the
2   identity of the investors that gave it funds to pursue its "Single Investment" strategy.

3              **b.      Politan Must Disclose It Sought Control From Outset**

4              Politan also violated Item 4 of Schedule 13D, which required Politan to reveal
5   its intent in connection with its rapid accumulation of Masimo securities.  17 C.F.R.
6   § 240.13d-101, Item 4.  Defendants argue Politan's Item 4 disclosure was sufficient
7   because it stated that Politan intended to "discuss" "the composition" of the Board,
8   and Koffey's self-serving deposition testimony ███████████████████████████
9   ████████████████  Opp. 32-33.  But none of that can be squared with what limited
10  discovery[2] has revealed, which includes the 47-page June 2022 slide deck that
11  Politan showed to investors that demonstrated its intention to take control of
12  Masimo, and that Politan solicited funds specifically to purchase—and did
13  purchase—*only Masimo securities* between at least May and November 2022.  *See*
14  Ex. 4 at -1268, -1272.  Politan filed its Schedule 13D in August 2022, directly in the
15  middle of its Masimo buying spree.

16             Defendants argue the June 2022 presentation does not expressly ████████
17  ██████████████████████████████████████████████████████████████████████
18  ██████████████████████████████████  Opp. 32.  What Defendants
19  ignore is that ████████████████████████████████████████████████████████
20  ████████████████████—which would result in the ***replacement of four out of five***
21  ***Masimo directors***, giving Politan total control after the 2024 vote.  The next
22  substantive slide details ████████████████████████████████  *Id.* -

---

24  [2] In two separate orders, the Court ordered Defendants to produce documents
25  regarding Politan's initial investment thesis, plans, and strategy for its Masimo
    investment.  Dkt. 13, 32; Dkt. 32; Dkt. 58.  Defendants refused to do so.  At an
26  August 16, 2024 hearing regarding this discovery dispute, Defendants' counsel
    represented ████████████████████████████████████████
27  ████████████████████████████ Ex. 136, -24.  Defendants finally
    produced the Single Investment presentation—a "PowerPoint presentation"—two
28  days later.  Defendants still have not produced a single email related to that
    presentation.

1275.  The only logical inference from the deck is that Politan determined to pursue a two-year campaign for control of Masimo.   Politan's contention that the presentation lacks the magic words that it intended to "take control" is beside the point.  *See SEC v. Teo*, 746 F.3d 90, 100 (3d Cir. 2014) ("conversations" defendant had "about his intention to become a Board member" is "sufficient evidence" that defendant had "decided upon or intended a course of action").

### c.  Politan's Material Omissions Require Correction

In a final effort to avoid its disclosure obligations under the SEC rules, Defendants argue that Masimo's Section 13(d) claim is "[i]rrelevant" because "Masimo does not seek injunctive relief on" that claim.  Opp. 32.  That is inaccurate. Plaintiff's Supplemental Brief discussed three Section 13(d) violations and explained how omitting the information required to be disclosed under SEC rules caused the Politan Proxy Materials to be materially misleading in violation of Section 14(a).   *See* Mot. 18-20.   Defendants do not dispute that material misrepresentations and omissions otherwise required by 13(d) can serve as the basis for a Section 14(a) claim based on false statements and material omissions, as here. Mot. 18-19; *Allergan*, 2014 WL 5604539, at *14-15 (granting preliminary injunction for violation of Section 14(a) based on defendant's failure to disclose information required by Rule 13(e)).

### 3.  Politan Must Correct Misstatements Regarding the Spin-off Process

**Kiani's Purported "Demands" for Self-Interested Spin-Off Terms**. Politan lied about the origin of the spin-off terms to paint Kiani as the one who tanked the transaction—and to further Defendants' narrative about Kiani being self-interested.  Ex. 86, -9.  Defendants defend their statements by arguing that Kiani "proposed the spin-off" (Opp. 17), but who proposed the idea of a spin off in the first place is a red herring.  The terms Politan couches as Kiani "demands"—Kiani's control of SpinCo and preservation of his existing Employment Agreement—are

terms on which Koffey was aligned. Ex. 121. The weight of the evidence establishes that it was *Koffey* who proposed these terms. Exs. 92, 124:2-13; 54, -8486 (January 30 term sheet stating, "Joe to get either high vote stock or 50+% of NewMasimo" and "Special Payment not forfeited and instead triggered by above"); *see* Reynolds ¶¶4-6. The evidence from three witnesses confirms that Koffey himself described these two terms *as agreed*—and only later added a self-serving footnote to board minutes documenting the topic to manufacture a disagreement. Exs. 92, 122:10-123:5, 124:6-8; 86, -9 (falsely claiming that Koffey told Kiani as a single director he could not agree to the terms); 42; McClenahan ¶11; Reynolds ¶6; Chapek ¶8.[3]

Koffey's testimony and his destruction of the relevant electronic information are further evidence that his version of these events is not reliable. ███████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

███████████████████████████████████. This story turned out to be false: Koffey's counsel later admitted that Koffey had sent the term sheet to his lawyer for review on January 30 "as an attachment to a privileged email"; and after receiving "feedback" from that lawyer, Koffey revised the document before he presented it to Kiani. Ex. 139. Such inconsistencies are enough to infer that Koffey destroyed the information because he knew it conflicted with his narrative.[4]

The spin-off failed not because *Kiani* made self-interested demands, but because a majority of the Board recognized that Koffey had no intention of negotiating in good faith to create a viable SpinCo. ████████████████

---

[3] ████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████

[4] At a minimum, the versions Koffey exchanged with Richard Brand on January 29 or 30—which are not subject to any credible claim of privilege—should be produced. *See* Exs. 138, 264:18-265:15; 139 (confirming exchange of term sheet).

███████████████████████████████████████████████████████

██████████████████████████████████ Koffey's intention was to offload all of Masimo's liabilities onto SpinCo., while depriving it of intellectual property and cash—an untenable proposition. Ex. 92, 181:25-182:15. Defendants' claim that it was Kiani who insisted on controlling SpinCo is demonstrably false. Ex. 92, 184:16-24. Yet Politan continued to represent that *Kiani* demanded these terms and cratered a deal for selfish reasons. Ex. 86, -9-10 (falsely describing the agreed upon terms as Kiani's "demands," for example, "Mr. Kiani's demands at this stage included…supermajority voting stock that would confer majority voting control to Mr. Kiani, granted to him without additional consideration"). The collective impact of these lies has been precisely what Politan and Koffey had hoped—ISS and Glass Lewis parroted a nearly identical false narrative. Exs. 111, -17-18; 112, -33-34.

**Pretextual Manipulation of the Committee Process.** Defendants' statement that the Special Committee "unanimously" approved the revised term sheet in March is likewise misleading. Opp. 21. Koffey secured the Committee's agreement to send the term sheet by withholding information from them, hijacking the process to serve his own agenda, and falsely misrepresenting that the agreement aligned with his prior discussions with Kiani. Mot. 11-12 (Exs. 51; 88; Reynolds ¶¶9-11). Koffey accomplished this deception by taking control of the advisor interactions—a point Defendants do not dispute—and misleading other Committee members (including Brennan) about the substance of prior discussions with Kiani and the ongoing Committee process.

*First,* Defendants are wrong that Plaintiff's evidence is comprised of "only [] Kiani's testimony." Opp. 17. Plaintiff cited testimony and documents from multiple witnesses. ███████████████████████████████████████████████████████

██████████████████████████████████████ Exs. 40; 92, 53:1-4, 57:4-9, 173:8-17; 93; Reynolds ¶11. Defendants offer no serious reason to discredit the testimony of Reynolds, a highly qualified independent director. Reynolds ¶¶1-3.

1    *Second*, Defendants' assertion ██████████████████████████

2    ██████████████████████████████████████████—an entirely new

3    explanation for his exclusion of other Committee members contradicted by Koffey's

4    testimony—is wrong and beside the point.  Politan's proxy disclosures imply that

5    Kiani rejected terms the Committee unanimously developed.  The facts show

6    otherwise.  Koffey alone provided strategic direction to the Committee's advisors to

7    advance his interests, routinely excluding other Committee members from the

8    conversation.  Exs. 39; 46; 49; 51; 82. ██████████████████████

9    ████████████████████████████████████████████████████

10   █████████████████████████████████ This backdrop makes

11   Defendants' concession that Koffey never shared earlier term sheets with the other

12   Committee members (Opp. 20) all the more critical:  that he shared the documents

13   with advisers he hand-picked and kept siloed does not excuse keeping the Committee

14   in the dark.  Koffey's touting of the "unanimous" approval of a Committee he

15   manipulated is misleading.

16           **4.**      **Politan Must Correct Misstatements Regarding the Joint**

17                    **Venture**

18       Masimo's motion highlighted four false statements about the potential JV.

19   Mot. 21-22.  In response, Defendants admitted the falsity of one of those statements:

20   the receipt of the identity of the potential JV partner prior to May 16.  Mot. 22; Opp.

21   24.  The remaining three statements are equally misleading.

22       *First*, Politan claims that Masimo "refused to disclose" ████████████ until

23   Koffey made his Section 220 demand on May 8.  Opp. 22; Ex. 80.  But (1) Kiani did

24   not refuse to provide these details, even after Koffey and Brennan refused to sign

25   the NDA and (2) Koffey and Brennan were already set to receive the identity at the

26   next Board meeting.  Mot. 13-14; 21-22.

27       Indeed, it remains undisputed that ████ "was concerned that Mr. Koffey and

28   Ms. Brennan would disclose ████████ publicly in order to stifle the potential

1  transaction in advance of Masimo's stockholder meeting, and ▮▮▮ asked us to take

2  steps to ensure the confidentiality of our negotiations and ▮▮▮▮▮▮▮" Muhsin

3  ¶4; *see also* Ex. 77, -1223 (Kiani asking board to sign NDA because "the JV Partner

4  is very concerned about its identity being disclosed…"); ▮▮▮▮▮▮▮▮

5  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

6      *Second*, Politan stated that Kiani intended to be chairman of a separated entity.

7  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

8  ▮▮▮▮▮▮▮▮. Defendants ignore this uncontroverted evidence, citing

9  to documents either pre-dating the term sheet, which have no substance, or which

10  relate to Kiani's position in the spin-off rather than the JV.  Opp. 24.

11      *Third*, Politan contends Kiani signed the joint venture term sheet without

12  providing "any information to the Board." Opp. 23.  The evidence is to the contrary.

13  On April 30, ▮▮▮▮▮▮▮▮▮▮▮▮

14  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

15  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

16  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

17  ▮▮▮▮  Only thereafter was the non-binding term sheet signed on May 7.  Ex.

18  80, -9347.  Unable to dispute this evidence, Defendants point to the April 30 Board

19  Book, claiming ▮▮▮▮▮▮▮▮▮▮

20  ▮▮▮▮▮▮▮▮▮▮▮▮  But the minutes and materials from

21  that meeting unequivocally demonstrate the Board's receipt of details of the

22  Potential JV on April 30.  Exs. 73, -3019; 70, -6638, -6640, -6646.

### 5.      Politan Must Correct Its Misstatements Regarding Onboarding

25      Defendants' arguments regarding onboarding, the budget, and their refusal to

26  sign the 10-K are outrageous mischaracterizations of Politan's statements.

27  Defendants have misrepresented that Masimo's onboarding issues and information

28  flow to the Board are so deficient as to reflect a corporate governance crisis.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW

Defendants' arguments are so deficient that, as board novices, they had to hire an expert (himself with no public board experience) to make their case. Defendants statements are false. *See, e.g.*, Ex. 142 (quoting email from Classon thanking Kiani for "outstanding onboarding session" and being "so generous with [his] time"); Chapek ¶6.

**a.    The Politan Directors' Refusal to Sign the 10-K and Conflicted S&C Consultation Were Pretextual**

While the Politan Directors assert they did not sign the 10-K because they believed they "did not receive sufficient information to be able to approve the financials consistent with their fiduciary duties," Opp. 27, they do not even attempt to rebut sworn testimony proving otherwise. Chapek testified that Koffey did not sign because Koffey's lawyers advised him "it would not look good if he had criticized the lack of information he had received and then signed the Form 10-K." Chapek ¶11. As for Brennan, Defendants do not rebut undisputed evidence that her purported concerns were addressed (Mikkelson ¶3; McClenahan ¶9), the financial statements received a clean audit, and she did not mention any issues with the financial statements in her letter to stockholders yet refused to sign anyway. Ex. 93, 62:20–63:14, 68:13–20.

Koffey and Brennan's advice-of-counsel "defense" based on their personal consultation with Sullivan & Cromwell ("S&C") (Opp. 19, 28) falls apart under basic scrutiny. █████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ███████████████████████████████████████ (based on Koffey's lie that he did not receive sufficient information)[5]—with no rigorous attempt to understand the

---

[5] *E.g.*, Ex. 124, -13578 (Koffey manipulating S&C by sharing incomplete and misleading information regarding information he requested and received).

1  facts, or apply serious standards that took into account the Board members' basic

2  obligations and responsibilities.

3      Even setting aside the cursory nature of the request for advice, the Politan

4  Directors knew S&C was indisputably conflicted; it had no business advising Board

5  members in their individual capacities adverse to Masimo while representing a board

6  special committee, without proper disclosure or waivers, which the Politan Directors

7  deliberately did not obtain.  Not only were Defendants obligated to disclose to the

8  Board (and obtain consent for) their conflicted relationship with S&C, but their

9  failure to disclose it to stockholders is a material omission.  *See City of Dearborn*

10 *Police & Fire Revised Ret. Sys. v. Brookfield Asset Mgmt. Inc.*, 314 A.3d 1108, 1134

11 (Del. 2024) (special committee's counsel prior and concurrent work for transaction

12 counterparty "were material facts for stockholders that required disclosure" in proxy

13 materials).

14          **b.     The Larcker Report Holds No Weight**

15     Defendants improperly rely on a late-disclosed expert report from David

16 Larcker, an individual with zero background on Masimo ***who has never served on***

17 ***a board of a public company***.  Defendants themselves have extremely limited

18 experience serving on public company boards (Koffey had none; Brennan served for

19 a limited time on two prior boards). Mot. 6; Exs. 137, 10:16-12:2; 94, 97:4–5. They

20 had no basis from their own experience to declare that their onboarding was so

21 deficient as to demonstrate broken corporate governance.  That they hired an expert

22 who also has no public company board experience is telling.[6]

23  _____

24 [6] The majority of statements Defendants contend are opinions subject to *Omnicare*
   are not.  As to the small subset of statements that are qualified as beliefs, opinion
25 statements like these are actionable when they "convey facts about the speaker's
   basis for holding that view."  *Omnicare, Inc. v. Laborers Dist. Council Constr.*
26 *Indus. Pension Fund*, 575 U.S. 175, 176 (2015).  The onboarding statements are
   actionable because they falsely suggest a basis in fact where there is none. Opp. 24–
27 25.  Masimo's management went above and beyond to respond to Koffey and
   Brennan's excessive requests. McClenahan ¶¶ 3–4; Exs. 12-13 (sharing voluminous
28 materials on request); 35,-7070; 24,-7102; 34; 125, -8834-38 (listing more than 150
   documents provided to Brennan and Koffey).

### c.    The Politan Directors Received Full Financials

Defendants' attempt to invent a budget issue has been exposed as a lie. Defendants claim they received in October 2023 a ███████████████████ ████████████████████████████████████████████ Opp. 26. Defendants fail to tell the Court (and apparently their own expert) that in addition to ████████████████████████████████████████████████ ████████████████████████████████████████████████ ███████████████████████████████████████ Accordingly, Larcker's opinions on "Budget Planning and Review" are false and unreliable. Koffey and Brennan, in fact, were provided a "disaggregated breakdown of costs" and other financial information that Larcker opines constitutes the "hallmark of a budget." Opp. 26 (Larcker ¶¶57-64).

Defendants also claim that the operating plan presented at the February 13, 2024 Board meeting contained █████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ██████████████████████████ This too is false according to the evidence. Ex. 123, -2263-64. Defendants claim they were ███████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████ The Board members with decades of board experience were satisfied with that information. *See, e.g.,* Ex. 95, 67:15-21; Young Reply ¶3.

### 6.    Politan Must Correct Misstatements Regarding the Sale Process

Politan asserted in its Proxy Materials that the Board delegated "authority to [] Kiani" to "carry out a sale of the entire company without any obligation to provide process updates to the Board." Ex. 85, -6. Politan then asserted that it was left in the dark about the process until October 2023, and then "Kiani told the full Board"

in January 2024 "that he was unable to find a deal on what he considered to be satisfactory terms." *Id.* The implication of Politan's statements is apparent: that Kiani was given carte blanche to run a sale process, and did not find any transaction that he considered to be on "satisfactory terms." That fanciful story is contradicted by the evidence. The Global Head of M&A at Morgan Stanley affirmed that he updated Koffey and Brennan on the strategic alternative review process during an August 1, 2023 zoom meeting. Collins ¶2. In response, Politan had no choice but to file a supplemental proxy *conceding* that its prior statement that Koffey and Brennan did not receive a substantive update until October 2023 was false. Ex. 140; Opp. 28-29.

But Politan has not corrected two other false statements. First, Politan stated Kiani had authority to "carry out a sale without any obligation to" update the Board (Ex. 85, -6), but the Board minutes reflect no such thing and instead delegate to management the duty to ███████████████████████████████████████ ████████████████████████████████████████████ ██████ Ex. 9, -995. Second, Politan stated "Kiani told the full Board that he was unable to find a deal on what he considered to be satisfactory terms." Ex. 85, -6. In reality, *no deal* was available. There *is* a material difference between "not receiving an offer," and not "find[ing] a deal on what [Kiani] considered to be satisfactory terms," a misleading statement which leads investors to believe Kiani received offers and unilaterally determined they were not satisfactory. Opp. 29; Ex. 85, -6.

### 7.    Politan's Supplemental Disclosures Do Not Moot Plaintiff's Section 14(a) Claim

Politan argues that by filing Masimo's complaints and claiming that Defendants "den[y] all allegations," it has mooted Plaintiff's claims. Opp. 14; Exs. 140, -2; 141, -2. But a statement that Defendants "vigorously den[y]" Plaintiff's allegations does not moot Plaintiff's claims. *Arvin Indus. v. Wanandi*, 722 F. Supp. 532, 540–41 (S.D. Ind. 1989) ("informing the public of the existence of the dispute

1  is not enough to make the case nonjusticiable"); *Liberty National Ins. Holding v.*

2  *Charter Co.* 734 F.2d 545, 560 (11th Cir. 1984) (same).  Indeed, where, as here, a

3  plaintiff seeks more than just an accurate 13D statement "a concrete controversy still

4  remains."  *Id.* n.31; *see also Dan River, Inc. v. Unitex, Ltd.*, 624 F.2d 1216, 1228

5  (4th Cir.1980) (refusing to dismiss without discovery on issue of completeness of

6  13D filing).

7         Defendants fail to acknowledge this authority and cite *none* holding that

8  issuing a supplemental proxy appending a complaint moots a Section 14(a) claim,

9  perhaps because that makes no sense.  Merely denying Plaintiff's allegations,

10  without disclosing the truth or correcting the factual misstatements, does not ensure

11  an informed stockholder vote.  To hold otherwise would nullify Section 14(a) in the

12  context of a proxy contest as parties would have no obligation to disclose actual

13  facts.  *See Warner Commc'ns, Inc. v. Murdoch*, 581 F. Supp. 1482, 1501 (D. Del.

14  1984) ("fact[s] must be disclosed, not the possibility of the fact[s]"); *Allergan*, 2014

15  WL 5604539, *15 (requiring disclosure of potential liability *and* the factual basis for

16  their statements to ensure an informed vote).

17         **C.    Defendants Concede the Proxy Materials Are an "Essential Link"**

18         Defendants do not dispute that if Masimo shows a likelihood of success on

19  the merits, Masimo also satisfies transaction causation because Politan's proxy

20  solicitation is an "essential link" to achieving the election of its slate.  Opp. 12-13

21  (conceding "essential link" is an element of Section 14(a) and failing to oppose it);

22  *Hartranft v. Encore Cap. Grp.*, 543 F. Supp. 3d 893, 913-14 (S.D. Cal. 2021)

23  (arguments unaddressed by non-moving party in opposition are waived).

24         **D.    Defendants Do Not Rebut Masimo's Negligence Showing**

25         Politan is wrong that Masimo simply "recites" the negligence standard and

26  describes it without pointing to evidence.  Opp. 31.  Extensive evidence supports

27  that Politan was negligent in its Proxy Materials.  Mot. 9-12, 20-23 (demonstrating

28  Koffey negligently described, or intentionally misrepresented, the proposed spin-off

and his onboarding); Ex. 51, -2847 (confirming Koffey's statement to the Special Committee was to "have as little clarity upfront as possible" to get the Special Committee "closer to evaluating other options"); Ex. 132.  There can be no serious dispute that Politan failed to exercise "reasonable prudence" and that Masimo easily satisfies the negligence standard under federal securities laws.  *See SEC v. Prakash*, 2024 WL 781037, \*5 (N.D. Cal. Feb. 26, 2024).

### E.    An Injunction Would Serve the Public Interest

Defendants' myopic view that this Court "should let [shareholders] vote" because it was "supposed to happen two months ago" should be rejected.  Opp. at 36.  The touchstone of securities laws is ensuring a fully informed stockholder vote, not that potentially uninformed votes happen expeditiously.  *See, e.g.*, *Allergan*, 2014 WL 5604539, at \*16 (informed shareholder vote serves the public interest). An injunction here serves the public interest by "preventing uninformed shareholder vote" and maintaining the integrity of corporate governance.  *See, e.g.*, *Taseko Mines Ltd. v. Raging River Cap.*, 185 F. Supp. 3d 87, 94 (D.D.C. 2016) (recognizing "effective enforcement" of securities laws); *Bender v. Jordan*, 439 F. Supp. 2d 139, 178 (D.D.C. 2006) (same); *Lone Star Steakhouse & Saloon v. Adams*, 148 F. Supp. 2d 1141, 1150 (D. Kan. 2001) (public interest is served by the truth).

### F.    The Balance of Equities Strongly Favors Injunctive Relief

Defendants offer no compelling response to Masimo's cited cases confirming that the balance of equities favors Masimo: Masimo faces the threat of irreparable harm resulting from a potential change in control of the Board whereas Defendants face comparably little harm by being forced to correct their misleading disclosures so stockholders can cast an informed vote.  Instead, Defendants dodge this point by repeating their unsubstantiated claim that Masimo conspired to engage in "empty voting."  Opp. 36.  But, in fact, Masimo moved its record date and annual meeting at Politan's request, and in accordance with an interpretation of SEC Rule 14a-13

1  endorsed by the Delaware Chancery Court.  Ex. 134, -39 ("I do read the rule the way

2  the [Masimo] defendants do ...").

3      Defendants argue that issuing corrective disclosures *would* harm them

4  because a preliminary injunction could be viewed as an adjudication of wrongdoing.

5  This argument is entirely circular.  Defendants can't make false statements and then

6  cry foul when Masimo attempts to adjudicate them.  Mot. 29 (citing *Lone Star*, 148

7  F. Supp. 2d at 1150; *Allergan*, 2014 WL 5604539, *16 (same)).

8  **III.    CONCLUSION**

9      The Court should issue an order preliminary enjoining Defendants from

10 voting any proxies solicited by them until corrective disclosures are made.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1   Dated: September 4, 2024                    Respectfully submitted,

2                                               LATHAM & WATKINS LLP

3

4                                               By /s/Michele D. Johnson

5                                                   Michele D. Johnson (SBN 198298)
                                                    Kristin N. Murphy (SBN 268385)
6                                                   Jordan D. Cook (SBN 293394)
                                                    650 Town Center Drive, 20th Floor
7                                                   Costa Mesa, CA 92626
                                                    T: (714) 540-1235
8                                                   F: (714) 755-8290
                                                    michele.johnson@lw.com
9                                                   kristin.murphy@lw.com
                                                    jordan.cook@lw.com

10                                                  Colleen C. Smith (SBN 231216)
                                                    12670 High Bluff Drive
11                                                  San Diego, California 92130
                                                    T: (858) 523-5400
12                                                  F: (858) 523-5450
                                                    colleen.smith@lw.com

13
                                                    Matthew Rawlinson (SBN 231890)
14                                                  140 Scott Drive
                                                    Menlo Park, CA 94025
15                                                  T: (650) 328-4600
                                                    F: (650) 463-2600
16                                                  matt.rawlinson@lw.com

17                                                  Robert J. Ellison (SBN 274374)
                                                    10250 Constellation Blvd., Suite 1100
18                                                  Los Angeles, CA 90071
                                                    T: (213) 485-1234
19                                                  F: (213) 891-8763
                                                    robert.ellison@lw.com

20
                                                    Kathryn George (*Pro Hac Vice*)
21                                                  330 N. Wabash Ave., Suite 2800
                                                    Chicago, IL 60611
22                                                  T: (312) 876-7700
                                                    F: (312) 993-9767
23                                                  katie.george@lw.com

24                                                  *Attorneys for Plaintiff Masimo Corporation*

25

26

27

28

1

## **CERTIFICATE OF COMPLIANCE**

2          The undersigned, counsel of record for Masimo Corporation, certifies that

3   this brief contains 6997 words, which complies with the word limit of L.R. 11-6.1.

4

5   Dated:  September 4, 2024                          /s/ *Michele D. Johnson*

6                                                              Michele D. Johnson

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28