1  LATHAM & WATKINS LLP
   Michele D. Johnson (Bar No. 198298)
2  Jordan D. Cook (Bar No. 293394)
   650 Town Center Drive, 20th Floor
3  Costa Mesa, CA 92626-1925
   T: (714) 540-1235 / F: (714) 755-8290
4  michele.johnson@lw.com
   jordan.cook@lw.com
5
   Colleen C. Smith (Bar No. 231216)
6  12670 High Bluff Drive
   San Diego, California 92130
7  T: (858) 523-5400 / F: (858) 523-5450
   colleen.smith@lw.com
8
   *Attorneys for Plaintiff Masimo Corporation*
9
   [Additional Counsel Listed on Signature
10 Page]

11
12          **UNITED STATES DISTRICT COURT**

13          **CENTRAL DISTRICT OF CALIFORNIA**

14
15 MASIMO CORPORATION                    Civil Action No. 8:24-cv-01568-JVS-JDE

16              Plaintiff,               **PLAINTIFF'S SUPPLEMENTED**
                                         **MEMORANDUM OF POINTS &**
16              v.                       **AUTHORITIES IN SUPPORT OF**
                                         **MOTION FOR PRELIMINARY**
17                                       **INJUNCTION**
   POLITAN CAPITAL
18 MANAGEMENT LP, POLITAN
   CAPITAL MANAGEMENT GP LLC,
19 POLITAN CAPITAL PARTNERS GP
   LLC, POLITAN CAPITAL NY LLC,         Hearing Date:    September 9, 2024
20 POLITAN INTERMEDIATE LTD.,           Time:            1:30 PM
   POLITAN CAPITAL PARTNERS             Courtroom:       10C
21 MASTER FUND LP, POLITAN              Honorable James V. Selna
   CAPITAL PARTNERS LP, POLITAN
22 CAPITAL OFFSHORE PARTNERS            **REDACTED VERSION OF**
   LP, QUENTIN KOFFEY, MICHELLE         **DOCUMENT FILED UNDER SEAL**
23 BRENNAN, MATTHEW HALL,
   AARON KAPITO, WILLIAM
24 JELLISON, DARLENE SOLOMON,

25              Defendant(s).

26
27
28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## CONTENTS

I.      INTRODUCTION ................................................................................III

II.     STATEMENT OF FACTS ................................................................2

   A.   Kiani Founds Masimo In His Garage 35 Years Ago ...........................2

   B.   Self-Described "Veteran Activist" Koffey Launches
        Hedge Fund And Immediately Targets Masimo .................................2

   C.   Koffey Arrives On Board With No Intent To Work
        Constructively ...................................................................................4

        1.   Koffey And Politan Recruit Former Masimo
             Employees, Some Of Whom Later Appear As
             "Confidential Witnesses" Against Masimo.............................4

        2.   Masimo Extensively Onboards Koffey And
             Brennan....................................................................................6

        3.   The Company Presents FY 2024 Budget To The
             Board.........................................................................................8

        4.   Koffey And Brennan Refuse To Sign 10-K .............................8

        5.   Koffey Manipulates Plans For A Potential Spin-
             Off.............................................................................................9

        6.   Masimo Considers Other Avenues To Increase
             Stockholder Value ................................................................12

        7.   Koffey And Politan Rush To Block Separation Of
             Consumer Business Ahead Of Stockholder
             Meeting ..................................................................................13

   D.   Masimo's Stockholders Will Decide The Future Of The
        Company on September 19, 2024.....................................................15

III.    ARGUMENT ..................................................................................15

   A.   Masimo Is Likely To Succeed On The Merits..................................15

        1.   The Politan Proxy Materials Are False And
             Misleading .............................................................................16

        2.   The Politan Proxy Materials Caused Masimo's
             Injury And Are An "Essential Link" To The
             Election Of The Politan Slate ................................................25

        3.   Defendants Acted with at Least Negligence ..........................26

   B.   Masimo And Its Stockholders Will Suffer Irreparable
        Harm Absent A Preliminary Injunction.............................................27

| | C. | The Balance Of Equities Favors Masimo | 29 |
| | D. | A Preliminary Injunction Serves The Public Interest | 30 |
| | E. | No Security Should Be Required For The Preliminary Injunction | 30 |
| IV. | | CONCLUSION | 30 |

LATHAM&WATKINS LLP
ATTORNEYS AT LAW

CIVIL ACTION NO. 8:24-cv-01568-JVS-JDE
PLAINTIFF'S SUPP. MEMO IN SUPPORT OF
MOTION FOR PRELIMINARY INJUNCTION

## TABLE OF AUTHORITIES

**Page(s)**

### CASES

*Allergan, Inc. v. Valeant Pharms. Int'l, Inc.*,
    2014 WL 5604539 (C.D. Cal. Nov. 4, 2014) .................................. 16, 27, 29, 30

*Arcturus Therapeutics Ltd. v. Payne*,
    2018 WL 2316790 (S.D. Cal. May 22, 2018) .................................... 27

*Ariz. Dream Act Coal. v. Brewer*,
    757 F.3d 1053 (9th Cir. 2014) ...................................................... 27

*Beck v. Dobrowski*,
    559 F.3d 680 (7th Cir. 2009) (Posner, J.) ...................................... 26

*Bender v. Jordan*,
    439 F. Supp. 2d 139 (D.D.C. July 21, 2006) .................................. 28

*Caribbean Marine Servs. Co. v. Baldrige*,
    844 F.2d 668 (9th Cir. 1988) ........................................................ 27

*Conn. Gen. Life Ins. v. New Images of Beverly Hills*,
    321 F.3d 878 (9th Cir. 2003) ........................................................ 30

*Diaz v. Brewer*,
    656 F.3d 1008 (9th Cir. 2011) ...................................................... 30

*Enzo Biochem, Inc. v. Harbert Discovery Fund, LP*,
    2021 WL 4443258 (S.D.N.Y. Sept. 27, 2021) ............................ 25, 26

*Himmelberger v. Kiani*,
    No. 24-cv-00868 (S.D. Cal. May 16, 2024), Dkt. 1 ........................ 6

*In re Maxim Integrated Prods., Inc., Deriv. Litig.*,
    574 F. Supp. 2d 1046 (N.D. Cal. 2008) ........................................ 26

*Lone Star Steakhouse & Saloon, Inc. v. Adams*,
    148 F. Supp. 2d 1141 (D. Kan. 2001) ...................................... 29, 30

*Mason-Dixon Bancshares, Inc. v. Anthony Invs., Inc.*,
    1997 U.S. Dist. LEXIS 23638 (D. Md. Feb. 28, 1997) .................... 19

LATHAM&WATKINS LLP
ATTORNEYS AT LAW

iii

CIVIL ACTION NO. 8:24-cv-01568-JVS-JDE
PLAINTIFF'S SUPP. MEMO IN SUPPORT OF
MOTION FOR PRELIMINARY INJUNCTION

*Mills v. Elec. Auto-Lite Co.*,
   396 U.S. 375 (1970) ....................................................................................... 15

*Mind Med. (MindMed) Inc. v. Freeman*,
   2024 WL 729260 (S.D.N.Y. Feb. 22, 2024) ................................................... 16

*MONY Grp., Inc. v. Highfields Cap. Mgmt., L.P.*,
   368 F.3d 138 (2d Cir. 2004) .......................................................................... 28

*Pension Fund v. Haley*,
   235 A.3d 702 (Del. 2020) .............................................................................. 24

*Piper v. Christ–Craft Indus.*,
   430 U.S. 1 (1977) ..................................................................................... 2, 27

*Ret. Sys. v. Jobs*,
   593 F.3d 1018 (9th Cir. 2010), *overruled on other grounds by*
   *Lacey v. Maricopa County*, 693 F.3d 896 (9th Cir. 2012) ............................. 15

*SEC v. Dain Rauscher, Inc.*,
   254 F.3d 852 (9th Cir. 2001) ........................................................................ 26

*St. Louis Police Ret. Sys. v. Severson*,
   2012 WL 5270125 (N.D. Cal. Oct. 23, 2012) ................................................ 27

*Taseko Mines Ltd. v. Raging River Cap.*,
   185 F. Supp. 3d 87 (D.D.C. 2016) ............................................................ 27, 30

*True N. Commcn's Inc. v. Publicis S.A.*,
   711 A.2d 34 (Del. Ch. 1997), *aff'd*, 705 A.2d 244 (Del. 1997) ...................... 28

*Va. Bankshares, Inc. v. Sandberg*,
   501 U.S. 1083 (1991) .................................................................................... 25

*Vazquez v. Masimo Corp.*,
   No. 23-cv-01546-L-DEB (S.D. Cal. Aug. 22, 2023) ......................................... 4

*Winter v. Nat. Res. Def. Council*,
   555 U.S. 7 (2008) ................................................................... 15, 27, 29, 30

**STATUTES**

Securities Exchange Act § 13(d) ............................................................................. 18

# RULES

Fed. R. Civ. Proc. 65(c) .................................................................................... 30

# REGULATIONS

17 C.F.R.
    § 240.13d-101 ........................................................................... 18, 19, 20
    § 240.14a-9 ................................................................................ 15, 26, 30

LATHAM&WATKINS LLP
ATTORNEYS AT LAW

CIVIL ACTION NO. 8:24-cv-01568-JVS-JDE
PLAINTIFF'S SUPP. MEMO IN SUPPORT OF
MOTION FOR PRELIMINARY INJUNCTION

# I.    INTRODUCTION

Masimo stockholders face a monumental decision in less than four weeks: should Masimo's independent board, led by the Company's inspirational founder, Chairman, and CEO, Joe Kiani, run the Company, or should stockholders allow Politan and its predatory founder and activist investor, Quentin Koffey, to take full control of the Board with only 9% ownership of Masimo?  Under the federal securities laws, the stockholders must be allowed to make this decision based on truthful information and facts, not misrepresentations.  Expedited discovery has conclusively revealed that Koffey and his New York-based hedge fund, Politan, made false and misleading statements in their Proxy Materials as part of a multi-year plan to gain control of Masimo on false pretenses, while depriving Masimo's stockholders of a valuable control premium (often 20%-40% above the trading price).  If Masimo stockholders vote for Politan's director nominees based on misrepresentations, the harm will be irreparable.

Discovery has shown that Politan and Koffey—while a Masimo director with fiduciary duties to all stockholders—directly contacted former employees of Masimo to dig up dirt on the Company; those former employees later became "confidential witnesses" in complaints filed against Masimo by several firms including Wolf Haldenstein.  Moreover, Koffey and Politan solicited investors into their fund specifically to take control of Masimo, while misrepresenting that their intentions were broader than a "single investment" attack.  They lied by denying they were trying to take control of the Company.  They made up stories about not being onboarded properly and being denied access to information.  And they misrepresented potential strategic transactions that could have unlocked value for all of Masimo's stockholders—because what was good for the Company's stock price was bad for their chances of winning the proxy contest.

Their lies mattered.  Shareholder advisory services Institutional Shareholder Services ("ISS") and Glass Lewis parroted Koffey's lies in recommending that

stockholders vote in favor of Politan's slate. Stockholders are at risk of believing the misrepresentations. Court intervention is necessary to prevent Koffey and Politan from taking control by misleading Masimo's stockholders. The harm would be irreparable once Koffey and Politan are empowered to undertake all manner of corporate actions that cannot be unwound. As the Supreme Court has instructed, "in corporate control contests the stage of preliminary injunctive relief, rather than post-contest lawsuits, is the time when relief can best be given." *Piper v. Christ–Craft Indus.*, 430 U.S. 1, 42 (1977). The relief Masimo seeks is simple—an order enjoining Koffey and Politan from voting any proxies they solicited until they correct their false statements.

## II.    STATEMENT OF FACTS

### A.    Kiani Founds Masimo In His Garage 35 Years Ago

Kiani founded Masimo in 1989, growing the company from a garage start-up into a successful public company that generates $2 billion in annual revenue. Ex. 106. Since going public in 2007, Masimo has delivered average annual revenue growth of 12%, more than double the market growth rate. Ex. 105.

### B.    Self-Described "Veteran Activist" Koffey Launches Hedge Fund And Immediately Targets Masimo

Koffey started Politan three years ago in New York. Ex. 8, -16. Koffey has never held a senior management position at any medical or consumer technology company (or any public company), has no prior investment experience in the medical device industry, and had no public company board experience before joining Masimo's Board in 2023. *See id.*; Ex. 4, -275-277. Koffey and Politan have launched proxy contests against Centene Corporation and Azenta Life Sciences, both of which have since underperformed. *Id.*

In February 2022, Masimo's stock price fell after announcing its acquisition of consumer-technology company Sound United, and Koffey saw an opportunity to eventually take control of Masimo. Just three days later, Politan engaged AlphaSights—a company that claims to provide "frictionless access" to confidential

1  "expert insights" on companies—and began gathering intelligence on Masimo's
2  corporate governance, operations, finances, and strategies. Ex. 96; Ex. 1. Over the
3  next several months, AlphaSights identified ten former Masimo employees for
4  Koffey and others at Politan to speak with about Masimo. *See* Ex. 2, -488-494; Ex.
5  3; Ex. 5, -613-629. During these paid-for conversations, Politan sought information
6  on a number of topics, including their views of the impact on Masimo "*[i]f Kiani*
7  *left*." Ex. 6, -590; *see also* Ex. 94, 43:21-24.

8       By June 2022, Politan's plans for Masimo were clear: "*take board seats as*
9  *necessary*." Ex. 4, -241. Politan solicited current and potential investors with a slide
10 deck marketing a "Single Investment" in Masimo. *Id.* Politan highlighted Koffey's
11 "History of Engaging and Driving Consequential Changes" at eight companies,
12 including obtaining board seats at seven of them and a CEO change at five. *Id.*, -
13 276; *see also* Ex. 94, 177:2-21; 179:18-25. The presentation outlined a "Clear Path
14 to Board Seats" at Masimo and targeted each of the next two annual meetings, with
15 a focus on 2024.[1] *Id.*, -268, -272.

16      Politan finally filed a Schedule 13D on August 16, 2022, revealing it had been
17 quietly accumulating $750 million worth of Masimo stock for months—apparently
18 through swaps and derivative instruments to avoid SEC reporting requirements—
19 and now owned 8.4% of the Company. *See* Ex. 101; Ex. 7; *see also* Ex. 94, 177:2-
20 178:11. Notwithstanding its direct marketing and fundraising efforts, Politan never
21 disclosed in its Schedule 13D that it had solicited or obtained funds from investors
22 for the specific purpose of acquiring Masimo shares.

23

24

---

[1]   In correspondence with the SEC in 2023 about the sufficiency of these
25 disclosures, Politan assured the SEC that the funds used to acquire Masimo stock
   came from Politan's general fund and not from a special purpose vehicle that was
26 specifically targeting the purchase of Masimo stock. Discovery in this action has
   shown that Politan was, in fact, fundraising for the specific purpose of buying
27 Masimo stock. As Politan's proxy filings reveal, the vast majority of its acquisition
   of the Masimo derivatives occurred in the months immediately *after* the June 2022
28 "Single Investment" presentation. *See* Ex. 84, Schedule I, I-1, I-2; Ex. 86, Schedule
   I, I-1, I-2.

In April 2023, Politan nominated Koffey and Brennan to fill the two open Board seats.  Both were elected.  Ex. 8, -11; Ex. 86, -6.

### C.    Koffey Arrives On Board With No Intent To Work Constructively

#### 1.    Koffey And Politan Recruit Former Masimo Employees, Some Of Whom Later Appear As "Confidential Witnesses" Against Masimo

Less than two months after Koffey joined the Masimo Board, the Company was named in a securities class action lawsuit.  The stockholder plaintiffs in that case alleged that Masimo misled investors about its financial performance in the second quarter of 2023.  *See Vazquez v. Masimo Corp.*, No. 23-cv-01546-L-DEB (S.D. Cal. Aug. 22, 2023).  Two weeks later, Masimo instructed Koffey to preserve all documents relating to the lawsuit.  *See* Ex. 102, -941; Ex. 94, 311:22-313:4.

Shortly after learning about the lawsuit, Koffey's Politan partner Aaron Kapito contacted AlphaSights again, this time with a new "angle"—Politan wanted to "set up calls with former Masimo sales people – the more recent the departure the better."  Ex. 26, -142.

But AlphaSights' policy prohibited former employees from disclosing material nonpublic information about their employers, and thus did not allow those employees to speak about their employment until six months after they left.  Politan assured AlphaSights that the six-month rule "should not apply" because, "[w]e are on the board of the company."  *Id.*  That representation did not persuade AlphaSights, which explained that the rule "protect[ed] clients and is in line with best practices for our industry."  *Id.*  Undeterred, Politan insisted that AlphaSights find Masimo salespeople "who left less than 6 months ago."  *Id.*  When AlphaSights connected with a salesperson who left in July 2022 (more than six months earlier), Politan responded:  "we are really focused on what happened in 4Q22, 1Q23 and 2Q23."  *Id.*

That same day, Politan again asked AlphaSights to "keep sourcing 2023 formers."  Ex. 27, -585.  AlphaSights refused to violate its "six-month rule," but it

1    did recruit other former employees who left Masimo in 2022, including ███████

2    ████, a Patient Monitoring Specialist from December 2020 through June 2022 who

3    reported "to the Head of Sales for the US." *Id.*, -583.

4          Unsatisfied with AlphaSights' results, Politan contacted Mosaic Research

5    Management—another "expert network" service. Ex. 29. Kapito asked Mosaic to

6    "initiate a search for former Masimo employees [ ] who specifically were employed

7    at the company in 2023." *Id.* Kapito assured Mosaic, "We are on the board of the

8    company, so we have no rules pertaining to when employees left the company." *Id.*

9    Mosaic located "three former employees who departed in early 2023." *Id.* Two days

10   later, Mosaic sent information about one such employee, ████████, who had

11   served as Territory Manager for Alternate Care, Great Lakes West, from June 2011

12   through April 2023. ██████ said he had reported to an Area Manager (three levels

13   from the CEO). *See* Ex. 31, -764. Mosaic asked if Politan wanted to speak with

14   ██████ and Kapito immediately responded, "Yes!" *Id.* When they connected a

15   few days later, ██████ specifically told Kapito that ██████ was "[n]ot aware of any

16   discounting or channel stuffing" at Masimo. Ex. 32, -680.

17         Koffey—a *sitting director*—did not inform either the Board or anyone at

18   Masimo that he and Politan were finding, recruiting, and paying former Masimo

19   employees to secretly speak with Politan.

20         Less than four months after Politan privately communicated with these former

21   employees, the stockholder plaintiffs in the securities class action filed an amended

22   complaint. That complaint expanded the class period to cover (among other periods)

23   4Q22, 1Q23, and 2Q23—the same periods Politan told AlphaSights it was "really

24   focused on." Ex. 27, -598. The complaint also added allegations citing unnamed

25   former Masimo employees. Two of those former employees (CW-4 and CW-6) fit

26   the exact descriptions of ████████, whom Politan had found and recruited

27   to speak to Politan about the Company. *See, e.g.*, *Vazquez*, Dkt. 28, ¶¶ 44, 46

28   (describing CW-4 as a "Remote Patient Monitoring Specialist" from December 2020

1  to June 2022, and CW-6 as "Territory Manager for Alternate Care, Great Lakes
2  West" from June 2011 to April 2023).   In a follow-on derivative lawsuit, the
3  plaintiffs, represented by Wolf Haldenstein Adler Freeman & Herz LLP, cited these
4  same former employees in their complaint.  *See Himmelberger v. Kiani*, No. 24-cv-
5  00868 (S.D. Cal. May 16, 2024), Dkt. 1, ¶¶ 32, 34 (describing FE 4 as a "Remote
6  Patient Monitoring Specialist" from December 2020 to June 2022 and FE 6 as
7  "Territory Manager for Alternate Care, Great Lakes West" from June 2011 to April
8  2023).

9  ## 2.    Masimo Extensively Onboards Koffey And Brennan

10  Koffey and Brennan's statements in their proxy materials (the "Politan Proxy
11  Materials")[2] that they were somehow not properly onboarded is belied by the facts.
12  First, neither director has any meaningful point of comparison:  Koffey has *no* prior
13  public company board experience, and Brennan has served on only two public
14  company boards, one of which she served on behalf of activist shareholders.  Ex. 93,
15  10:16-12:2; Ex. 94, 97:4-5.  According to Bob Chapek,[3] a Masimo director with
16  substantial board and management experience, Masimo's onboarding process for
17  directors is robust.  Chapek Decl. ¶ 6.

18  Shortly after joining Masimo's Board, Koffey sent Masimo's General
19  Counsel, Tom McClenahan, an "initial" list of items that Koffey wanted to review
20  for his onboarding.  McClenahan promptly shared those voluminous materials,
21  including board books and minutes from prior meetings, engagement letters with
22  advisors, organizational charts, forecasts by product platform, and quarterly

---

24  [2] The Politan Proxy Materials consist of:  (1) The Preliminary Proxy Statement filed
25  on June 3, 2024; (2) the Definitive Proxy Statement filed on June 21, 2024; (3) the
Investor Letter regarding Politan's proxy campaign released on June 26, 2024; (4)
26  the Investor Presentation released on June 26, 2024; (5) the "Correcting the Record"
Investor Presentation released on July 1, 2024; (6) the letter released by Michelle
27  Brennan urging a "cultural reset" in the Company's boardroom on July 11, 2024;
and (7) the August 6, 2024 amendment to the Definitive Proxy Statement.

28  [3] Chapek is the former Chief Executive Officer of The Walt Disney Company
(including serving on its board of directors), and spent nearly 30 years at Disney.

1   financial updates.  Exs. 12, 13; McClenahan Decl. ¶¶ 3-6; *see also* Ex. 19.  Masimo
2   made its outside advisors available to Koffey and Brennan, and they met with
3   Masimo's financial advisor, Morgan Stanley.  Ex. 18; Collins Decl. ¶ 2.

4       In the months that followed, while Politan pumped AlphaSights for meetings
5   with former employees (*supra* Section II.B), Koffey and Brennan continued to
6   receive detailed information about the Company from management.  Ex. 24, -102
7   ▮, -106-11; *see also* Young Decl. ¶ 7.

8       In October 2023, Young presented the Board with a detailed management plan
9   for 2024 and long-range plans through 2033, and then shared the materials with
10  Koffey.  Exs. 33, -130; ▮, -1132.

11      Koffey further received extensive onboarding materials related to his role on
12  Masimo's Audit Committee.  Ex. 36.  Masimo's VP of Internal Audit, Michael
13  Palumbo, offered Koffey a "deeper dive on [his] [Audit Committee] slides."  Ex. 37.
14  Koffey and Palumbo spoke for over an hour and addressed Koffey's questions.
15  Palumbo Decl. ¶ 4, 6-7.  Palumbo also offered to meet with Brennan, a meeting
16  *Brennan* eventually cancelled.  Ex. 47.

17      Koffey and Brennan had ample opportunity to meet with and receive
18  information from the COO for Healthcare, Bilal Muhsin, and COO for Consumer,
19  Blair Tripodi, who presented detailed operating plans and major initiatives for their
20  businesses.  *See supra* Section II.C; Ex. 41.[4]  The Politan Proxy Materials
21  nevertheless state that Koffey and Brennan were never given access to the head of
22  U.S. sales.  Ex. 86, -7.  As Chapek testified, however, the Board had ample access
23  to management and, in fact, the bosses to whom the head of U.S. sales reports met
24  with the Board.  Ex. 95, 172:13-174:13.

25      Koffey's requests were unusual.  According to Chapek, "I had never seen in
26  my three years of being on the Disney board a board member asking for that much

27
28  ---
    [4] On February 13, 2024, the financial guidance for 2024 was approved by the Board, and the short- and long- term financial targets for executive compensation were approved by the compensation committee.

1    information, that specific of information, and that detailed level of information." Ex.
2    95, 66:21-67:2; *see also* McClenahan Decl. ¶ 8; Palumbo Decl. ¶ 9.

3              **3.    The Company Presents FY 2024 Budget To The Board**

4              The Politan Proxy Materials state that the Board did not see a draft or final
5    budget for FY 2024. Ex. 86, -7. The opposite is true. In October 2023, management
6    presented the preliminary budget for 2024 and the next five years. Ex. 92, 286:6-
7    18. At the February 13, 2024 Board meeting, Masimo's management presented the
8    Company's operating plan, *i.e.*, the budget. Ex. 95, 97:5-10. Chapek testified that
9    anyone who had a "reasonable understanding of, you know—a very cursory
10   understanding of business" would recognize that the materials presented to the
11   Board were the Company's budget and operating plan. *Id.*, 100:12-19. Chapek
12   added: "This is the first time in my nearly 40-year career that there has been some
13   perceived level of ambiguity as to what a budget is or what a plan is." *Id.*, 102:12-
14   15, 104:22-25. Chapek applauded management for the information presented and
15   the quality of the reports. *Id.*, 67:4-21.

16             **4.    Koffey And Brennan Refuse To Sign 10-K**

17             Koffey and Brennan received all the information they could reasonably need
18   to sign Masimo's 10-K. But they refused, because signing was inconsistent with
19   their efforts to win their proxy fight. *See* Mikkelson Decl. ¶¶ 3-4.

20             By late February all of the independent directors were prepared to sign the 10-
21   K, except Koffey and Brennan. In an attempt to address whatever ambiguous,
22   purported concerns Koffey had, Masimo management met with Koffey for hours on
23   Saturday, February 24, 2024, and spent Sunday and Monday preparing for additional
24   presentations on Tuesday. Palumbo Decl. ¶ 8; McClenahan Decl. ¶ 10. At these
25   meetings, the operating heads of major businesses each made lengthy presentations.
26   Ex. 95, 33:7-10. The Board, including Koffey, was provided ample opportunity to
27   ask questions. *Id.*, 33:4-6, 11-14. Koffey and Brennan did not have additional
28   questions after those presentations, but still refused to sign. The remaining directors

ultimately approved and signed the 10-K. Koffey admitted that while all of his questions had been answered, "his lawyers had told him it would not look good if he had criticized the lack of information he had received and then signed the Form 10-K." Chapek Decl. ¶ 11.

### 5.    Koffey Manipulates Plans For A Potential Spin-Off

Koffey engaged in a pattern of manipulation regarding a potential spin off of Masimo's Consumer Business and the related special committee ("Committee") process. He lied about who proposed key terms (to create the appearance that Kiani was prioritizing his interests over stockholders); he lied about the extent of his negotiations with Kiani before the Committee was established (to shift the Committee's role from evaluating only targeted aspects of the proposed transaction to renegotiating entirely); and he lied about the Committee process itself.

On January 29, 2024, Kiani and Koffey met to discuss a proposed spin-off of Masimo's Consumer Business. Ex. 92, 122:10-24. Both expressed general support for the idea. *Id.*, 123:17-19. During that meeting, Koffey suggested that Kiani obtain control of the proposed spun-off entity ("SpinCo") through the issuance of high-vote stock and depart from the existing Masimo entity ("RemainCo"), triggering Kiani's change-in-control payment under his employment agreement. *Id.*, 122:25-123:5, 124:6-8. This structure would enable Koffey to oust Kiani from Masimo, while allowing Kiani an exit strategy. *Id*., 123:11-16.

Shortly after, Koffey hand-delivered a term sheet to Kiani memorializing their agreed-upon terms, including Kiani's change-in-control payment being "triggered" by the transaction and Kiani's "control" of SpinCo through "either high vote stock or 50+%." Ex. 54, -486; Ex. 92, 124:11-13, 128:21-22, 133:17-21. Koffey also agreed to support, at the Board level, three handwritten additions (proposed by Kiani) concerning *employees'* change-in-control provisions, and the transfer of cash and Masimo's headquarters to SpinCo. Ex. 54, -486; Ex. 92, 124:14-16, 130:10-131:5.

On February 1 and 3, 2024, counsel for Politan and Masimo exchanged term sheets, confirming these fundamental terms but providing additional detail concerning the structure of the contemplated transaction. Exs. 38, -55; Ex. 92, 134:1-6, 135:5-9. Following these exchanges, Koffey and Kiani agreed to present their agreement to the Board. Ex. 88; Ex. 92, 146:4-147:7. They also discussed forming a special committee to negotiate only those portions of the deal implicating Kiani's financial interest—namely his ownership in SpinCo. Ex. 55; Ex. 92, 131:15-132:18, 136:14-19.

At a dinner with several other directors on February 12, 2024, Koffey represented that he and Kiani had reached agreement on the spin-off terms. *See* Reynolds Decl. ¶¶ 5-6. Koffey outlined the terms, which mirrored those Kiani had described to board member Craig Reynolds after the January 29 meeting, including Kiani's entitlement to a change-in-control payment and control of SpinCo. *Id.*

The next day, on February 13, these discussions were confirmed when the Board discussed the transaction and formation of the Committee. Ex. 42. At the Board meeting, Koffey "provided an overview of the agreement he and Kiani reached," including that Kiani would leave Masimo, obtain "majority voting control of SpinCo through high vote stock," and would be entitled to his change-in-control payment. *Id.*; Ex. 92, 147:3-15; Reynolds Decl. ¶ 6; Chapek Decl. ¶ 7; McClenahan Decl. ¶ 11. The Board then approved the Committee, composed of Koffey, Brennan, Reynolds, and Rolf Classon. Ex. 42.[5]

When the Committee was formed, Koffey had already begun working behind the scenes to advance his own interest for Politan's forthcoming proxy contest, contrary to the goals he had represented to the Board. *See* Ex. 93, 34:2-12. At Koffey's insistence, the Committee retained Sullivan & Cromwell ("S&C") despite

---

[5] Notably, on April 25, after derailing the Committee process, Koffey requested a "correction" to the February 13 board minutes denying that he had reached an agreement with Kiani. *See* Ex. 72; Chapek Decl. ¶ 8; McClenahan Decl. ¶¶ 11-12. This "correction" was later added to the meeting minutes as a footnote. Ex. 42; McClenahan Decl. ¶ 12.)

1   the fact that Koffey had a separate personal attorney-client relationship with S&C

2   that he used to seek advice on matters relevant to Politan's proxy contest. Ex. 92,

3   187:12-20; Reynolds Decl. ¶ 7. Koffey then carefully controlled the flow of

4   information and used the Committee's advisors to advance his own views— ███

5   ████████████████████████████████████████████████████████████████████████████

6   ██████████████████████████████████████    ███████████████████████████████

7   ███████████[6] Importantly, the term sheets exchanged between Koffey and Kiani in

8   early February *were never distributed to the rest of the Committee*. Ex. 92, 173:8-

9   17; Ex. 93, 53:1-4, 57:4-9; Reynolds Decl. ¶ 11.

10      With the Committee in place, Koffey abandoned his prior agreement on key

11  terms and sought to discredit Kiani. ██████████████████████████████████████████

12  ████████████████████████████████████████████████████████████████████████████

13  ████████████████████████████████████████████████████████████████████████████

14  ████████████████████████████████████████████████████████████████████████████

15  ████████████████████████████████████████████████████████████████████████████

16  ████████████████████████████████████████████████████████████████████████████

17  ████████████████████████████████████████████████████████████████████████████

18  ███████████████████

19      Koffey's significant pivot was noticeable and immediately caused concern.

20  Reynolds and Classon believed the Revised Term Sheet was inconsistent with the

21  February 13 Board meeting, and doubted SpinCo's viability. Ex. 88; Ex. 92, 167:24-

22  168:4, 168:19-23; Reynolds Decl. ¶ 9. In response, Koffey claimed that the Revised

---

[6] S&C seemed to take direction directly from Koffey, rather than the Committee as a whole, leading to frustration among other Committee members regarding their roles. Throughout its representation, Koffey was the Committee's primary liaison with S&C. ████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████

1   Term Sheet was consistent with his conversations with Kiani. Reynolds Decl. ¶ 10.

2   Having not received copies of the earlier term sheets, Reynolds and Classon

3   reluctantly agreed to send the new term sheet to Kiani on the condition that Koffey

4   call Kiani to preview it. Ex. 92, 168:5-168:9, 170:12-14, 171:1-6; Ex. 88; Reynolds

5   Decl. ¶¶ 10-11. ███████████████████████████

6   ██████████████████████████████████████████

7   ████████████████████

8       After receiving the Revised Term Sheet, Kiani called Koffey to express his

9   frustration that it represented an entirely different transaction and made SpinCo

10  unviable. Ex. 92, 181:25-182:15. Koffey falsely claimed that the term sheet

11  reflected the entire Committee's views. *Id.*, 169:15-20, 181:17-24. Kiani then

12  contacted Reynolds and Classon, who confirmed they had never seen the original

13  February term sheets and shared his concerns. *Id.*, 169:6-10, 169:21-23, 173:8-17;

14  Reynolds Decl. ¶¶ 11-12; ███████████████████████

15  ████████. After Kiani provided them with the original term sheets, Ex. 92, 174:6-

16  8; Reynolds Decl. ¶ 11, he attempted to salvage the agreement, including by making

17  significant concessions regarding control, but Koffey refused to engage. Ex. 92,

18  184:10-185:1; Ex. 95, 233:10-234:14; Ex. 88.

19      Notwithstanding these facts, the Politan Proxy Materials portray the

20  Committee, and by extension Koffey, as having "protected" Masimo stockholders

21  against Kiani's self-interested SpinCo transaction demands—when in fact it was

22  Koffey who proposed the terms. *See* Ex. 84, 10-11; Ex. 86,9-10.

23          **6.    Masimo Considers Other Avenues To Increase Stockholder**

24                  **Value**

25      After his bait-and-switch collapsed the Special Committee, Koffey continued

26  to develop the false narrative that Kiani was obstructing corporate governance and

27  refusing to provide information to Board members—this time with respect to a

28  Potential Joint Venture (the "Potential JV") with third-party investor ███. In March

2024, ███ indicated to Masimo management that ███ would be interested in confidentially exploring a potential partnership. Exs. 48, 56.

The Board met on March 22, 2024, where "the Board authorized management to evaluate the separation of the Company's consumer business"—separate from the proposed spin-off that was under the purview of the Committee. Ex. 58. The Board also authorized the Company to "issue a press release after the Meeting to announce the evaluation," *id.*, which the Company issued later that same day. *See* Ex. 59. Masimo's stock price spiked 14% in after-hours trading on the news. Ex. 68.

### 7. Koffey And Politan Rush To Block Separation Of Consumer Business Ahead Of Stockholder Meeting

But a stock price spike and successful separation would undermine Koffey's efforts to take control, so he sprang into action. First, Koffey sought to quell any excitement about the potential value-maximizing transaction, texting Classon within a few hours of the March 22 Board meeting, "I need to make a series of decisions promptly now. I appreciate your being available." Ex. 64. Koffey then quickly reached out to Politan's nominees in the upcoming proxy contest, Bill Jellison and Darlene Solomon (the "Politan slate"), telling them that Politan would announce their nomination to the Board through a proxy contest the next business day, and that they would need to work over the weekend to finalize the announcement. Exs. 60, 61.

Before trading hours on Monday, March 25, 2024, Politan announced its nominations, resulting in an immediate 9% stock drop. Ex. 67; Ex. 68.

Koffey continued to stall the Potential JV and lie about its terms. On April 30, 2024, Kiani provided the Board with additional detail regarding the Potential JV with ███ ███. Unconcerned with enhancing stockholder value, Koffey demanded that the Board "vote to resolve that the Company will not enter into any binding agreements relating to the separation and/or JV of the Consumer Business before the conclusion of the 2024 annual meeting of shareholders." Ex. 72.

Because ▮▮▮ expressed concerns about Koffey and Brennan specifically, on May 7, 2024, all nonexecutive Board members were asked to sign a non-disclosure agreement ("NDA") to protect ▮▮▮▮▮▮▮.  Ex. 77; Muhsin Decl. ¶ 4; Ex. 92, 211:11-16.  ▮▮▮ "was concerned" that the Politan Directors would "disclose [its] name publicly in order to stifle the potential transaction in advance of Masimo's stockholder meeting."  Muhsin Decl. ¶ 4.  Koffey and Brennan refused to sign.  Ex. 77.

Despite Koffey and Brennan's refusal, on May 8 Kiani asked the Board to meet the following week to discuss the Potential JV.  Ex. 79.  Rather than wait for the Board meeting, that afternoon Koffey served Masimo with a Section 220 Demand (the "Demand"), purporting to seek the very same information regarding the Potential JV that he was set to receive just a week later.  Ex. 78.  He then publicized his Demand.  Ex. 75.

As planned, on May 13, 2024, all members of the Board were informed of ▮▮▮▮▮▮▮ and provided with 75 pages of materials about the Potential JV, including a non-binding term sheet, a proposed exclusivity agreement, and preliminary structural and financial analyses.  Ex. 80, -344-345.  Koffey and Brennan urged the Board to delay any further assessment until after the annual meeting, presumably to prevent Masimo from negotiating a favorable deal that might harm the Politan slates' election chances.  *Id.*

On July 15, 2024, the Board met and discussed extension of Masimo's exclusivity agreement with ▮▮▮ which had since expired.  Ex. 90.  In an effort to quell the supposed concerns raised by Koffey while preserving the opportunity to enhance stockholder value, Kiani confirmed that "he would not vote in favor of any joint venture or similar transaction with respect to a separation of the Company's consumer business unless the transaction is approved by Mr. Koffey."  *Id.*  Koffey and Brennan still refused to vote for the extension.

**D.    Masimo's Stockholders Will Decide The Future Of The Company on September 19, 2024**

Masimo's 2024 Annual Meeting of Stockholders, where the future of the Company will be decided, is set for September 19, 2024.  If the Politan slate wins, Politan and Koffey will control four Board seats and therefore the majority of the Board.

## III.    ARGUMENT

A preliminary injunction is proper when, as here, (1) Masimo is likely to succeed on the merits; (2) Masimo is likely to suffer irreparable harm without preliminary relief; (3) the balance of equities tips in Masimo's favor; and (4) an injunction is in the public interest.  *See Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 20 (2008).  Masimo meets these four required elements for its Section 14(a) and SEC Rule 14a-9 claims.  Injunctive relief is necessary to prevent Koffey and Politan from executing their takeover through stockholder votes obtained through false and misleading proxy materials.

**A.    Masimo Is Likely To Succeed On The Merits**

Section 14(a) was intended "to promote the free exercise of the voting rights of stockholders by ensuring that proxies would be solicited with explanation to the stockholder of the real nature of the questions for which authority to cast his vote is sought."  *Mills v. Elec. Auto-Lite Co.*, 396 U.S. 375, 381 (1970) (quotation omitted).  A proxy statement violates Section 14(a) if (1) it contains "a material misrepresentation or omission which (2) cause[s] the plaintiff injury and (3) [] the proxy solicitation itself, rather than the particular defect in the solicitation materials, was an essential link in the accomplishment of the transaction."  *N.Y.C. Emps.' Ret. Sys. v. Jobs*, 593 F.3d 1018, 1022 (9th Cir. 2010) (quotation omitted), *overruled on other grounds by Lacey v. Maricopa County*, 693 F.3d 896 (9th Cir. 2012).  Each element is satisfied here.

1    **1.    The Politan Proxy Materials Are False And Misleading**

2    Masimo is likely to prove that the Politan Proxy Materials contain false and

3    misleading statements and omissions and that there is a substantial likelihood that a

4    reasonable stockholder would consider them "important in deciding whether to vote"

5    for the Politan slate. *Allergan, Inc. v. Valeant Pharms. Int'l, Inc.*, 2014 WL 5604539,

6    at *15 (C.D. Cal. Nov. 4, 2014). A reasonable stockholder would find it important

7    that the Politan directors were, for example, purposefully sabotaging strategic deals

8    that could increase stockholder value, and recruiting "confidential witnesses" who

9    then appear in complaints *against* the Company and the Board. *See Mind Med.*

10    *(MindMed) Inc. v. Freeman*, 2024 WL 729260, at *2, *4 (S.D.N.Y. Feb. 22, 2024)

11    (complaint pled material misstatements where proxy "materials assert that the

12    defendants 'attempted to engage constructively with the Board'" but omitted that

13    defendants in fact declined to participate in director selection process).

14    The Politan Proxy Materials contain a number of misrepresentations and

15    omissions that warrant correction to ensure a fully informed stockholder vote:

16    **(i) The Politan Proxy Materials Fail to Disclose That Politan Secretly**

17    **Identified and Recruited Confidential Witnesses to Undermine Masimo.** In four

18    weeks of expedited discovery, Masimo has been unable to prove that Koffey worked

19    directly with law firms representing plaintiffs in pending stockholder actions against

20    the Company. The deponents denied any such contact, and the investigators ██████

21    ████████████████████████████████████████████████████████████████

22    ████████████████████████████████████████████████████████████████

23    ██████████ *See* Ex. 107, 44-45.[7]

24    ────────────────

[7] Masimo hired ████████████ to conduct an investigation in connection with

25    Koffey's proxy contest. ████████████████████████████████████████████

26    ████████████████████████████████████████████████████████████████

27    ████████████████████ Ex. 110. ███████████████████████████████████

28    ████████████████████████████████████████████████████████████████

1 ██████████████████████████████████████████

2 ████████████████████████████████████████████

3 ████████████████████████████████████████████

4 ████████████████████████████████████████████

5 ████████████████████ Ex. 108 -28. █████████████

6 ████████████████████████████████████████████

7 ████████████████████████████████████████████

8 ███████████████ Ex. 107, -92. ████████████████

9 ████████████████████████████████████████████

10 ████████████████████████████████████████████

11 ████████████████████████████████████

12     Given the fast pace of a proxy contest and stockholder vote, Masimo was

13 compelled to seek immediate relief to remedy the misstatements in Politan's proxy

14 filings. ██████████████████████████████████

15 ████████████████████████████████████████████

16 ████████████████████████████████████████████

17 ███████████ Ex. 107, 60-61. ████████████ were not able to verify the

18 information through on-the-record sources in the compressed timeframe, even while

19 ████ confirmed she had no reason to believe the information was inaccurate. *Id.* 95-

20 96.

21     But discovery *has* revealed direct links between Politan's public statements in

22 support of its proxy contest and the litigation filed by lawyers including Wolf

23 Haldenstein. In Politan's PowerPoint presentation filed with the SEC, Politan urged

24 stockholders to vote for its director candidates because of pending "whistleblower"

25 lawsuits against Masimo. Ex. 113 at 68. According to Politan, reasons to vote in its

26 ──────────────

27 ████████████████████████████████████ *See* Exs. 110, 114.

28 █████████████████████████ *Id.* ████████████ *Id.*; Ex. 107, -74.

favor include the securities class action. Politan features a screenshot of the securities class action complaint in its presentation, and quotes a former employee cited in that complaint (and in the companion derivative complaint) in order to question Masimo's financial reporting in the second quarter of 2023. Politan uses that former employee to falsely suggest the Company was improperly discounting its products and channel stuffing.

Koffey and Politan have concealed that they had recruited and paid former employees to privately discuss the Company's performance in that same quarter—including former employees who are cited as confidential sources in the class action and derivative complaints against Masimo. *See supra* Section II.C.1. Koffey and Politan omit that they had talked to another cited confidential source who told them he was not aware of "*any* discounting or channel stuffing." Ex. 32. Neither Koffey nor Politan ever told Masimo or investors that while Koffey served on the Board, he was secretly digging up dirt to help his proxy contest (and, in turn, lawsuits against the Board). Parading the allegations in the pending lawsuits as a reason to vote for his director candidates is false and misleading without also disclosing the work Politan had done in support of those allegations (and the evidence they uncovered that undermined the allegations). Stockholders should know that one of their directors has been secretly recruiting witnesses to harm the Company.

**(ii) The Politan Proxy Materials Fail To Disclose Investor Information Required By Rule 13D.** Item 3 of Section 13(d) of the Exchange Act provides that "if any part of the purchase price is or will be represented by funds or other consideration borrowed or otherwise obtained for the purpose of acquiring, holding, trading or voting the securities, a description of the transaction and the names of the parties thereto" must be disclosed. Ex. 103; *see also* 17 C.F.R. § 240.13d-101. Politan's 13D filings do not satisfy any of Section 13(d)'s requirements. These material misrepresentations and omissions in its Schedule 13D Filings—which it has left uncorrected—can serve as the basis for a Section 14(a) claim. *See Mason-Dixon*

*Bancshares, Inc. v. Anthony Invs., Inc.*, 1997 U.S. Dist. LEXIS 23638, at *14-18 (D. Md. Feb. 28, 1997) (finding likelihood of success on merits of Section 14(a) claim based on material omissions in Schedule 13D filings).

*First*, Section 13(d) requires investors to inform the market if they intend to take control of a company, as Politan planned to do here. 17 C.F.R. § 240.13d-101, Item 4; *see also supra* Section II.B. But instead of doing so, Politan declined to reveal its strategy. *See* Ex. 7. Indeed, when the SEC inquired with Politan in 2023 about its investment in Masimo, Politan assured the SEC that the money for the Masimo investment was coming from its general fund with purely passive investors, and was not being used to target control of the Company. In reality, and unbeknownst to the SEC, in June 2022, Politan was showing potential investors its "Single Investment" presentation targeting Masimo, and outlining a "Clear Path to Board Seats." Ex. 4, -1268, -1272. In the wake of that presentation, Politan went on to acquire the vast majority of its derivatives and other interests in Masimo, which served as the launch pad for its subsequent proxy contests and efforts to take control. Yet, in both its correspondence with the SEC and its Schedule 13D, Politan omitted its plans to take over the Company. *Id.*

*Second*, Politan's Schedule 13D Filings do not comply with Item 3 of Regulation 13D, which requires disclosure of "the source and the amount of funds," including "a description of the transaction and the names of the parties thereto." 17 C.F.R. § 240.13d-101, Item 3. Politan identified the source as "derived from the capital of the Politan Funds." Ex. 7. But Politan raised funds for the direct purpose of investing in and taking control of Masimo. *See* Ex. 4 . To comply with Item 3, Politan was required to name those investors. It failed to do so.

*Third*, Politan failed to comply with Item 6, which requires disclosing the existence of contracts or other relationships related to its investment in Masimo and "the persons with whom such contracts, arrangements, understandings or relationships have been entered into." 17 C.F.R. § 240.13d-101, Item 6. Politan's

Schedule 13D disclosures claim that, besides the stock swaps, Politan had "no contracts, arrangements, understandings or relationships (legal or otherwise) with respect to any securities of" Masimo.  Ex. 7.  But that representation cannot be squared with its solicitation of funds from current and potential investors for the express purpose of investing in Masimo.

**(iii) The Politan Proxy Materials Misrepresent the Potential Spin-Off and Koffey's Manipulation of the Special Committee.**  The Politan Proxy Materials falsely claim that Kiani proposed the transaction on terms favorable to himself, the Committee proposed different terms, and Kiani then killed the deal and disbanded the Committee when he didn't get his way.  *See* Ex. 84 at 10-11; Ex. 86 at 9-10. These misrepresentations falsely portray Kiani as self-serving, suggesting that he was primarily interested in securing his own control and compensation, when in reality, *Koffey* was the one pushing for these terms so Politan could gain control over RemainCo.  Ex. 92, 122:15-123:16; 124:6-8; 127:2-13.  The Board did not form the Committee because Kiani proposed a series of self-serving terms; rather, the potential conflict existed only because *Koffey* proposed these terms, agreed to them, and then sold the Board on them.[8]  Defendants' misrepresentation distorts the true nature of the discussions and agreements, misleading stockholders about the origins and intentions behind the spin-off proposal.

Politan's Proxy Materials also misleadingly omit that Koffey controlled the Committee process—and relatedly falsely state that the Revised Term Sheet reflected the Committee's "unanimous[] agree[ment]" and "independent position." Ex. 84, -11.  In reality, the views expressed purportedly by the Committee and its advisors were, in fact, Koffey's views. ███████████████████████████

█████████████████████████████████████████████ Ex.

_____

[8] ████████████████████████████████████████████████████████
████████████████

92, ██████████████████████████████

██████████████████████████████████

██████████████████████████████████

██████████████████████████████████

Koffey recognized that if a spin-off were accomplished prior to the 2024 annual meeting, his main purported justification for his proxy campaign—to ensure that a transaction involving the Consumer Business was overseen by a Board composed of a majority of Politan directors—would become irrelevant. Ex. 86, -15.

The evidence shows that Koffey procured Classon's and Reynolds's reluctant agreement to send the Revised Term Sheet to Kiani only after falsely assuring them that Kiani was on board with the new terms, and by withholding the actual term sheets the parties had exchanged in February. Ex. 92, 168:5-168:9, 170:12-14, 171:1-6; Ex. 88; Reynolds Decl. ¶¶ 9-11. Classon and Reynolds only agreed to send the Revised Term Sheet to Kiani on the condition that Koffey first discuss the terms with Kiani, which Koffey never did. Ex. 92, 167:24-168:9, 167:22-24, 179:18, 168:19-169:23; Ex. 93, -56-57. Koffey's actions undermined the spin-off process, sabotaging a potentially value-maximizing deal for Masimo's stockholders, for the purpose of aiding his forthcoming proxy contest. By manipulating the Special Committee and presenting a term sheet that did not reflect the agreed-upon terms, Koffey created confusion and mistrust among the board. Ex. 92, 189:25-16; Ex. 88. The failed spin-off process had significant consequences, as it prevented the Company from pursuing a strategic transaction that could have unlocked substantial value for stockholders. Ex. 92, 160:9-16, 167:24-168:9, 173:11-174:3, 184:10-185:1; Ex. 93, -57-58.

**(iv) The Politan Proxy Materials Fail To Disclose and Misrepresent Politan and Koffey's Work To Delay and Defeat Other Stockholder Value-Maximizing Transactions**. The Politan Proxy Materials falsely claim Masimo

"refused to disclose" the Potential JV Partner's identity to the Board until Koffey made his Demand on May 8, 2024. Ex. 84, -11-13; Ex. 86 -10-12. Not so. On May 7, 2024, all nonexecutive Board members were asked to sign the same NDA to protect ███████████ at ██████ request given its concern that the Politan Directors would "disclose [its] name publicly in order to stifle the potential transaction[.]" Muhsin Decl. ¶ 4. Ex. 79; Ex. 92, 211: 11-16. At no point did Kiani refuse to provide these details, even after Koffey and Brennan refused to sign the NDA: instead, that same day Kiani asked the Board to meet the next week to further discuss the Potential JV. Ex. 79. Koffey *thereafter* sent the Demand, demanding information on the Potential JV, Ex. 78, information he was already set to and did receive just a week later. Ex. 80 ].

The Politan Proxy Materials falsely claim that Kiani signed a term sheet with ████ "without providing any information to the Board." Ex. 89, Slide 15. However, on April 30, ████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████ Ex. 73. It was not until May 7 that Masimo entered into a *non-binding* term sheet with ██████ Likewise, Politan's statement that "on May 16, 2024, the Board was for the first time provided with the name of the joint venture partner" is also false. Ex. 86. The Board was provided ample information about the JV, ██████████████████, on May 13, three days before the May 16 Board meeting.

The Politan Proxy Materials further falsely claim that "Kiani intends to be Chairman of the new entity." Ex. 87, -6. Again, this is false. █████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████

LATHAM&WATKINSᴸᴸᴾ
ATTORNEYS AT LAW

**(v) The Politan Proxy Materials Falsely State That The Politan Directors Were Not Properly Onboarded.**  The Politan Proxy Materials falsely allege that the Politan Directors were never "onboard[ed]," did not receive "basic information," were "denied…access to management," and were excluded from Board meetings. Ex. 84, -6-7, 17; *see also* Ex. 87, -2; Ex. 89, -24.  These statements are contradicted by the extensive onboarding briefings and information provided to the Politan Directors, which included thousands of pages of Masimo's historical Board materials and numerous meetings with and routine access to Masimo's management team, independent auditor, and outside advisors. *Supra* Section II.C.2.  Furthermore, the Politan Directors were invited to, and did attend, all Board and committee meetings since joining the Board. *Id.*  Section II.C.  Neither their lack of experience nor desire to win the proxy contest justifies Koffey and Brennan's misrepresentations about their onboarding experience.

**(vi) The Politan Proxy Materials Falsely State That the Politan Directors Were Not Provided With a Budget.**  The Politan Proxy Materials falsely claim that the Politan Directors never received budget information.  This assertion, which Koffey repeated to ISS and ISS printed, is demonstrably false, as the indisputable evidentiary record makes clear.  Ex. 112, -22 ("[T]he dissident reports that the board does not see or approve a budget, is provided with information solely at the CEO's discretion, and is uninformed about basic financials and material risks. . . ."); *supra* Section II.C.3.  Masimo stockholders should know the truth:  Koffey manufactured this lie to create the appearance of mismanagement and corporate governance issues where none exist.

**(vii)  The Politan Proxy Materials Fail to Disclose Why The Politan Directors' Refused To Sign The Form 10-K.**  The Politan Proxy Materials fail to disclose that the Politan Directors refused to sign Company's 2023 Form 10-K even though all of their concerns were addressed.  *Supra* Section C.4.  The reason was simple:  Koffey knew that if the entire Board did not sign the Form 10-K, it would

LATHAM&WATKINSLLP
ATTORNEYS AT LAW

CIVIL ACTION NO. 8:24-cv-01568-JVS-JDE
PLAINTIFF'S SUPP. MEMO IN SUPPORT OF
MOTION FOR PRELIMINARY INJUNCTION

suggest to stockholders that something was amiss with the Company's financials just months before the stockholder vote at which control of the Company was at stake. *See* Chapek Decl. ¶ 11.

**(viii) The Politan Proxy Materials Mischaracterize the Board's Oversight of a Potential Whole-Company Sale Process.** Politan's Proxy Materials state that the Board delegated "authority to [] Kiani" to "carry out a sale of the entire company ***without any obligation to provide process updates to the Board***." Ex. 86, -6 (emphasis added). Politan further states that Brennan and Koffey did not "receive a substantive update about the process until the first in-person Board meeting" in October 2023, and that ultimately, Kiani told the Board that he was unable to find a deal on "what he considered to be satisfactory terms." *Id.* These statements are demonstrably untrue.

*First*, the Board did not delegate to Kiani the authority to carry out a sale of the entire Company, much less the authority to negotiate such a sale with no oversight or input from the Board. Instead, as the June 24, 2023 Board meeting minutes record, the Board made a *limited* delegation of authority to management to: (1) "coordinate with Morgan Stanley on the process for exploring strategic transaction options," including soliciting "potential third party offers," and (2) "retain additional financial and other advisors to assist with exploring and pursuing any such options." Ex. 9. This was an entirely standard delegation to management to undertake a process to explore strategic transactions and engage with potential counterparties. *See City of Ft. Myers Gen. Emps.' Pension Fund v. Haley*, 235 A.3d 702, 721 n.69 (Del. 2020) ("There is nothing inherently wrong with a Board delegating" authority to "negotiat[e] a transaction."). It was *not* an abdication of the Board's authority or ability to review—and ultimately approve—such a transaction, as Politan's disclosure states. And there are no facts to suggest otherwise.

*Second*, it is not true that the Politan Directors did not "receive a substantive update" before October 31, 2023. Instead, Koffey and Brennan connected with the

Company's lead banker, John Collins, on July 13, 2023—less than three weeks after they joined the Board. Exs. 15, 21. On August 1, 2023, Collins met with the Politan Directors for an hour over Zoom to orient on the strategic alternative review process, which included a potential sale of the whole Company, and answer any questions. Ex. 23; Ex. 22; Collins Decl ¶ 2.

*Third,* Politan asserts that "Kiani told the full Board that he was unable to find a deal *on what he considered to be satisfactory terms.*" Ex. 86, -6. That statement is materially misleading, as it suggests that Kiani in fact received offers and unilaterally evaluated whether they were "satisfactory." But **no offers were submitted**: as the February 13, 2024 minutes state, Kiani "informed the Board" that "none of the strategic parties contacted by the Company or its financial advisors" provided a bid. Ex. 41.

## 2. The Politan Proxy Materials Caused Masimo's Injury And Are An "Essential Link" To The Election Of The Politan Slate

Masimo satisfies the loss causation and transaction causation prongs of the Section 14(a) violation test. As for loss causation, Masimo "was forced to expend unnecessary Company resources in waging a proxy contest against" Politan, a proxy contest which was illegitimate because of Politan's material misrepresentations and omissions. *Enzo Biochem, Inc. v. Harbert Discovery Fund, LP*, 2021 WL 4443258, at *9 (S.D.N.Y. Sept. 27, 2021) (finding loss causation plausibly pled where company incurred significant expenses due to proxy contest necessitated by misleading proxy materials). The Politan Proxy Materials are also an "essential link" to achieving the election of a Politan slate, *see Va. Bankshares, Inc. v. Sandberg*, 501 U.S. 1083, 1100 (1991), as they are necessary for Defendants to vote stockholder proxies. Moreover, the false and misleading Politan Proxy Materials convinced proxy advisory firms to endorse the Politan candidates, in reports that parrot Defendants' lies as facts. *See* Ex. 111, 112; *see also Enzo Biochem, Inc. v.*

*Harbert Discovery Fund, LP*, 2021 WL 4443258, *10 (S.D.N.Y. Sept. 27, 2021) (concluding plaintiff pled transaction causation where proxy solicitations persuaded proxy advisory firm to endorse defendants' candidates, and solicitations misled majority of stockholders into voting for defendants).

### 3.    Defendants Acted with at Least Negligence

Defendants made the misstatements and omissions in the Politan Proxy Materials with the requisite level of culpability, which for Section 14(a) and Rule 14a-9 is mere negligence. *See In re Maxim Integrated Prods., Inc., Deriv. Litig.*, 574 F. Supp. 2d 1046, 1066 (N.D. Cal. 2008).   Under federal securities laws, negligence is a failure to exercise "reasonable prudence." *SEC v. Dain Rauscher, Inc.*, 254 F.3d 852, 856 (9th Cir. 2001).   "Section 14(a) requires proof only that the proxy solicitation was misleading, implying at worst negligence by the issuer.   And negligence is not a state of mind; it is a failure, whether conscious or even unavoidable …, to come up to the specified standard of care." *Beck v. Dobrowski*, 559 F.3d 680, 682 (7th Cir. 2009) (Posner, J.) (citation omitted).   Not only was Politan careless in manufacturing the lies outlined above, it *knew* that its attacks on Masimo and Kiani were not true, and made them anyway. *See, e.g.*, Ex. 51.

**B.    Masimo And Its Stockholders Will Suffer Irreparable Harm Absent A Preliminary Injunction**

Masimo is likely to suffer irreparable harm without a preliminary injunction, *Winter*, 555 U.S. at 20—because Masimo's stockholders would be required to vote on directors in a contest for corporate control based on materially false and misleading proxy materials.  Such an election, and any subsequent actions by the Board, cannot be easily unwound or redressed with money damages.  Irreparable harm is harm "for which there is no adequate legal remedy, such as an award of damages." *Ariz. Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1068 (9th Cir. 2014). This harm must be imminent, *see Caribbean Marine Servs. Co. v. Baldrige*, 844 F.2d 668, 674 (9th Cir. 1988), a requirement which is easily satisfied here given the upcoming stockholder meeting.

 "[I]n corporate control contests the stage of preliminary injunctive relief, rather than post-contest lawsuits, is the time when relief can best be given." *Piper v. Chris–Craft Indus.*, 430 U.S. 1, 42 (1977) (quotation omitted) (citation omitted). "[P]reventing an uninformed shareholder vote through corrective disclosures once the inadequate disclosure is discovered is preferable to sorting out post-vote remedies for uninformed shareholders." *Allergan*, 2014 WL 5604539, at *16.  This principle is why courts have repeatedly found that the threat of an uninformed stockholder vote presents an irreparable harm when the vote involves "significant changes to [] corporate governance," including major board elections.  *Allergan*, 2014 WL 5604539, at *16; *see also Arcturus Therapeutics Ltd. v. Payne*, 2018 WL 2316790, *8 (S.D. Cal. May 22, 2018) (finding irreparable harm where "shareholders face a vote on a proxy contest without being informed of the truth behind their choices"); *Taseko Mines Ltd. v. Raging River Cap.*, 185 F. Supp. 3d 87, 93-94 (D.D.C. 2016) (finding irreparable harm where uninformed stockholder vote could "significantly affect who wins several director positions"); *St. Louis Police Ret. Sys. v. Severson*, 2012 WL 5270125, *6 (N.D. Cal. Oct. 23, 2012) (similar).

So too here.  If Defendants are allowed to vote proxies they solicited in violation of Section 14(a) and if other similarly uninformed stockholders vote for the Politan slate, Politan will have gained majority control of the Board and Masimo on false pretenses—all without providing Masimo stockholders with a control premium.  *See Bender v. Jordan*, 439 F. Supp. 2d 139, 176 (D.D.C. July 21, 2006) (finding irreparable harm where there was a threat of an uninformed stockholder vote and a substantial likelihood that allowing the election to go forward "would helplessly complicate matters, perhaps making it impossible to unscramble the eggs") (quotations omitted).

Additionally, Koffey and Brennan are not working to achieve the most value-maximizing deal for the sale of the Consumer Business.  Not only have they urged the Board to delay assessment on a Potential JV, which risks losing the highest reasonable price, but Koffey has also said Masimo should give the Consumer Business away for nothing.  *See, e.g.,* Ex. 72; Muhsin Decl. ¶¶ 3-4; *see also MONY Grp., Inc. v. Highfields Cap. Mgmt., L.P.*, 368 F.3d 138, 148 (2d Cir. 2004) (finding irreparable harm where uninformed proxy vote "could spell the loss of a business opportunity that (by its nature) can only exist at one point in time and cannot be recovered or repaired with money damages"); *True N. Commcn's Inc. v. Publicis S.A.*, 711 A.2d 34, 44-45 (Del. Ch. 1997) (describing the loss of a unique business opportunity as "the essence of irreparable harm," noting that "the loss of such opportunity cannot be quantified"), *aff'd*, 705 A.2d 244 (Del. 1997).  And Koffey's and Politan's connections to the confidential witnesses in lawsuits that Masimo and the Board are defending—including a witnesses who specifically told Politan that channel stuffing had ***not*** occurred at Masimo—jeopardizes Masimo's defense (and potentially causes financial harm to the Company).  *See* Ex. 26 , -142; Ex. 29; Ex. 32; *supra* Section II.C.1.

Politan's lies are already working.  Recent Glass Lewis and ISS reports recommend Masimo stockholders vote their proxies in favor of the Politan slate,

LATHAM&WATKINSLLP
ATTORNEYS AT LAW

1   citing Defendants' lies as the truth.  *See* Exs. 111, 112.  If the Politan slate is elected

2   without a fully informed vote, a Politan-run Board would make untold decisions that

3   cannot be unwound easily, if at all.  Even if not viewed as a change-of-control

4   scenario (and it is), a newly constituted (but invalid) Board could take any number

5   of material, irreversible actions, including, for example, firing the Company's

6   founder and CEO or pursuing strategic transactions that could forever alter the

7   Company.[9]

8         Politan's own actions demonstrate this point: in a related action in the

9   Delaware Court of Chancery, Politan sought and obtained a status quo order

10  requiring five days' notice before Masimo could undertake certain strategic

11  transactions on the basis that such a transaction would result in irreparable harm

12  because it "could dramatically, and potentially irreversibly affect the Company

13  before the imminent Annual Meeting." Ex. 99, ¶ 18 (internal quotation marks

14  omitted).  The parties are thus in agreement about what constitutes irreparable harm.

15        **C.    The Balance Of Equities Favors Masimo**

16        The balancing of equities favors Masimo.  *See Winter*, 555 U.S. at 24.

17  Masimo's potential harm is great, as without the limited injunction requested,

18  uninformed stockholders may vote to change control of the Board in Politan's favor.

19  *See, e.g.*, *Lone Star Steakhouse & Saloon, Inc. v. Adams*, 148 F. Supp. 2d 1141, 1150

20  (D. Kan. 2001) (balance of hardship "clearly favors" plaintiff where plaintiff subject

21  to "irreparable injury to its reputation and shareholder trust," and "may be subject to

22  a major change" to its Board).  In contrast, Defendants are not harmed by an

23  injunction that simply requires them to correct their own false and misleading

24  disclosures, which would involve little expense.  *See id.*; *see also Allergan*, 2014

25  WL 5604539, at *16 (balance of equities for plaintiff where only cost to defendants

26

27

28  [9] Moreover, among others, more than 280 Masimo engineers recently threatened to leave Masimo "if Joe Kiani is replaced by Quentin Koffey and Politan Capital." Ex. 104.

was expense of making corrective disclosures).  The requested relief would level the playing field for Masimo and allow stockholders to cast an informed vote.

### D.    A Preliminary Injunction Serves The Public Interest

Masimo satisfies the last *Winter* factor:  the requested injunctive relief serves the public interest because it will lead to an informed stockholder vote.  *See, e.g.*, *Allergan*, 2014 WL 5604539, at *16 ("An injunction ordering corrective disclosures is also in the public interest, as it prevents an uninformed shareholder vote."). Additionally, "effective enforcement of the federal securities laws promotes the public interest."  *Taseko Mines Ltd.*, 185 F. Supp. 3d, at 94; *see also Lone Star Steakhouse & Saloon,* 148 F. Supp. 2d at 1150 (holding a preliminary injunction requiring a corrective disclosure served public interest because "the public interest always lies with the truth").

### E.    No Security Should Be Required For The Preliminary Injunction

Although Federal Rule of Civil Procedure 65(c) provides that a preliminary injunction requires the movant give "security in an amount that the court considers proper," FRCP 65(c), the "district court retains discretion as to the amount of security required, *if any*."  *Diaz v. Brewer*, 656 F.3d 1008, 1015 (9th Cir. 2011) (quotation omitted).  And it is Defendants' burden to "present[] evidence that a bond is needed."  *Conn. Gen. Life Ins. v. New Images of Beverly Hills*, 321 F.3d 878, 883 (9th Cir. 2003).  The bond amount may be "zero" with no evidence of damage suffered from the injunction.  *Id.* at 882.  There is no chance, much less likelihood, of harm to Defendants here.  No security should be required.

## IV.    CONCLUSION

Masimo respectfully requests that the Court issue an order preliminarily enjoining Defendants from voting any proxies solicited by them in violation of Section 14(a) or Rule 14a–9 until corrective disclosures are made.

1     Dated:  August 23, 2024                Respectfully submitted,

2                                      LATHAM & WATKINS LLP

3

4                                      By */s/Michele D. Johnson*

5                                      Michele D. Johnson (SBN 198298)
                                        Jordan D. Cook (SBN 293394)

6                                      650 Town Center Drive, 20th Floor
                                       Costa Mesa, CA 92626

7                                      T: (714) 540-1235
                                       F: (714) 755-8290

8                                      michele.johnson@lw.com
                                       jordan.cook@lw.com

9                                      Colleen C. Smith (SBN 231216)
                                       12670 High Bluff Drive

10                                      San Diego, California 92130
                                       T: (858) 523-5400

11                                      F: (858) 523-5450
                                       colleen.smith@lw.com

12

13                                      Matthew Rawlinson (SBN 231890)
                                       140 Scott Drive

14                                      Menlo Park, CA 94025
                                       T: (650) 328-4600

15                                      F: (650) 463-2600
                                       matt.rawlinson@lw.com

16                                      Robert J. Ellison (SBN 274374)
                                       10250 Constellation Blvd., Suite 1100

17                                      Los Angeles, CA 90071
                                       T: (213) 485-1234

18                                      F: (213) 891-8763
                                       robert.ellison@lw.com

19

20                                      Kathryn George (*Pro Hac Vice*)
                                       330 N. Wabash Ave., Suite 2800

21                                      Chicago, IL 60611
                                       T: (312) 876-7700

22                                      F: (312) 993-9767
                                       katie.george@lw.com

23                                      *Attorneys for Plaintiff Masimo Corporation*

24

25

26

27

28

LATHAM&WATKINS LLP
ATTORNEYS AT LAW

# <u>CERTIFICATE OF COMPLIANCE</u>

The undersigned, counsel of record for Masimo Corporation, certifies that this brief contains 9193 words, which complies with the word limit of set by court order dated August 23, 2024  (Dkt. 117).


Dated:  August 23, 2024                  <u>/s/ *Michele D. Johnson*   </u>

Michele D. Johnson