HUESTON HENNIGAN LLP
John C. Hueston, State Bar No. 164921
jhueston@hueston.com
Marshall A. Camp, State Bar No. 231389
mcamp@hueston.com
620 Newport Center Dr., Suite 1300
Newport Beach, CA 92660
Telephone:   (949) 229-8640
Facsimile:    (888) 775-0898

Attorneys for Proposed Amicus Curiae
Joseph E. Kiani

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MASIMO CORPORATION, | Case No. 8:24-cv-01568-JVS-JDE |
| Plaintiff, | **[PROPOSED] AMICUS CURIAE BRIEF OF JOSEPH E. KIANI IN OPPOSITION TO (1) DOCKET NO. 267: MASIMO CORPORATION'S NOTICE OF WITHDRAWAL OF APPLICATION FOR AN ORDER FINDING DEFENDANTS IN CONTEMPT; (2) DOCKET NO. 268: MASIMO CORPORATION'S MOTION TO VACATE CONTEMPT ORDER; AND (3) DOCKET NO. 277: DEFENDANTS' JOINDER IN MASIMO'S MOTION TO VACATE ORDER** |
| v. | |
| POLITAN CAPITAL MANAGEMENT LP, et al., | |
| Defendants. | |
| | Judge: Hon. James V. Selna |
| | Crtrm.: 10C |

# **TABLE OF CONTENTS**

I.   INTRODUCTION .................................................................................. 2

II.  FACTUAL BACKGROUND ................................................................. 4

     A.   Joseph Kiani Founds Masimo and Develops It Into a
          Massively Successful Company............................................... 3

     B.   Defendants Commit Contempt as Part of a Hostile
          Takeover Campaign ................................................................ 3

     C.   Masimo, Under Defendants' Control, Undertakes a Sham
          Investigation and Moves to Unwind the Court's Contempt
          Finding .................................................................................... 7

     D.   Defendants Double Down on Their Incredible Distinction
          Between Disclosing the Contents and the Disposition of a
          Sealed Court Order ................................................................. 9

III. ARGUMENT ...................................................................................... 10

     A.   Masimo Cannot Withdraw an Application The Court
          Already Acted Upon and Should Be Judicially Estopped
          from Reversing Its Position; Alternatively, the Court
          Should Initiate Contempt and Sanctions Proceedings on Its
          Own Motion ........................................................................... 10

     B.   Defendants Committed Contempt, and No Changed
          Circumstances or Blame-Shifting Reduces The Flagrancy
          of Their Wrongdoing............................................................. 12

     C.   Serious Sanctions Are Necessary to Provide Remedial
          Relief and to Vindicate the Court's Authority...................... 14

          1.   Civil Contempt Sanctions Are Warranted to Afford
               Full Remedial Relief .................................................... 14

               (a)   Masimo's counterarguments are unpersuasive ............... 17

               (b)   Defendants' counterarguments are
                     unpersuasive .................................................... 18

          2.   Criminal Sanctions Are Warranted to Vindicate the
               Court's Authority.......................................................... 22

IV.  CONCLUSION .................................................................................. 26

# <u>TABLE OF AUTHORITIES</u>

**Cases**                                                                **Page(s)**

*Alexander v. United States,*
   509 U.S. 544 (1993) ........................................................................... 21

*Ashcroft v. Free Speech Coalition,*
   535 U.S. 234 (2002) ........................................................................... 21

*Bridges v. California,*
   314 U.S. 252 (1941) ........................................................................... 21

*Cetacean Research v. Sea Shepherd Conservation Soc.,*
   774 F.3d 935 (9th Cir. 2014) ....................................................... 16, 17

*Cooke v. United States,*
   267 U.S. 517 (1925) ........................................................................... 23

*Cox Broadcasting Corp. v. Cohn,*
   420 U.S. 469 (1975) ........................................................................... 21

*Craig v. Harney,*
   331 U.S. 367 (1947) ........................................................................... 21

*Doe v. Maywood Housing Auth.,*
   71 F.3d 1294 (7th Cir. 1995) ............................................................. 23

*Felder v. McVicar,*
   113 F.3d 696 (7th Cir. 1997) ............................................................. 10

*FTC v. Affordable Media,*
   179 F.3d 1228 (9th Cir. 1999) ........................................................... 19

*Gen. Signal Corp. v. Donallco, Inc.,*
   787 F.2d 1376 (9th Cir. 1986) ........................................................... 14

*Gentile v. State Bar of Nev.,*
   501 U.S. 1030 (1991) ......................................................................... 21

*Gompers v. Buck's Stove & Range Co.,*
   221 U.S. 418 (1911) ........................................................................... 14

*Hamilton v. State Farm Fire & Cas. Co.*,
    270 F.3d 778 (9th Cir. 2001) ................................................................... 11

*Hicks v. Feiock*,
    485 U.S. 624 (1988) ......................................................................... 23, 24

*HM Elecs., Inc. v. R.F. Techs., Inc.*,
    171 F. Supp. 3d 1020 (S.D. Cal. 2016) ................................................... 18

*Hoptowit v. Ray*,
    682 F.2d 1237 (9th Cir. 1982) ............................................................ viii

*In re Bayshore Fraud Trucks Sales, Inc.*,
    471 F.3d 1233 (11th Cir. 2006) .......................................................... viii

*In re Bradley*,
    588 F.3d 254 (5th Cir. 2009) ........................................................... 15, 22

*In re C.W. Mining Co.*,
    625 F.3d 1240 (10th Cir. 2010) ............................................................ 16

*In re Dual-Deck Video Cassette Recorder Antitrust Litig.*,
    10 F.3d 693 (9th Cir. 1993) .................................................................. 20

*In re Establishment Inspection of Hern Iron Works, Inc.*,
    881 F.2d 722 (9th Cir. 1989) ............................................................... 22

*In re Osborne*,
    344 F.2d 611 (9th Cir. 1965) ............................................................... 11

*Int'l Union, United Mine Workers of Am. v. Bagwell*,
    512 U.S. 821 (1994) .................................................................. 14, 22, 25

*Kamakana v. City & County of Honolulu*,
    447 F.3d 1172 (9th Cir. 2006) ............................................................. 21

*Landmark Communics., Inc. v. Virginia*,
    435 U.S. 829 (1978) ........................................................................... 21

*Lyn-Lea Travel Corp. v. Amer. Airlines, Inc.*,
    283 F.3d 282 (5th Cir. 2002) .......................................................... 15, 18

*McComb v. Jacksonville Paper Co.*,
   336 U.S. 187 (1949) .............................................................. 15, 16, 18

*Multimedia Holdings Corp. v. Cir. Ct. of Fla., St. Johns County*,
   544 U.S. 1301 (2005) ...................................................................... 21

*Muniz v. Hoffman*,
   422 U.S. 454 (1975) .................................................................. 24, 25

*Nebraska Press Ass'n v. Stuart*,
   427 U.S. 539 (1976) ........................................................................ 21

*Nixon v. Warner Communics., Inc.*,
   435 U.S. 589 (1978) ........................................................................ 20

*Northeast Women's Ctr., Inc. v. McMonagle*,
   939 F.2d 57 (3d Cir. 1991) ............................................................ 16

*Oracle USA, Inc. v. Rimini Street, Inc.*,
   81 F.4th 843 (9th Cir. 2023) .......................................................... 15

*Padilla v. Beard*,
   2017 WL 1364666 (E.D. Cal. Apr. 14, 2017) .............................. viii

*Parsons v. Ryan*,
   949 F.3d 443 (9th Cir. 2020) ......................................................... 15

*Portland Feminist Women's Health Ctr. v. Advocates for Life, Inc.*,
   877 F.2d 787 (9th Cir. 1989) ......................................................... 16

*Ruelas v. Muniz*,
   2016 WL 4009953 n.1 (C.D. Cal. May 6, 2016) .......................... viii

*Sandin v. Conner*,
   515 U.S. 472 (1995) ...................................................................... viii

*SEC v. Naftalin*,
   460 F.2d 471 (8th Cir. 1972) ......................................................... 17

*Shuffler v. Heritage Bank*,
   720 F.2d 1141 (9th Cir. 1983)..................................................................17, 18

*Spallone v. United States*,
   493 U.S. 265 (1990) ........................................................................................11

*Taggart v. Lornezen*,
   587 U.S. 554 (2019) ....................................................................................7, 21

*United States v. Arredondo-Valenzuela*,
   2011 WL 2489745 n.2 (D. Kan. Jun. 20, 2011)................................................10

*United States v. Ballek*,
   170 F.3d 871 (9th Cir. 1999).............................................................................25

*United States v. Dickinson*,
   465 F.2d 496 (5th Cir. 1972)..............................................................................22

*United States v. Glass*,
   361 F.3d 580 (9th Cir. 2004)..............................................................................24

*United States v. Martin*,
   226 F.3d 1042 (9th Cir. 2000)............................................................................17

*United States v. Mine Worker*s of Am.,
   330 U.S. 258 (1947) ..................................................................................passim

*United States v. Neville*,
   985 F.2d 992 (9th Cir. 1993)..............................................................................11

*United States v. Twentieth Century Fox Film Corp.*,
   882 F.2d 656 (2d Cir. 1989)...............................................................................25

*Walker v. City of Birmingham*,
   388 U.S. 307 (1967) ...........................................................................................22

*Whaley v. Belleque*,
   520 F.3d 997 (9th Cir. 2008)..............................................................................11

*Wood v. Georgia*,
   370 U.S. 375 (1962) ...........................................................................................21

CIVIL ACTION NO. 8:24-cv-01568-JVS-JDE
PROPOSED AMICUS BRIEF OF MASSI JOSEPH E. KIANI

**Statutes**

18 U.S.C. § 401 ................................................................................................ 22

18 U.S.C. § 3553(a) ........................................................................................ 25

**Rules**

Federal Rule of Criminal Procedure 42 ....................................................... 24

Federal Rule of Civil Procedure 7 ............................................................... vii

Federal Rule of Civil Procedure 60 ............................................................. 17

**STATEMENT OF IDENTITY, INTEREST, AND AUTHORITY TO FILE**

Proposed amicus curiae Joseph E. Kiani is the founder and former Chairman and Chief Executive Officer of Masimo Corporation. Over the course of nearly 36 years, Mr. Kiani built Masimo from scratch into a wildly successful health technology business with more than $2 billion in annual revenue, over 8,000 employees, and approximately 4,000 patents and patent applications, including 900 on which Mr. Kiani is a named inventor or co-inventor. On September 19, 2024, Mr. Kiani was forced out of Masimo by activist investors at Defendant Politan Capital Management LP.

Mr. Kiani has a substantial interest in this case. He is a significant Masimo shareholder, beneficially owning 9.1% of its common stock, and more in options. He is also entitled under his Employment Agreement to termination benefits including restricted share units equivalent to approximately 5% of Masimo's common stock once vested. Prior to being forced out of the company he founded and led, Mr. Kiani chaired the Board of Directors that filed this case and pursued the contempt motion that Masimo now purports to withdraw, which resulted in the contempt order that Masimo, now led by Politan's directors, seeks to vacate. The contempt committed by Politan and its managing director, Quentin Koffey, was designed to advance Politan's hostile, and ultimately successful, bid to take over Masimo and remove Mr. Kiani from his positions at the company.

This amicus brief is filed pursuant to Federal Rule of Civil Procedure 7(b) and the Court's "inherent authority," *In re Bayshore Fraud Trucks Sales, Inc.*, 471 F.3d 1233, 1249 n.34 (11th Cir. 2006); *Padilla v. Beard*, 2017 WL 1364666, at *5 (E.D. Cal. Apr. 14, 2017); *Ruelas v. Muniz*, 2016 WL 4009953, at *1 n.1 (C.D. Cal. May 6, 2016), and "broad discretion" to permit the filing of amicus briefs, *Hoptowit v. Ray*, 682 F.2d 1237, 1260 (9th Cir. 1982), *abrogated on other grounds by Sandin v. Conner*, 515 U.S. 472 (1995).

## STATEMENT OF AUTHORSHIP

This amicus brief was authored by Mr. Kiani's counsel, Hueston Hennigan LLP, with Mr. Kiani's feedback and edits. Mr. Kiani paid his counsel's fees to fund the preparation and submission of this brief. No other person contributed money that was intended to fund the preparation or submission of this brief.

# AMICUS BRIEF

## I.    INTRODUCTION

Politan Capital Management and its managing partner, Quentin Koffey, are in the business of breaking the rules.  They operate with impunity to derive tactical advantages and then whitewash their wrongdoing once the damage is done.  That is why this suit originated: Politan and Koffey ("defendants") made a series of false and misleading statements in their SEC filings to facilitate their hostile takeover of Masimo Corporation; capitalized on their deception to obtain an advantage in proxy battles for Masimo board seats; and, only once caught, issued half-hearted corrective disclosures in amended filings to "moot" their malfeasance.  Defendants' lie-first/correct-later strategy culminated in contempt of court.  Just one week before Masimo's 2024 annual meeting, and with proxy voting already underway, defendants issued a press release divulging the outcome of the Court's "UNDER SEAL" order denying Masimo's motion for a preliminary injunction.  Compounding the harm from that premature and prohibited disclosure, defendants' press release inaccurately asserted that the Court had rejected Masimo's allegations against defendants when, in fact, the Court's sealed ruling had confirmed numerous allegations to be true: defendants had made multiple false or misleading statements in its campaign to secure the election of its nominees.  But Masimo, abiding by the rules, was powerless to reveal the truth, and defendants' plan worked.  They prevailed in the proxy contest, secured two additional seats on Masimo's Board of Directors, and forced Joe Kiani out of the company he had built from the ground up over the course of more than 35 years.

This Court already condemned defendants' premature disclosure in forceful terms.  The day after they violated the sealing order, the Court conducted a hearing and held "Politan and Quentin Koffey in contempt for the disclosure."  (Docket No. 219 ("Sept. 13 Contempt Order") at 1.)  It was not a close call.  The Court found that defendants committed contempt "by clear and convincing evidence" and concluded

that there was "no *fair ground of doubt* as to the wrongfulness of Politan and Koffey's conduct." (*Id.* at 1-2 (quotation marks and citation omitted).) The Court was particularly unimpressed by their claim that they had only divulged the outcome of the Court's order and not its specific contents—"That is not a credible distinction." (Sept. 13, 2024 Hearing Tr. at 10:8.) The Court set a later hearing only "to consider the imposition of monetary or other sanctions" (Sept. 13 Contempt Order at 2), and subsequently advised that it was "considering awarding Masimo Corporation its attorney's fees and costs in pursuing an order of contempt" and was "also considering a monetary sanction against Politan in the same amount but not less than $50,000" (Docket No. 248 ("Sept. 27 Contempt Order") at 1).

Having flouted this Court's authority to advance their hostile takeover bid, defendants now seek to escape any consequence for their contempt. Using Masimo as their puppet, defendants purport to withdraw the contempt application that this Court already granted and ask that the Court vacate its finding of contempt. That proposal would make a mockery of the Court's authority. It would mean that parties to litigation could *strategically violate* the Court's orders to seize control of their opponents and then exercise that newfound control to whitewash their preceding malfeasance. Defendants would reap the tactical benefits of their contempt and suffer no corresponding sanction. They are "in [every] way suggesting that the Court's interest in enforcing compliance with its orders is insignificant [and] should be brushed aside." (Docket No. 268-1 ("Mot. to Vacate") at 4.)

This Court should condone nothing of the sort. "The interests of orderly government demand that respect and compliance be given to orders issued by courts possessed of jurisdiction of persons and subject matter." *United States v. United Mine Workers of Am.* ("*Mine Workers*"), 330 U.S. 258, 303 (1947). "One who defies the public authority and willfully refuses his obedience, does so at his peril." *Id.* The same acts of contempt may warrant civil sanctions "to coerce the defendant into compliance with the court's order, and to compensate the complainant for losses

sustained"; criminal sanctions "for the purpose of vindicating the authority of the court"; or both. *Id.* at 302-04.

Here, the Court should deny Masimo's motions to erase defendants' contempt and should impose a remedy along the lines of what the Court previously contemplated. Specifically, the Court should order (1) civil contempt sanctions holding each defendant jointly and severally liable for Masimo's attorneys' fees and costs in pursuing an order of contempt; and (2) criminal contempt sanctions requiring that each defendant pay the Court $50,000 for their malfeasance. Such sanctions would both benefit Masimo's shareholders by contributing funds to the company and vindicate the authority of the Court after defendants plainly violated its sealing order.

## II.    FACTUAL BACKGROUND

### A.    Joseph Kiani Founds Masimo and Develops It Into a Massively Successful Company

Joe Kiani founded Masimo Corporation 35 years ago. Masimo is a health technology company responsible for life-saving inventions and products, including a pulse oximetry technology that Mr. Kiani co-invented and is used to monitor more than 200 million people per year. As Masimo's Chairman and CEO, Mr. Kiani built Masimo into a company generating over $2 billion in annual revenues, employing over 8,000 people, and holding approximately 4,000 patents and patent applications, including 900 on which Mr. Kiani is a named inventor or co-inventor. After taking the company public in 2007, Mr. Kiani led Masimo to a nearly 800% increase in annual revenue and a market capitalization reaching, at its apex, nearly $17 billion.

### B.    Defendants Commit Contempt as Part of a Hostile Takeover Campaign

Defendants are not in the business of medical innovation or advancing public health. Politan is a New York hedge fund, and Koffey is its managing partner. Koffey has never held a senior management position in any medical or consumer technology company, or any public company at all, and he has no prior investment

- 3 -

experience in the medical device industry.  Defendants, however, methodically plotted to overtake Masimo.  Politan acquired 9% of Masimo's shares by August 2022, and in connection with Masimo's 2023 annual shareholder meeting, defendants launched a successful proxy contest for two seats on the company's board—which were filled by Koffey and his handpicked ally, Michelle Brennan.

The following year, defendants commenced a new proxy campaign for two additional seats on the Masimo board, including Mr. Kiani's.  Politan selected William Jellison and Darlene Solomon as its nominees.  Two months before the company's annual meeting on September 19, 2024, Masimo filed this lawsuit, alleging that Politan had made false and misleading statements in its proxy communications to shareholders.  Masimo sought a preliminary injunction to prohibit defendants and their co-defendants from voting any proxies obtained by means of misleading statements.  On the evening of September 11, 2024, the Court issued a sealed order to deny Masimo's request for a preliminary injunction and provided copies of that order to the parties so that they could propose redactions by September 13, 2024 at 12:00 p.m.  (*See* Sept. 13 Contempt Order at 1; Docket No. 201 (under seal order); Docket No. 278-6 (email providing parties with sealed order).)

Defendants, however, did not wait until the order was unsealed.  On the morning of Thursday, September 12, 2024—just one week before Masimo's annual meeting and with shareholders already voting in the proxy contest—defendants issued a press release announcing the Court's ruling.  (*See* Sept. 13 Contempt Order at 1; Sept. 13, 2024 Hrg. Tr. at 3-6.)  Defendants titled the press release: "Politan Comments on Judge's Decision to Deny Masimo's Request for a Preliminary Injunction."  (Docket No. 277-26 (Docket No. 277-2 at 2 ¶ 10.)  By 6:44 a.m. Pacific Time, the press release was already in the media, published in full by Business Wire. (Docket No. 277-26 (dated Sept. 12, 2024 at 9:44 a.m. Eastern Daylight Time).)  Despite knowing that the Court's order remained "under seal," Politan boasted about the outcome, and Koffey expressed that he was "pleased by the court's ruling."  (*Id.*)

Defendants' press release, moreover, implied that they had done nothing wrong and had been fully absolved. They claimed that Masimo's litigation was "nothing more than a desperate move to prevent a fair election" and that Masimo had leveled a string of mere "accusations" after its "original arguments were exposed to be false." (*Id.* at 2.) The subheading of their press release proclaimed: "*Judge Found that Masimo's Endless Array of Allegations Did Not Hold Up in Court*." (*Id.* at 1.)

That was untrue. The litigation had actually *confirmed* a number of Masimo's allegations, exposing multiple false claims in defendants' proxy statements. (*See, e.g.*, Docket No. 221 at 21 (identifying false statement); *id.* at 24 n.7 (same); *id.* at 25 (same); *id.* at 26 n.8 (same); *id.* at 34-35 (same); *id.* at 36 (same).) The Court agreed with Masimo that defendants had made "false or misleading statements" that were "likely to be an 'essential link' in the accomplishment of Politan's" effort to secure "the election of its [board] Nominees." (Docket No. 221 at 43.) However, the Court denied injunctive relief principally because after deceiving investors, defendants had scrambled to correct their misstatements by filing "amended" and "supplemental" proxy materials, including as late as September 9, 2024, when proxy voting was already well underway. (Docket No. 221 at 4, 9, 11, 12, 18, 24, 26, 35, 36, 37, 49; Docket No. 198 ¶ 22; Docket No.198-21.) Defendants' press release was thus highly misleading, at best, but because the Court's order remained under seal on September 12 and because Masimo, unlike Politan, abided by the rules, it was unable to immediately respond. Masimo's only option was to file an "*Ex Parte* Application for an Order Finding Defendants in Contempt of Court and for Sanctions" based on their "flagrant violation of this Court's sealing order," which "directly prejudiced Masimo in the ongoing proxy fight." (Docket No. 203-2 at 1.)

The following morning, Friday, September 13, the Court held a hearing on defendants' unauthorized disclosure. (*See* Sept. 13, 2024 Hrg. Tr. at 3.) By that point, their statements had been in the media for over 25 hours, the Masimo board election was six days away, and, as the Court observed, any further reporting would

- 5 -

not be possible until "the end of the day on a Friday." (*Id.* at 3-6, 24.) Defendants attempted to justify their wrongdoing by claiming a distinction between divulging the disposition and the details of the Court's order, claiming that only the latter was prohibited. (*See* Docket No. 208 at 1, 3, 6.) "That is not a credible distinction," the Court explained. (Sept. 13, 2024 Hrg. Tr. at 10:8; *see also id.* at 11:13 ("I must tell you that's not credible."); *id.* at 29:12-13 ("I don't find that distinction credible.").) After all, "the bottom line" disposition, and not any of the Court's "individual findings," was "[p]robably the most important fact flowing from the Court's ruling." (*Id.* at 10:8-16.) "[O]ne could not come away believing that one could disclose the disposition[.]" (*Id.*)

At the end of the hearing, the Court found defendants in contempt. (*Id.* at 27, 29.) They had "violated" the Court's order "by disseminating information under seal." (*Id.* at 27:2-3.) And the damage had been done: "Once the information is out, it's out." (*Id.* at 27:4-5.) The Court denied without prejudice Masimo's request to order a delay of the shareholder meeting and indicated that, "[a]t present," the Court was "only contemplating monetary relief." (*Id.* at 27:21-22) The Court set a further hearing "on an Order to Show Cause why the Court should not impose monetary sanctions or other sanctions for the contempt which I have found." (*Id.* at 27:22-25.)

Later that same day, the Court issued a Minute Order confirming its finding of contempt. (Sept. 13 Contempt Order.) Therein, the Court explained that it had "held Politan and Quentin Koffey in contempt for the disclosure" of information in the Court's sealed order and that its contempt finding was supported "by clear and convincing evidence." (*Id.* at 1.) The Court also reiterated the unreasonableness of defendants' distinction between divulging the disposition and the details of a sealed order. "Any reasonable person would understand that no portion of the sealed document could be disclosed without the permission of the Court," "disclosing the result, but not the particulars" was not substantially in compliance with the Court's sealing order, and "[n]otwithstanding the advice of counsel, relying on the distinction

- 6 -

between the result and the particulars of the Order was not reasonable and not credible." (*Id.* at 2.)  The Court pointed out, moreover, that there was no dispute that the impermissibly disclosed order "would be material to an investor's vote decision in the proxy fight," and "Politan's disclosure gave it an unfair advantage in the proxy fight." (*Id.*)  In short, there was "no '*fair ground of doubt* as to the wrongfulness of' Politan and Koffey's conduct.'" (*Id.* (quoting *Taggart v. Lornezen*, 587 U.S. 554, 561 (2019).)  The Court reserved only the question of whether to impose sanctions for defendants' contempt.  (*Id.*)

The parties filed supplemental briefs (Docket Nos. 226, 227), after which, on September 27, 2024, the Court issued another Minute Order, reaffirming that it had "found Politan Capital Management LP and Quentin Koffey in contempt," and all that was left was a "hearing to determine appropriate sanctions" (Docket No. 248). The Court informed the parties that it was "considering awarding Masimo Corporation its attorney's fees and costs in pursuing an order of contempt" and was "also considering a monetary sanction against Politan in the same amount but not less than $50,000." (*Id.*)  The sanctions hearing was initially scheduled for October 9, 2024 (Sept. 13, 2024 Hrg. Tr. at 27:21-25; Sept. 13 Contempt Order at 2; Sept. 27 Contempt Order) but, after defendants prevailed in the proxy fight, the Court granted the parties' stipulations to continue the sanctions hearing three times—first, to December 9, 2024 (Docket No. 250); second, to January 13, 2025 (Docket No. 265); and third, to February 3, 2025 (Docket No. 276).  The sanctions hearing is now set for February 3, 2025 at 1:30 p.m.  (*Id.*)

## C.    Masimo, Under Defendants' Control, Undertakes a Sham Investigation and Moves to Unwind the Court's Contempt Finding

After defendants took control of Masimo at the September 19 annual meeting, the Politan-controlled board frantically began the process of trying to erase defendants' wrongdoing and reverse this Court's contempt order.  That process began just five days (and merely three business days) after the shareholder vote.  On

"September 24, 2024," Masimo's new board formed a "Special Committee" (Mot. to Vacate at 10) designed to insulate defendants from any consequence for their contempt and to unwind the underlying litigation in this case.  The Special Committee spent two months on those endeavors.  (*Id*.)  Now, before following the Special Committee's directive "to seek dismissal of the case with prejudice" (*id.* at 11), Masimo's new counsel brought in by Politan seeks to "withdraw" the ex parte application for an order finding defendants in contempt and for sanctions (Docket No. 267) and requests that the Court "vacate its prior order of contempt" (Docket No. 268).

Although Masimo touts its "Special Committee" as "independent" (Mot. to Vacate at 10), it is nothing of the sort.  It is comprised of just two individuals, Jellison and Solomon—the two Politan-nominated directors who obtained their Board seats on September 19 as a result of Politan's proxy fight.  (*See* Docket No. 268-4 at 1-2.)  Thus, Politan committed contempt to aid in the election of the two directors whose report now requests "that the Court vacate its finding of contempt." (Mot. to Vacate at 11.)  The beneficiaries of the contempt request that it be excused. Those beneficiaries claim in their report that "sanctions no longer serve any useful purpose to Masimo" (Docket No. 268-3 at 21), but that is plainly not true.  As any honest fiduciary knows, money flowing into the company's coffers benefits the company's shareholders.  Confirming the true impetus of Masimo's request to allow defendants to go unpunished, the report observes that "Politan is a major shareholder of Masimo and Mr. Koffey has since been voted in as lead independent director." (*Id.*)  The Special Committee was designed to serve defendants' interests, not Masimo's.

Masimo's new counsel retained after the Politan takeover similarly describes itself as "independent" when, in fact, it is being paid to try to undo this Court's contempt order.  (Mot. to Vacate at 2.)  To achieve that aim, Masimo's new counsel parrots arguments that defendants advanced in their supplemental brief on September

15 (Docket No. 227).  Defendants' supplemental brief claimed that the contempt order itself "sufficiently serve[d] the remedial purposes that concerned the Court." (*Id.* at 13.)  Masimo's new counsel makes the same claim, contending that "[t]he primary purpose of the contempt motion was achieved" by the contempt order itself. (Mot. to Vacate at 2, 18.)  Defendants' supplemental brief attempted to shift the blame to Masimo's former counsel by asserting that after defendants impermissibly disclosed the sealed order on September 12, Masimo should have "agree[d] to redactions to the Court's Order so it could become public" before the Court's redaction deadline of September 13 at noon.  (Docket No. 227 at 3-4, 16-17.) Masimo's new counsel attempts the same blame-shifting, contending that Masimo's prior counsel "engaged in gamesmanship" by failing "to expedite public release of a redacted copy of the order."  (Mot. to Vacate at 3, 8-9, 15-16; *accord* Defendants' Joinder at 5-6, 18-19 (repeating same blame-shifting argument).)  After defendants made those arguments in their supplemental brief, this Court *reaffirmed its contempt finding* and articulated the sanctions it was contemplating.  (Docket No. 248.) Masimo echoes defendants' arguments nonetheless.

### D.    Defendants Double Down on Their Incredible Distinction Between Disclosing the Contents and the Disposition of a Sealed Court Order

Defendants, the contemnors, have now joined Masimo's motion to vacate the Court's finding of contempt.  (Docket No. 277 ("Defendants' Joinder").)  But rather than issue unqualified apologies for their malfeasance, defendants double down on their claim that there is a difference between divulging the contents and the disposition of a sealed court order.  (*Id.* at 1, 4-5, 13-16.)  Even though (1) the public docket text regarding the sealed order read: "SEALED [IN CHAMBERS] ORDER"; (2) the sealed order "stated 'UNDER SEAL' on the first page"; and (3) the cover email providing the sealed order to the parties for purposes of proposing redactions stated that the order "was filed under seal," defendants still maintain that the order's "disposition" was not "embargoed."  (*Id.* at 4.)  They suggest that they were

- 9 -

permitted to disclose that disposition because the Court's tentative sealed order had
been discussed in open court and the final sealed order, cover email to the parties,
and docket text did not specifically say "that the motion's disposition was embargoed
or should not be disclosed." (*Id.* at 2-4; *see also id.* at 11 ("The order, docket text,
and email did not expressly provide that the outcome of the motion, i.e., a statement
that the Court has denied the motion, was to be treated as sealed.").)  Defendants also
argue that holding them in contempt for disclosing the disposition of the Court's
sealed order "raises serious First Amendment concerns" and would be unfair because
they acted in "good faith" (*id.* at 10-19)—even though they not only violated this
Court's directives but did so in a manner that mischaracterized the Court's
substantive determinations.  They propose that the Court should permit them to walk
away consequence-free.

### III.  ARGUMENT

Masimo's motions to withdraw its contempt and sanctions application and to
vacate the Court's contempt order should be denied.  The Court should instead
reaffirm its contempt findings and impose civil and criminal sanctions on each
defendant.

#### A.  Masimo Cannot Withdraw an Application The Court Already Acted Upon and Should Be Judicially Estopped from Reversing Its Position; Alternatively, the Court Should Initiate Contempt Proceedings on Its Own Motion

Masimo cites no precedent permitting a party to unilaterally withdraw a
motion that the Court has already acted upon.  Indeed, even where a court has not yet
ruled, "[i]t is generally well established that a party cannot 'withdraw' a motion
which has already been presented to and considered by the Court in an attempt to
circumvent an adverse ruling on the merits." *United States v. Arredondo-Valenzuela*,
2011 WL 2489745, at *1 n.2 (D. Kan. Jun. 20, 2011); *see, e.g.*, *Felder v. McVicar*,
113 F.3d 696, 698 (7th Cir. 1997) (holding that a petitioner who realizes the district
court is going to rule against him cannot withdraw his habeas application to avoid the

bar on successive petitions). Here, the Court already found defendants in contempt based on Masimo's application for a contempt finding and sanctions, and the Court reaffirmed that finding in two written minute orders. All that is left is for the Court "to determine appropriate sanctions" for defendants' contempt. (Docket No. 248.) Masimo cannot simply withdraw an application the Court previously acted upon.

But even if such unilateral action to thwart the Court's intent were ever permissible, Masimo should be judicially estopped from taking such action here. Judicial estoppel "precludes a party from gaining an advantage by asserting one position, and then later seeking an advantage by taking a clearly inconsistent position." *Hamilton v. State Farm Fire & Cas. Co.*, 270 F.3d 778, 782 (9th Cir. 2001). The doctrine ensures that a party may not "reverse its position in order to suit its current objectives." *Whaley v. Belleque*, 520 F.3d 997, 1002 (9th Cir. 2008). That is exactly what Masimo devises to do. Having persuaded the Court that defendants committed contempt, Masimo—now overtaken by the contemnors—has reversed its position to suit its current objectives. It should be estopped from "such fast and loose toying with the judicial system." *United States v. Neville*, 985 F.2d 992, 1000 (9th Cir. 1993).

If, however, the Court concludes that Masimo has the authority to withdraw its application for a finding of contempt and sanctions, the Court should substitute its own comparable motion. Courts have always had "inherent power to enforce compliance with their lawful orders through civil contempt," *Spallone v. United States*, 493 U.S. 265, 276 (1990), and may also initiate criminal contempt proceedings on their "own motion[s]," *In re Osborne*, 344 F.2d 611, 616 (9th Cir. 1965). Defendants, having violated the Court's authority by publicizing a sealed order, should not now be permitted to evade the Court's authority by causing Masimo to withdraw its contempt application. The Court, if necessary, may safeguard against that stratagem by implementing contempt proceedings on its own motion.

**B.    Defendants Committed Contempt, and No Changed Circumstances or Blame-Shifting Reduces The Flagrancy of Their Wrongdoing**

There is no question that defendants committed flagrant contempt.  They were provided copies of a sealed Court order solely for the purpose of submitting proposed redactions before the Court issued a public version of its ruling and chose to defy the Court's sealing mandate.  (Sept. 13 Contempt Order at 1.)  Eager to weaponize the Court's ruling and get ahead of the Court's findings that they had lied to advance their position in the proxy contest, defendants treated the sealing order as a mere impediment to the accomplishment of their objectives and, just as with their initial disclosures, told a misleading story.  "They had full opportunity to comply with the order of the District Court, but they deliberately refused obedience and determined for themselves the validity of the order." *Mine Workers*, 330 U.S. at 306.  The Court found their contempt established "by clear and convincing evidence" and concluded that "there [was] no *fair ground of doubt* as to the wrongfulness of [their] conduct." (Sept. 13 Contempt Order at 1-2 (quotation marks omitted).)  And defendants' excuse for their misconduct was "not credible."  (Sept. 13 Hrg. Tr. at 11:13.)  Parties that are prohibited from divulging sealed orders cannot divulge the outcome of those orders.

Masimo's attempt to downplay defendants' contempt is not persuasive.  The only sense in which "circumstances have changed" (Mot. to Vacate at 13) is that defendants' misconduct paid off.  Their contempt has been rewarded, not rectified. They gained the benefit of advance disclosure of the Court's ruling without the details of the Court's adverse findings at a critical moment in the proxy contest by divulging what everyone knew was "a significant fact in terms of shareholders making their judgments in th[e] proxy fight."  (Sept. 13 Hrg. Tr. at 8-9.)  Though defendants refused to readily concede that point at their contempt hearing (*id.*), they now acknowledge that the ruling they divulged "held significant implications not only for the parties, but also for all voting shareholders of Masimo" (Defendants'

- 12 -

Joinder at 16).  The subsequent publication of the Court's redacted "preliminary injunction findings," as planned, did not remedy the premature disclosure (Mot. to Vacate at 13)—it was the timing that mattered.  Nor was the "contempt finding itself" or the dissemination of other information (*id.*) a remedy for defendants' wrongdoing.  While the Court's ruling on Masimo's preliminary injunction motion was undeniably important to the proxy battle, it is impossible to know whether the Court's finding of contempt had any effect on shareholder votes.  Moreover, contempt sanctions exist not just to compensate victims but also to redress the affront to the Court's authority.  No sham investigation, upswing in stock price, or purported increase in management "cohesion" (*id.* at 14) excuses defendants' contempt.

There is also no merit to Masimo's claim (lifted from defendants' prior briefing) that its former counsel shares in the blame.  Masimo's former counsel was rightly "shocked" by defendants' public disclosure of a sealed Court ruling (Docket No. 209-5 at 3) and appropriately moved for a finding of contempt.  The damage was done as soon as defendants violated the Court's sealing and protective orders, and no additional disclosures could have "mitigated" that damage (Mot. to Vacate at 3, 8, 15-17).  Indeed, even after "two months of investigation" (*id.* at 13), defendants still seem unable to appreciate the fundamental point that the parties were prohibited from divulging the preliminary injunction ruling a day early.  Without a further order of the Court, the parties could not have agreed to the "release of a public version of the Court's order." (Mot. to Vacate at 16.)  And even if defendants are now suggesting that they were contemplating a joint emergency motion to "expedite" disclosure of the Court's preliminary injunction ruling (*id.*; Defendants' Joinder at 18-19), that is not what they proposed (*see* Docket No. 209-5 at 1), and Masimo's prior counsel would have had every right to insist on waiting until the Court's noon deadline the next day.  Demanding compliance with Court orders and rejecting an opposing party's proposal to "mitigate" its contempt with a "remedy" that would further advance that party's interests is in no sense "gamesmanship."  (Mot. to

Vacate at 3.)  Masimo's prior counsel bears no responsibility for defendants' misconduct.[1]

### C.  Serious Sanctions Are Necessary to Provide Remedial Relief and to Vindicate the Court's Authority

"The interests of orderly government demand that respect and compliance be given to orders issued by courts possessed of jurisdiction of persons and subject matter." *Mine Workers*, 330 U.S. at 303.  "One who defies the public authority and willfully refuses his obedience, does so at his peril." *Id.*  The power to impose contempt sanctions exists for these purposes, ensuring compliance with court orders, compensation for contempt victims, and vindication of judicial authority.  *See id.* at 302-04.  That power "is a necessary and integral part of the independence of the judiciary, and is absolutely essential to the performance of the duties imposed on them by law." *Gompers v. Buck's Stove & Range Co.*, 221 U.S. 418, 450 (1911).  A party cannot anoint himself "a judge of the validity of orders which have been issued, and by his own act of disobedience set them aside." *Id.*  To avoid any such "mockery" of the "judicial power of the United States," courts may impose civil or criminal contempt sanctions.  *Id.* at 441-42, 450.  Both are appropriate here.

#### 1.  Civil Contempt Sanctions Are Warranted to Afford Full Remedial Relief

"[A] contempt sanction is considered civil if it is remedial, and for the benefit of the complainant." *Int'l Union, United Mine Workers of Am. v. Bagwell* ("*Bagwell*"), 512 U.S. 821, 827 (1994).  Civil contempt sanctions may be imposed "to compensate the complainant for losses sustained," *Mine Workers*, 330 U.S. at 303-04, or "injuries resulting from the contemptuous behavior," *Gen. Signal Corp. v.*

---

[1] Masimo's new counsel also argues that vacatur of the Court's order is necessary to prevent Masimo from having to handle litigation against Koffey (Mot. to Vacate at 4), but that dilemma can be resolved by permitting Mr. Kiani to participate as amicus before this Court, and the Ninth Circuit similarly retains discretion to appoint amici as needed.

*Donallco, Inc.*, 787 F.2d 1376, 1380 (9th Cir. 1986).  "The measure of the court's power in civil contempt proceedings is determined by the requirements of full remedial relief."  *McComb v. Jacksonville Paper Co.*, 336 U.S. 187, 193 (1949).  As "a creature of inherent power," civil contempt authority "is broad and pragmatic, reaching where it must—consistent with prudent court management and due process—to prevent insults, oppression, and experimentation with disobedience of the law."  *In re Bradley*, 588 F.3d 254, 265-66 (5th Cir. 2009).  The rule that district judges exercise authority "to enter broad compensatory awards" as civil contempt sanctions is "longstanding" and "unaltered."  *Parsons v. Ryan*, 949 F.3d 443, 456 (9th Cir. 2020).  As a result, courts imposing civil contempt remedies may require "a variety of acts" by the contemnor and may even award compensatory relief to parties other than the complainant.  *McComb*, 336 U.S. at 189, 193-94 (where Department of Labor administrator "instituted [the] contempt proceeding" based on the defendant's failure to comply with court-ordered wage and hour provisions, trial court was permitted to order payment of back wages to employees).  "[T]ypically," however, civil contempt sanctions "tak[e] the form of unconditional monetary sanctions paid to the aggrieved party."  *Oracle USA, Inc. v. Rimini Street, Inc.*, 81 F.4th 843, 859 (9th Cir. 2023) (quotation marks omitted).

The Court should order the civil contempt remedy it previously contemplated: "awarding Masimo Corporation its attorney's fees and costs in pursuing an order of contempt."  (Docket No. 248.)  The Fifth Circuit has endorsed similar sanctions on similar facts.  Where a contemnor "violated the [district court's] protective orders by revealing the contents of sealed documents to the press," the circuit affirmed a civil contempt sanction of "all the costs, attorneys' fees and expenses incurred by [the complainants] in attempting to obtain the compliance of [the contemnor] and its representatives with the terms of the protective orders."  *Lyn-Lea Travel Corp. v. Am. Airlines, Inc.*, 283 F.3d 282, 290-91 (5th Cir. 2002) (awarding nearly $124,000 in fees plus $30,000 in contingent appellate fees).  The Ninth Circuit has also affirmed

civil contempt sanctions for the "costs of bringing the contempt proceeding, including reasonable attorney's fees." *Portland Feminist Women's Health Ctr. v. Advocs. for Life, Inc.* ("*Women's Health*"), 877 F.2d 787, 790 (9th Cir. 1989). So have other circuits. *See, e.g.*, *In re C.W. Mining Co.*, 625 F.3d 1240, 1244, 1247 (10th Cir. 2010); *Ne. Women's Ctr., Inc. v. McMonagle*, 939 F.2d 57, 70 (3d Cir. 1991). Awarding "fees and costs incurred in bringing and prosecuting [civil] contempt proceedings" based on the violation of a court order is appropriate because "[t]he cost of bringing the violation to the attention of the court is part of the damages suffered by the prevailing party and those costs would reduce any benefits gained by the prevailing party from the court's violated order." *Inst. of Cetacean Rsch. v. Sea Shepherd Conservation Soc'y.*, 774 F.3d 935, 958 (9th Cir. 2014).

Such an award makes good sense here. Masimo's contempt application was a direct response to defendants' unauthorized and misleading disclosure and was designed "to redress Defendants' flagrant violation of this Court's sealing order" and to "place [Masimo] in the position it would have occupied if Defendants had adhered to the Court's orders." (Docket No. 203-2 at 1, 3.) Masimo went to great lengths to devise a remedy to "address the harm [defendants] caused," to "remove the improper advantage [they] obtained," and to "level the playing field in a manner that is still possible to achieve." (Docket No. 226 at 1-2.) Because the bell could not be unrung—"Once the information is out, it's out." (Sept. 13, 2024 Hrg. Tr. at 27:4-5)—Masimo proposed other measures that might afford it the "full remedial relief," *McComb*, 336 U.S. at 193, to which it was entitled (*see* Docket No. 226 at 3-6). The Court, however, was concerned that it did not have the power to order the remedies Masimo proposed. (*See* Sept. 13, 2024 Hrg. Tr. at 19, 26-27.) Defendants, as a result, reaped the benefit of their contempt while Masimo suffered the consequences. The impact of defendants' contempt on the shareholder vote or Masimo's long-term health are impossible to measure, but the fees and costs Masimo incurred in "bringing the violation [of the Court's] order to the attention of the [C]ourt,"

*Cetacean Research*, 774 F.3d at 958, and pursuing "the contempt proceeding," *Women's Health*, 877 F.2d at 790, are readily measurable. Defendants should be ordered to pay those fees and costs to Masimo.

(a)    Masimo's counterarguments are unpersuasive

Masimo and the Special Committee's claim that "sanctions no longer serve any useful purpose to Masimo" (Mot. to Vacate at 11; Docket No. 268-3 at 21) is both false and troubling. Masimo is, of course, a publicly traded company; its shareholders are its owners. Funds flowing into the company are the simplest form of shareholder benefit. The fact that the directors on the Special Committee would brush aside reimbursement for attorneys' fees and costs as serving no "useful purpose" to Masimo (*id.*) reveals that those Politan-nominated fiduciaries have forgotten which company they serve. They owe a duty of loyalty to Masimo, not Politan. Their pursuit of the interests of "a major shareholder" (*id.*) with an under 10% interest in Masimo (*see* Docket No. 221 at 2; Masimo Corp., Schedule 13D (Sept. 25, 2024), http://edgar.secdatabase.com/553/110465924102768/filing-main.htm) cannot come at the expense of the shareholders who own more than 90% of the company. Those shareholders will benefit from any fees and costs defendants pay to Masimo as compensation for their misconduct.

Masimo's new counsel, which also represents the company, cannot insulate defendants from civil contempt sanctions by claiming mootness. (Mot. to Vacate 12.) While it is true that this Court's contempt order is not final until some sanction is imposed, *Shuffler v. Heritage Bank*, 720 F.2d 1141, 1145 (9th Cir. 1983); *SEC v. Naftalin*, 460 F.2d 471, 475 (8th Cir. 1972), that final judgment rule is merely what triggers appealability.[2] The fact that a civil contempt order is not yet final does not

---

[2] The fact that the Court's order is not yet "final" also removes Masimo's motion from the ambit of Federal Rule of Civil Procedure 60(b). *United States v. Martin*, 226 F.3d 1042, 1048 n.8 (9th Cir. 2000) ("Rule 60(b) . . . applies only to motions attacking final, appealable orders[.]"). Masimo's and defendants' discussions of the Rule 60(b) standard (Mot. to Vacate at 12; Defendants' Joinder at 9) are misplaced.

1   mean it is moot.  Defendants committed contempt, and whether to impose sanctions

2   for that contempt "remains a live controversy."  *Shuffler*, 720 F.2d at 1145.  This is

3   not a case in which the parties "*bargained away*" civil, compensatory sanctions

4   through "settlement" after the Court "awarded" them.  *HM Elecs., Inc. v. R.F. Techs.,*

5   *Inc.*, 171 F. Supp. 3d 1020, 1029, 1030, 1031, 1032 (S.D. Cal. 2016) (emphasis

6   added).  While an arms-length, bargained-for settlement may moot compensatory

7   sanctions, a collusive unopposed motion to vitiate a judicial finding of contempt does

8   not strip the Court of its authority to order "full remedial relief," *McComb*, 336 U.S.

9   at 193.  The Court can and should order such relief here.

10              (b)    Defendants' counterarguments are unpersuasive

11          Defendants' own arguments are equally unavailing.  Although they continue to

12  insist that the sealing of a Court order only prohibits disclosure of the order's

13  "contents" and not its "disposition" (Defendants' Joinder at 1, 4-5, 13-16), this Court

14  already recognized that distinction for what it is: "lame," "misleading," and simply

15  "not credible" (Sept. 13, 2024 Hrg. Tr. 7:5, 11:13).  "[O]ne could not come away

16  believing that one could disclose the disposition[.]"  (*Id.* at 10:11-13.)  Defendants'

17  purported reliance on the advice of counsel to adopt a "distinction between the result

18  and the particulars of the Order was not reasonable and not credible."  (Sept. 13

19  Contempt Order at 2.)  Confronted with a similar claim, the Fifth Circuit was equally

20  unimpressed.  The circuit offered a succinct rejoinder to a litigant's argument that

21  protective orders "merely prohibited disclosure of the confidential documents but did

22  not prohibit disclosure of the contents of such documents": that "argument is

23  disingenuous."  *Lyn-Lea*, 283 F.3d at 291.  It would "render [protective orders] a

24  nullity."  *Id.* (affirming contempt sanctions).  That is true here, too, where "the

25  bottom line" disposition, and not any of the Court's "individual findings," was

26  "[p]robably the most important fact flowing from the Court's ruling."  (Sept. 13,

27  2024 Hrg. Tr. at 10:8-16.)  Revealing the outcome was what mattered.

28

Defendants' contention that the outcome had already been "previewed to the public" through preliminary Court comments or open "discussion of the Court's tentative order" (Defendants' Joinder at 13-14) is also mistaken. A "tentative" order is by definition non-final and subject to change. Defendants' brief, moreover, is internally inconsistent. If the outcome of Masimo's preliminary injunction motion already had been publicized or preordained, shareholders' appetite for information would not have been "at an all-time high," and investors would not have been "working full tilt to analyze the latest developments before voting." (*Id.* at 17.) Defendants knew that a hearing discussing the Court's *tentative* order did not permit or excuse disclosure of the Court's *final* order. And the fact that the Court's disposition "was widely discussed at the contempt hearing before the public version of the order was issued" (*id.* at 16) was the *consequence* of defendants' contempt and not in any sense a circumstance that might mitigate defendants' wrongdoing.

Defendants' suggestion that they were unaware of their obligation not to disclose the disposition of the Court's order because that was not "expressly" prohibited (*id.* at 4, 11) is also incompatible with other concessions in their brief. Defendants understood that they could "not disclose any contents of the final order, such as its findings or analysis" (*id.* at 5) even though "[n]either the order, nor the email, nor the docket text stated that the [order's contents were] embargoed or should not be disclosed" (*id.* at 4). Just as the Court need not specifically prohibit disclosure of a sealed order's contents, it need not specifically prohibit disclosure of a sealed order's outcome. Filing the order as "SEALED [IN CHAMBERS]," designating the advance copy supplied to the parties as "UNDER SEAL," and instructing the parties that the order "was filed under seal" (*id.* at 4) was amply adequate to alert the parties that divulging the order—its contents or its disposition—was prohibited. And those "'specific and definite'" directives (*id.* at 9 (quoting *FTC v. Affordable Media*, 179 F.3d 1228, 1239 (9th Cir. 1999)), left nothing for defendants to "anticipate" (*id.* at 14). They committed contempt not by failing to *foresee* "that the Court would order

1  the disposition of its order be kept confidential *sua sponte*" (*id.*) but by failing to

2  *comply* with the order they actually received.

3      If, however, defendants had harbored any genuine doubt as to the propriety of

4  divulging the outcome of the sealed order, a mere inquiry to the Court would have

5  dispelled such doubt.  Their failure to make any such inquiry defeats their suggestion

6  that they "substantially complied" with the order or acted in "good faith."  (*Id.* at 10

7  (alterations adopted).)  "The contempt need not be willful, and there is no good faith

8  exception to the requirement of obedience to a court order."  *In re Dual-Deck Video*

9  *Cassette Recorder Antitrust Litig.*, 10 F.3d 693, 695 (9th Cir. 1993) (quotation marks

10  omitted).  A substantial-compliance or good-faith defense requires a party to have

11  taken "all reasonable steps within the party's power to comply."  *Id.*  Technical

12  violations may be excused "where every reasonable effort has been made to

13  comply."  *Id.*  A reasonable effort here would have entailed waiting the mere day and

14  a half until the Court authorized disclosure of its sealed order.  But even if there were

15  a compelling and urgent need to inform the public of the Court's decision prior to the

16  expiration of the period for proposed redactions, defendants should have simply

17  sought the Court's permission to act sooner.  Defendants fault Masimo's prior

18  counsel for not "expediting the process for obtaining a public version of the Court's

19  final order" *after* defendants impermissibly disclosed its outcome (*id.* at 18); but it is

20  defendants who should have sought expedited release *instead of* resorting to

21  contempt.

22      Defendants' First Amendment arguments (*id.* at 10-13) are a non-starter.

23  Virtually nothing was actually withheld from the public in the order that was released

24  on September 13, and defendants have never objected to the modest redactions in

25  that order.  (*See* Docket No. 221.)  Nor has any member of the public ever asserted

26  that the under-two-day delay between the Court's provision of the order to the parties

27  and the public release of the modestly redacted version impaired the public's right of

28  access.  "Every court has supervisory power over its own records and files," *Nixon v.*

- 20 -

*Warner Commc'ns, Inc.*, 435 U.S. 589, 598 (1978), and providing the parties with advance copies of the order so that they could propose redactions was an ordinary and reasonable means of ensuring that sensitive information was protected from release.

Defendants' citations are uniformly misplaced.  This is not a case involving the reporting of information that had already been publicly disclosed or known to the media.  *See, e.g.*, *Landmark Commc'ns, Inc. v. Virginia*, 435 U.S. 829 (1978); *Nebraska Press Ass'n v. Stuart*, 427 U.S. 539 (1976); *Cox Broad. Corp. v. Cohn*, 420 U.S. 469 (1975).  The order was not publicly available when defendants disclosed its outcome.  Nor is it a case in which a speech restriction could be deemed unconstitutional.  *See, e.g.*, *Ashcroft v. Free Speech Coal.*, 535 U.S. 234 (2002); *Gentile v. State Bar of Nev.*, 501 U.S. 1030 (1991); *Wood v. Georgia*, 370 U.S. 375 (1962); *Craig v. Harney*, 331 U.S. 367 (1947); *Bridges v. California*, 314 U.S. 252 (1941).  There was no vagueness, overbreadth, or viewpoint discrimination in the Court's simple directives that its order was "SEALED," remained "UNDER SEAL," and had been "filed under seal."  (Defendants' Joinder at 4.)  Those directives were obviously a "sealing order" (*id.* at 12), and there could be "no '*fair ground of doubt*'" (Sept. 13 Contempt Order at 2 (quoting *Taggart*, 587 U.S. at 561)) that the sealing order barred the parties from disclosing the disposition of the order that was sealed.

Had defendants wanted to challenge that sealing order as an impermissible restriction on public access, *see, e.g.*, *Kamakana v. City & County of Honolulu*, 447 F.3d 1172 (9th Cir. 2006), or a prior restraint on speech, *see, e.g.*, *Nebraska Press*, 427 U.S. 539; *see also Alexander v. United States*, 509 U.S. 544, 549-50 (1993) (no prior restraint); *Multimedia Holdings Corp. v. Cir. Ct. of Fla., St. Johns Cnty.*, 544 U.S. 1301 (2005) (Kennedy, J., in chambers) (stay application denied), they could have done so.  But they did not.  They resorted, instead, to self-help contempt.  That was not a permissible option.  "[A]n order issued by a court with jurisdiction over the subject matter and person must be obeyed by the parties until it is reversed by orderly

and proper proceedings." *Mine Workers*, 330 U.S. at 293. The "collateral bar rule" prohibits contemnors from challenging the validity of an order they defied. *In re Establishment Inspection of Hern Iron Works, Inc.*, 881 F.2d 722, 725-26 (9th Cir. 1989). "Invalidity is no defense to criminal contempt," *United States v. Dickinson*, 465 F.2d 496, 509 (5th Cir. 1972); "orders, once issued, must be respected," *Hern Iron Works*, 881 F.2d at 730. The collateral bar rule is therefore "one of the most fundamental doctrines of judicial authority." *Id.* at 725. It permits the imposition of contempt sanctions regardless of whether the underlying order "may be incorrect and even unconstitutional," *Id.*, reflecting the sound principle that "in the fair administration of justice no man can be judge in his own case," *Walker v. City of Birmingham*, 388 U.S. 307, 320 (1967). Those principles fully apply here. Defendants committed contempt and cannot now raise the First Amendment as a defense. The civil contempt sanctions the Court previously proposed are permissible and appropriate.

2. <u>Criminal Sanctions Are Warranted to Vindicate the Court's Authority</u>

The Court should also impose a $50,000 sanction on each defendant as a criminal contempt fine. Such a fine would represent the minimum the Court previously contemplated—"not less than $50,000"—but should be imposed against each defendant separately and not merely "against Politan" alone. (Docket No. 248.)

Criminal contempt sanctions are "punitive, to vindicate the authority of the court." *Bagwell*, 512 U.S. at 828. Unlike civil contempt, which derives from the Court's inherent power, criminal contempt is now defined by statute, 18 U.S.C. § 401. *See Bradley*, 588 F.3d at 265-66. As relevant here, the statute permits the imposition of a "fine or imprisonment, or both" for "[d]isobedience or resistance to" a court's "order, rule, decree, or command." 18 U.S.C. § 401(3). "[T]he intention with which acts of contempt have been committed must necessarily and properly have an important bearing on the degree of guilt and the penalty which should be

imposed," *Cooke v. United States*, 267 U.S. 517, 538 (1925), and a court imposing a fine as punishment for criminal contempt must "consider the amount of defendant's financial resources and the consequent seriousness of the burden to that particular defendant," *Mine Workers*, 330 U.S. at 304. Fines for criminal contempt are "paid to the court." *Hicks v. Feiock*, 485 U.S. 624, 632 (1988).

"[V]iolations of [a] protective order" specifically can "constitute criminal contempt." *Doe v. Maywood Hous. Auth.*, 71 F.3d 1294, 1296 (7th Cir. 1995). As in *Doe*, where the Seventh Circuit affirmed criminal contempt sanctions against an attorney whose pleadings referred to pseudonymous plaintiffs by their true names, defendants here "ignore[d] the authority of the district court" by violating the Court's protective order. *Id.* at 1295-97. Their "intention" in doing so, *Cooke*, 267 U.S. at 538, was unmistakable: defendants were determined to prevail in their scorched-earth proxy battle. They ignored the Court's authority to reap financial gain. Contempt was their cost of doing business.

Defendants derived an enormous bounty from their takeover of Masimo. As Masimo's recent public filings reveal, the company has total assets of over $3 billion and generates hundreds of millions of dollars in monthly revenues. *See* Masimo Corp., Form 10-Q at 3-4 (Nov. 5, 2024), https://d18rn0p25nwr6d.cloudfront.net/CIK-0000937556/811312bd-1fbf-4e36-97da-9cf45288e676.pdf. Politan, meanwhile, is a hedge fund that, by the end of the first quarter of 2024, held nearly $2 billion in assets split between just three companies. *See* Politan Capital Management LP, Form 13F (May 15, 2024), http://edgar.secdatabase.com/585/90266424003637/filing-main.htm (indicating Politan's $1,922,710,499 in holdings). By the end of the third quarter, Politan's nearly 9% stake in Masimo was valued at almost $630 million. *See* Masimo Corp., Schedule 13D (Sept. 25, 2024), http://edgar.secdatabase.com/553/110465924102768/filing-main.htm (indicating Politan's 8.8% ownership of Masimo); Politan Capital Management LP, Form 13F (Nov. 11, 2024), http://pdf.secdatabase.com/546/0000902664-24-006597.pdf

1   (valuing Politan's investment in Masimo at $628,617,084).  And Koffey's wealth is
2   obvious: when he wanted to get to Court on short notice, he chartered a private jet.
3   (Defendants' Joinder at 6; Docket No. 277-1 at 2.)

4        Considering "the amount of [Politan and Koffey's] financial resources and the
5   consequent seriousness of the burden to that particular defendant," *Mine Workers*,
6   330 U.S. at 304, requiring each defendant to pay $50,000 is the bare minimum.  A
7   $50,000 sanction would equate to a mere 0.0025% of Politan's approximately $2
8   billion in invested assets.  By comparison, if a defendant worth $1 million were
9   ordered to pay 0.0025% of his assets, the fine would be $25.  The $2,000 fine
10  assessed against the defendant attorney for violating a protective order in *Doe*, 71
11  F.3d at 1296, would have constituted 0.0025% of his wealth only if he had $80
12  million in assets.  As those examples reveal, a criminal fine of $50,000, payable to
13  the Court, will not make a ding, much less a dent, in Politan's resources.  Likewise,
14  the proposed amount will have no discernible impact on Koffey's wealth.  Nothing
15  less will suffice to vindicate the Court's authority.

16       Where, as here, the violation did not occur in the Court's "presence," Fed. R.
17  Crim. P. 42(b), the Court must employ certain procedural protections before finding
18  and punishing defendants' criminal contempt.  Specifically, the Court should give
19  defendants notice, request the appointment of a prosecuting attorney, and allow
20  defendants an opportunity to present evidence.  Fed. R. Crim. P. 42(a).  Although the
21  facts here are not at all complex or subject to any reasonable dispute, compliance
22  with the strictures of Rule 42(a) is necessary to safeguard due process.  *See United*
23  *States v. Glass*, 361 F.3d 580, 588-91 (9th Cir. 2004).  The Court must also make its
24  finding of guilt beyond a reasonable doubt.  *See Hicks*, 485 U.S. at 632.

25       The Court need not, however, conduct a jury trial for defendants' contempt.
26  Jury trials are required only for "serious" crimes, and the Supreme Court long ago
27  rejected "the proposition that a contempt must be considered a serious crime under
28  all circumstances."  *Muniz v. Hoffman*, 422 U.S. 454, 477 (1975).  Courts may

impose "petty fines for contempts . . . without conducting a jury trial." *Bagwell*, 512 U.S. at 839.  Indeed, even imprisonment of up to six months is permissible without a jury trial.  *See id.* at 826-27 (protections for "'serious' criminal contempts involving imprisonment of more than six months" include "the right to jury trial").  And while the availability of fines "in lieu of, or in addition to, incarceration may have some bearing on the question" of whether an offense is serious or petty, "these punishments are normally considered far less significant." *United States v. Ballek*, 170 F.3d 871, 876 (9th Cir. 1999).  Consistent with that logic, the Supreme Court in *Muniz* considered the defendant union's particular circumstances—it "collect[ed] dues from some 13,000 persons"—and concluded that a $10,000 fine imposed in 1970 (equivalent to approximately $80,000 today, *see* https://www.bls.gov/data/inflation_calculator.htm) was not "a deprivation of such magnitude that a jury should have been interposed."  422 U.S. at 457, 477.  Thereafter, the Second Circuit held in 1989 that an organization has a presumptive right to a criminal contempt jury trial only if assessed a fine in excess of $100,000 (equivalent to more than $250,000 today, *see* https://www.bls.gov/data/inflation_calculator.htm).  *United States v. Twentieth Century Fox Film Corp.*, 882 F.2d 656, 665 (2d Cir. 1989).  Because the $50,000 sanction this Court previously contemplated falls well below that threshold and because defendants are worth orders of magnitude more than $50,000, a jury trial is not necessary to punish them for their criminal contempt.

A fine of $50,000 per defendant is also consistent with the ordinary criminal sentencing factors.  *See* 18 U.S.C. § 3553(a).  Defendants violated the Court's sealing order and told a misleading story for the purpose of their own financial gain.  A fine that will have no discernible impact on their extraordinary wealth is a lenient punishment for their profit-at-all-costs offense.  Such a fine is also necessary to deter disrespect for court orders generally and to reduce defendants' temptation to treat future court orders as mere impediments to their economic objectives.  Those purposes are especially important here, where defendants have proven to be

vexatious litigants who, having forced Mr. Kiani out of the company he built from scratch over the course of nearly 36 years, are now waging a multi-front litigation campaign to avoid paying Mr. Kiani the severance to which he is contractually entitled. *See, e.g.*, *Masimo Corp. v. Kiani*, No. 24-cv-08147 (S.D.N.Y.); *Masimo Corp. v. Kiani*, No. 2024-1086-NAC (Del. Ch.); *Kiani v. Masimo Corp.*, No. 30-2024-01426785-CU-MC-CJC (Cal. Super Ct., Orange Cnty.). Requiring each defendant to pay a $50,000 criminal contempt fine would be appropriate and just.

## IV.    <u>CONCLUSION</u>

Defendants committed contempt as part of their successful strategy to overtake Masimo. They should not now be permitted to avoid any consequence for their wrongdoing. This Court should deny Masimo's motions to withdraw its contempt application and vacate the Court's contempt order and should instead reaffirm its finding of contempt and impose civil and criminal sanctions.

Dated: December 23, 2024                     HUESTON HENNIGAN LLP

                                                        By:   _/s/  John C. Hueston_
                                                              John C. Hueston

                                                              Attorneys for Proposed Amicus
                                                              Curiae Joseph E. Kiani